**United States District Court**
**Southern District of Florida**

Case Number: _23-CV-61804_

# SUPPLEMENTAL ATTACHMENT(S)

Please refer to supplemental "file" in the division where the
Documents/Exhibits were submitted and filed.

Division Document/Exhibits Submitted and Filed: _Fort Lauderdale_

These Documents/Exhibits must **not** be placed in the "temp chron file".

---

Documents/Exhibits Retained in Supplemental Files  **(Scanned)**

✗ • Poor quality scanned images (i.e. Handwritten, Photographs)

___ • Surety bonds

___ • Bound extradition papers

---

Documents/Exhibits Retained in Supplemental Files  **(Not Scanned)**

___ • CD, DVD, USB drive. (i.e. Audio/Visual)

---

** All other documents and documentary exhibits are part of the CM/ECF
Case Record in pdf format.

Date: _10/5/23_

Revised: 2/20/2019

Laura Ashley Jackson, CourtXpress@firmsolutions.us
Laura Ashley Jackson, FLCourtDocs@brockandscott.com
Stephen Christopher Wilson, scwilson862007@yahoo.com
Stephen Christopher Wilson, scwilson862007@yahoo.com
Tania Bartolini, tania.bartolini@bartolinilaw.com
Tania Bartolini, info@bartolinilaw.com
Willnae Lacroix, FLeFileTeam@brockandscott.com
Willnae Lacroix, FLCourtDocs@brockandscott.com
Willnae Lacroix, courtxpress@FirmSolutions.us
maurice symonette, BigBOSS@Clerk.com
maurice symonette, BIGBOSS1043@yahoo.com
maurice symonette, boss1@clerk.com


**Physically Served:**

**Home**
**Senate**
**House**
**Citator**
**Statutes, Constitution, & Laws of Florida**
- Florida Statutes
- Search Statutes
- Search Tips
- Florida Constitution
- Laws of Florida
**Legislative & Executive Branch Lobbyists**
**Information Center**
**Joint Legislative Committees & Other Entities**
**Historical Committees**
**Florida Government Efficiency Task Force**
**Legislative Employment**
**Legistore**
**Links**

Interpreter Services for the Deaf and Hard of Hearing





Select Year:  [2023 ▼]  [Go]

## The 2023 Florida Statutes

| Title X | Chapter 117 | View Entire Chapter |
|---|---|---|
| PUBLIC OFFICERS, EMPLOYEES, AND RECORDS | NOTARIES PUBLIC | |

**117.05**   Use of notary commission; unlawful use; notary fee; seal; duties; employer liability; name change; advertising; photocopies; penalties.—

(1)   A person may not obtain or use a notary public commission in other than his or her legal name, and it is unlawful for a notary public to notarize his or her own signature. Any person applying for a notary public commission must submit proof of identity to the Department of State. Any person who violates this subsection commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

(2)(a)   The fee of a notary public may not exceed $10 for any one notarial act under this part, except as provided in s. 117.045 or s. 117.275.

(b)   A notary public may not charge a fee for witnessing a vote-by-mail ballot in an election, and must witness such a ballot upon the request of an elector, provided the notarial act is in accordance with the provisions of this chapter.

(3)(a)   A notary public seal shall be affixed to all notarized paper documents and shall be of the rubber stamp type and shall include the words "Notary Public-State of Florida." The seal shall also include the name of the notary public, the date of expiration of the commission of the notary public, and the commission number. The rubber stamp seal must be affixed to the notarized paper document in photographically reproducible black ink. Every notary public shall print, type, or stamp below his or her signature on a paper document his or her name exactly as commissioned. An impression-type seal may be used in addition to the rubber stamp seal, but the rubber stamp seal shall be the official seal for use on a paper document, and the impression-type seal may not be substituted therefor.

(b)   The notary public official seal and the certificate of notary public commission are the exclusive property of the notary public and must be kept under the direct and exclusive control of the notary public. The seal and certificate of commission must not be surrendered to an employer upon termination of employment, regardless of whether the employer paid for the seal or for the commission.

(c)   A notary public whose official seal is lost, stolen, or believed to be in the possession of another person shall immediately notify the Department of State or the Governor in writing.

(d)   Any person who unlawfully possesses a notary public official seal or any papers or copies relating to notarial acts is guilty of a misdemeanor of the second degree, punishable as provided in s. 775.082 or s. 775.083.

(4)   When notarizing a signature, a notary public shall complete a jurat or notarial certificate in substantially the same form as those found in subsection (13). The jurat or certificate of acknowledgment shall contain the following elements:

(a)   The venue stating the location of the notary public at the time of the notarization in the format, "State of Florida, County of    ."

(b)   The type of notarial act performed, an oath or an acknowledgment, evidenced by the words "sworn" or "acknowledged."

(c)   Whether the signer personally appeared before the notary public at the time of the notarization by physical presence or by means of audio-video communication technology as authorized under part II of this chapter.

(d)   The exact date of the notarial act.

# Exh.207

CFN 2007R0290646
OR Bk 25468 Pgs 0289 - 291; (3pgs)
RECORDED 03/21/2007 13:14:02
HARVEY RUVIN, CLERK OF COURT
MIAMI-DADE COUNTY, FLORIDA

This Instrument Prepared By:

After Recording Return To:

Brb Abstracting Inc
6412 S Howell Ave.
Oak Creek, WI 53154

[Space Above This Line For Recording Data]

## ASSIGNMENT OF MORTGAGE

FOR VALUE RECEIVED, the undersigned hereby grants, assigns and transfers to

Mortgage Electronic Registration Systems, Inc.      P.O. Box 2026
whose mailing address is                            Flint, MI 48501-2026

all of the undersigned's right, title and interest in, to and under that certain Mortgage dated
OCTOBER 20, 2005          executed by  LEROY WILLIAMS, AN UNMARRIED
MAN

to  LANCASTER MORTGAGE BANKERS, A LIMITED LIABILITY COMPANY , as mortgagor,
                                                                   , as mortgagee,
and recorded either
☐  concurrently herewith; or
☐  as Instrument No. 2005R1193500 on 11/16/05                  in book 23966,
page 3465    , in the Official Records in the County Recorder's office of
FLORIDA                                              MIAMI-DADE  County.

A.P.N. #: 0622280113400                          , describing land therein as:

TOGETHER with the note or notes therein described or referred to, the money due and to become due thereon
with interest, and all rights accrued or to accrue under said Mortgage.

MIN: 1000534012254 00581
FLORIDA ASSIGNMENT OF MORTGAGE/CORPORATION OR PARTNERSHIP
                        Page 1



DocMagic eForms 800-645-1362
www.docmagic.com



EXH. 409

A"

CFN 2005R1193500
OR Bk 23966 Pgs 3465 - 3482; (18pgs)
RECORDED 11/16/2005 16:44:30
MTG DOC TAX 5,250.00
INTANG TAX 3,000.00
HARVEY RUVIN, CLERK OF COURT
MIAMI-DADE COUNTY, FLORIDA

This Instrument Prepared By:

After Recording Return To:
LANCASTER MORTGAGE BANKERS
20 INDEPENDENCE BLVD
WARREN, NEW JERSEY 07059
Loan Number: 150008387

———————[Space Above This Line For Recording Data]———————

# MORTGAGE

**DEFINITIONS**

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A)  "Security Instrument" means this document, which is dated OCTOBER 20, 2005 , together with all Riders to this document.

(B)  "Borrower" is LEROY WILLIAMS, AN UNMARRIED MAN

Borrower is the mortgagor under this Security Instrument.

(C)  "Lender" is LANCASTER MORTGAGE BANKERS

Lender is a LIMITED LIABILITY COMPANY                    organized and existing under the laws of NEW JERSEY .
Lender's address is 20 INDEPENDENCE BLVD, WARREN, NEW JERSEY 07059

Lender is the mortgagee under this Security Instrument.

(D)  "Note" means the promissory note signed by Borrower and dated OCTOBER 20, 2005 .
The Note states that Borrower owes Lender ONE MILLION FIVE HUNDRED THOUSAND AND 00/100                                      Dollars (U.S. $1,500,000.00                )
plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than NOVEMBER 1, 2035 .

(E)  "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(F)  "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3010 1/01                                    Page 1 of 18                         DocMagic €Fෆms 800-649-1362
www.docmagic.com



**Exh.213**

Miami-Dade Official Records - Print Document

CFN 2007R0831508
OR Bk 25873 Pg 2624 (1ps)
RECORDED 08/22/2007 08:58:28
HARVEY RUVIN, CLERK OF COURT
MIAMI-DADE COUNTY, FLORIDA
LAST PAGE

# ASSIGNMENT OF MORTGAGE

SPACE FOR RECORDING ONLY F.S.(695.26)

**FOR VALUE RECEIVED,** on or before May 15, 2007, the undersigned, **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INCORPORATED,** ("Assignor") whose address is 7700 W. Parmer Lane, Bldg D, Austin, Texas 78729, assigned, transferred and conveyed to: **DEUTSCHE BANK NATIONAL TRUST COMPANY AS TRUSTEE UNDER THE POOLING AND SERVICING AGREEMENT SERIES LAST 2006-AB (CXRB)** ("Assignee") whose address is 448 Sierra Madre Villa Ave, Suite 101, Mail Stop HS 01-04, Pasadena, CA 91107, its successors and/or assigns, all of the right, title, and interest of Assignor in and to that certain Mortgage (the "Mortgage") dated October 20, 2005 and recorded November 01, 2005 in Official Records Book 23966 at Page 3465 of the public records of DADE County, Florida, encumbering the following-described real property:

> **LOT 103, BLOCK 14 OF THE SANS SOUCI ESTATES, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 50, AT PAGE 86, OF THE PUBLIC RECORDS OF MIAMI-DADE COUNTY, FLORIDA.**

as the same may have been amended from time to time; together with the Note and indebtedness secured thereby.

MORTGAGOR(S): LEROY WILLIAMS

**IN WITNESS WHEREOF,** Assignor has executed and delivered this instrument on _July 31_, 2007.

Signed, sealed and delivered
in the presence of:

Witness
Typed Name _Georgia Salinor_

Witness
Typed Name _Sherry Brown_

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INCORPORATED
By: _____
Typed Name: _Don Bradley_
Title: Vice President

Assist: _____
Typed Name: _Paige Holen_
Title: Vice President

(Affix Corporate Seal)

STATE OF TEXAS
COUNTY OF WILLIAMSON

**BEFORE ME,** the undersigned, personally appeared _Don Bradley_ and _Paige Holen_ as Vice President and Vice President respectively, of **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INCORPORATED** known to me to be the persons that executed the foregoing instrument, and acknowledged that they executed the foregoing as its duly authorized officers and that such execution was done as the free act and deed of **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INCORPORATED** this _31_ day of _July_, 2007.

Notary Public: _Nai L. Thao_
My commission expires:

NAI LA THAO
Notary Public, State of Texas
My Commission Expires
June 16, 2011

Recording requested by, prepared by and return to:
Echevarria, Codilis & Stawiarski
P.O. Box 25018

FILE NUMBER: F07015531

DOC_ID: M001100

**\*F07015531\***

**\*M001100\***

https://www2.miami-dadeclerk.com/officialrecords/PrintDocument.aspx?QS=YaoUfOzxrv33T3LH8Dv9SeDx1stiZ4MFIX/dW5%2biiH4B%2boluS%2beAMo8hDU...   1/1

**Exh.217**





# Online Sunshine

Official Internet Site of the Florida Legislature

September 22, 2023 · Search Statutes: 2023 ⌄ [ ] [Search]

Advanced Legislative Search and Browse

- Home
- Senate
- House
- Citator
- Statutes, Constitution, & Laws of Florida
  - Florida Statutes
  - Search Statutes
  - Search Tips
  - Florida Constitution
  - Laws of Florida
- Legislative & Executive Branch Lobbyists
- Information Center

Select Year: 2023 ⌄ [Go]

## The 2023 Florida Statutes

| Title XL | Chapter 695 | View Entire Chapter |
| REAL AND PERSONAL PROPERTY | RECORD OF CONVEYANCES OF REAL ESTATE | |

695.26 Requirements for recording instruments affecting real property.—

(1) No instrument by which the title to real property or any interest therein is conveyed, assigned, encumbered, or otherwise disposed of shall be recorded by the clerk of the circuit court unless:

**Exh.222 pg.1**

**Online Sunshine**

Official Internet Site of the Florida Legislature

September 22, 2023   Search Statutes:   2023   Search

Home
Senate
House
Citator
Statutes, Constitution
& Laws of Florida
Florida Statutes
Search Statutes
Search Tips
Florida Constitution
Laws of Florida
Legislative & Executive
Branch Lobbyists
Information Center
Joint Legislative
Committees &
Other Entities
Historical Committee
Florida Government

Select Year:   2023   Go

## The 2023 Florida Statutes

| Title XL | Chapter 695 | View Entire Chapter |
|---|---|---|
| REAL AND PERSONAL PROPERTY | RECORD OF CONVEYANCES OF REAL ESTATE | |

**695.01  Conveyances and liens to be recorded.—**

(1)  No conveyance, transfer, or mortgage of real property, or of any interest therein, nor any lease for a term of 1 year or longer, shall be good and effectual in law or equity against creditors or subsequent purchasers for a valuable consideration and without notice, unless the same be recorded according to law; nor shall any such instrument made or executed by virtue of any power of attorney be good or effectual in law or in equity against creditors or subsequent purchasers for a valuable consideration and without notice unless the power of attorney be recorded before the accruing of the right of such creditor or subsequent purchaser.

**Exh.222 pg.2**



# Online Sunshine

Official Internet Site of the Florida Legislature

September 22, 2023 | Search Statutes: 2023 ⌄ [          ] [Search]    Advanced Legislative Search and Browse

Select Year: 2023 ⌄ [Go]

- Home
- · Senate
- House
- Citator
- Statutes, Constitution, & Laws of Florida
- **Florida Statutes**
- **Search Statutes**
- **Search Tips**
- **Florida Constitution**
- **Laws of Florida**
- Legislative & Executive Branch Lobbyists
- Information Center
- Joint Legislative Committees & · Other Entities
- Historical Committees
- Florida Government

## The 2023 Florida Statutes

| Title XI | Chapter 695 | View Entire Chapter |
|---|---|---|
| REAL AND PERSONAL PROPERTY | RECORD OF CONVEYANCES OF REAL ESTATE | |

**695.26**   **Requirements for recording instruments affecting real property.—**

(1)   No instrument by which the title to real property or any interest therein is conveyed, assigned, encumbered, or otherwise disposed of shall be recorded by the clerk of the circuit court unless:

(a)   The name of each person who executed such instrument is legibly printed, typewritten, or stamped upon such instrument immediately beneath the signature of such person and the post-office address of each such person is legibly printed, typewritten, or stamped upon such instrument;

Home
Senate
House
Citator
Statutes, Constitution,
& Laws of Florida
Florida Statutes
Search Statutes
Search Tips
Florida Constitution
Laws of Florida
Legislative & Executive
Branch Lobbyists
Information Center
Joint Legislative
Committees &
Other Entities
Historical Committees
Florida Government
Efficiency Task Force
Legislative Employment
Legistore
Links

Interpreter Services for the
Deaf and Hard of Hearing





Select Year: 2023 ▼ [Go]

## The 2023 Florida Statutes

| Title XXXIII | Chapter 494 | View Entire |
| REGULATION OF TRADE, COMMERCE, INVESTMENTS, AND SOLICITATIONS | LOAN ORIGINATORS AND MORTGAGE BROKERS | Chapter |

**494.0075    Requirements for selling loans to noninstitutional investors.—**

(1)    A mortgage lender, when selling a mortgage loan to a noninstitutional investor, shall:

(a)    Before any payment of money by a noninstitutional investor, provide an opinion of value from an appraiser stating the value of the security property unless the opinion is waived in writing. The opinion must state the value of the property as it exists on the date of the opinion. If any relationship exists between the lender and the appraiser, that relationship must be disclosed.

(b)    Provide to the noninstitutional investor a mortgagee's title insurance policy or an opinion of title by an attorney licensed to practice law in this state, or a copy thereof:

1.    If a title insurance policy is issued, it must insure the noninstitutional investor against the unmarketability of the mortgagee's interest in such title. It must also specify any superior liens that exist against the property. If an opinion of title is issued by an attorney, the opinion must include a statement as to the marketability of the title to the property described in the mortgage and specify the priority of the mortgage being purchased.

2.    If the title insurance policy or opinion of title is not available at the time of purchase, the licensee shall provide a binder of the title insurance or conditional opinion of title. This binder or opinion must include any conditions or requirements needed to be corrected before the issuance of the final title policy or opinion of title. The binder or opinion must also include information concerning the requirements specified in subparagraph 1. Any conditions must be eliminated or waived in writing by the investor before delivery to the noninstitutional investor. The policy or opinion, or a copy thereof, shall be delivered to the investor within a reasonable period of time, not exceeding 6 months, after purchase.

3.    The requirements of this paragraph may be waived in writing. If the requirements are waived by the noninstitutional investor, the waiver must include the following wording: "The noninstitutional investor acknowledges that the mortgage lender selling this mortgage loan is not providing a title insurance policy or opinion of title issued by an attorney who is licensed to practice law in the State of Florida. Any requirement for title insurance or for a legal opinion of title is the sole responsibility of the noninstitutional mortgage purchaser."

(c)    Provide, if the loan is other than a first mortgage, a statement showing the balance owed by the mortgagor on any existing mortgages prior to this investment and the status of such existing mortgages.

(d)    Provide a disclosure if the licensee is directly or indirectly acting as a borrower or principal in the transaction.

(2)    Each mortgage, or other instrument securing a note or assignment thereof, must be recorded before being delivered to the noninstitutional investor.

(3)    Each mortgage and assignment shall be recorded as soon as practical, but within 30 business days after the date of purchase.

(4)    If the loan is to be serviced by a licensee under this part for a noninstitutional investor, there shall be a written servicing agreement.

(5)    The mortgage lender shall cause the original note to be properly endorsed showing the assignment of the note to the noninstitutional investor.

History.—ss. 47, 50, ch. 91-245; s. 4, ch. 91-429; s. 99, ch. 2009-241.

**Exh.222 pg.4**

**Online Sunshine**

September 22, 2023    Search Statutes: 2023 ▾ [          ] [Search]    Official Internet Site of the Florida Legislature    Advanced Legislative Search and Browse

Home
Senate
House
Citator
Statutes, Constitution, & Laws of Florida
**Florida Statutes**
**Search Statutes**
**Search Tips**
**Florida Constitution**
**Laws of Florida**
Legislative & Executive Branch Lobbyists
Information Center
Joint Legislative Committees & Other Entities
Historical Committees
Florida Government Efficiency Task Force
Legislative Employment
Legistore
Links

**Interpreter Services for the Deaf and Hard of Hearing**

Select Year:  2023 ▾ [Go]

## The 2023 Florida Statutes

| Title XL | Chapter 701 | View Entire |
| REAL AND PERSONAL PROPERTY | ASSIGNMENT AND CANCELLATION OF MORTGAGES | Chapter |

**701.02    Assignment not effectual against creditors unless recorded and indicated in title of document; applicability.—**

(1)  An assignment of a mortgage upon real property or of any interest therein, is not good or effectual in law or equity, against creditors or subsequent purchasers, for a valuable consideration, and without notice, unless the assignment is contained in a document that, in its title, indicates an assignment of mortgage and is recorded according to law.

(2)  This section also applies to assignments of mortgages resulting from transfers of all or any part or parts of the debt, note or notes secured by mortgage, and none of same is effectual in law or in equity against creditors or subsequent purchasers for a valuable consideration without notice, unless a duly executed assignment be recorded according to law.

(3)  Any assignment of a mortgage, duly executed and recorded according to law, purporting to assign the principal of the mortgage debt or the unpaid balance of such principal, shall, as against subsequent purchasers and creditors for value and without notice, be held and deemed to assign any and all accrued and unpaid interest secured by such mortgage, unless such interest is specifically and affirmatively reserved in such an assignment by the assignor, and a reservation of such interest or any part thereof may not be implied.

**Exh.223**

PAGE 1 OF 1

# EMC
*Proven Performance*

*Mortgage Corporation*

P.O. Box 293150
Lewisville, TX 75029-3150

## BILLING STATEMENT

| | |
|---|---|
| Statement Date: | 03/02/07 |
| Loan Number: | 0014596589 |

85702-0010386-003

LEROY WILLIAMS
1977 NE 119TH RD
NORTH MIAMI FL 33181-3319

☎ Automated Information Line:
1-800-723-3004

Visit our Web Site:
www.emcmortgageservicing.com

**WESTERN UNION** Pay by Phone:
1-877-472-9362
*Pay by phone at no cost!*

☐ Check here if your address or phone numbers have changed and complete the form on the reverse side

PROPERTY ADDRESS:  1977 NE 119TH RD
MIAMI FL 33181

## ACCOUNT INFORMATION

| | |
|---|---|
| Loan Number | 0014596589 |
| Interest Rate | 10.1250% |
| Current Principal Balance* | 397,632.88 |
| Current Escrow Balance | 0.00 |
| Year-to-Date: Principal Paid | -713.94 |
| Year-to-Date: Interest Paid | -4,058.97 |
| Year-to-Date: Taxes Paid | 0.00 |
| Year-to-Date: Hazard Insurance Paid | 0.00 |
| Late Charge Fee (per month) | 177.36 |

*This is your Principal Balance only, not the amount required to pay your loan in full.

## PAYMENT SUMMARY

| | |
|---|---|
| Payment Due Date | 01/01/07 |
| Principal & Interest | $3,547.29 |
| Escrow Payment | 0.00 |
| Total Past Due | 10,641.87 |
| Late Charge | 354.72 |
| Returned Check Fee | 75.00 |
| Speedpay Fee | 19.90 |
| Total Amount Due | 14,638.78 |

## IMPORTANT MESSAGES

EMC is writing regarding the collection of your loan, and any information obtained will be used for that purpose.

## ACCOUNT ACTIVITY

| TRANSACTION DESCRIPTION | DUE DATE | TRAN DATE | TOTAL RECEIVED | PRINCIPAL | INTEREST | ESCROW | OPTIONAL PRODUCTS | OTHER | SUSPENSE |
|---|---|---|---|---|---|---|---|---|---|
| Returned Check | 02/07 | 03/02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -9.95 | 0.00 |
| Returned Check | 02/07 | 03/02 | 0.00 | -193.89 | -3,353.41 | 0.00 | 0.00 | 0.00 | 0.00 |
| Returned Check | 01/07 | 03/02 | 0.00 | -192.26 | -3,355.03 | 0.00 | 0.00 | 0.00 | 0.00 |
| Speedpay Fee | | 03/02 | 9.95 | 0.00 | 0.00 | 0.00 | 0.00 | 9.95 | 0.00 |
| Returned Check Fee | | 03/02 | 25.00 | 0.00 | 0.00 | 0.00 | 0.00 | 25.00 | 0.00 |

PLEASE DETACH AND RETURN BOTTOM PORTION WITH PAYMENT IN THE ENCLOSED ENVELOPE

# Exh.224

**EMC** *Mortgage Corporation*
*Proven Performance*

PAGE 1 OF 3

P.O. Box 141358
Irving, TX 75014-1358

## BILLING STATEMENT

Statement Date: 11/29/06
Loan Number: 0014596589

 Automated Information Line:
1-800-723-3004

 Visit our Web Site:
www.emcmortgageservicing.com

65526-0000041-001

LEROY WILLIAMS
1977 NE 119TH RD
NORTH MIAMI FL 33181-3319

☐ Check here if your address or phone numbers have changed and complete the form on the reverse side.

PROPERTY ADDRESS: 1977 NE 119TH RD
MIAMI FL 33181

## ACCOUNT INFORMATION

| | |
|---|---|
| Loan Number | 0014596589 |
| Interest Rate | 10.1250% |
| Current Principal Balance* | 387,823.53 |
| Current Escrow Balance | 0.00 |
| Year-to-Date: Principal Paid | 1,830.44 |
| Year-to-Date: Interest Paid | 33,652.41 |
| Year-to-Date: Taxes Paid | 0.00 |
| Year-to-Date: Hazard Insurance Paid | 0.00 |
| Late Charge Fee (per month) | 177.36 |

*This is your Principal Balance only, not the amount required to pay your loan in full.

## PAYMENT SUMMARY

| | |
|---|---|
| Payment Due Date | 12/01/06 |
| Principal & Interest | $3,547.29 |
| Escrow Payment | 0.00 |
| Late Charge | 354.72 |
| Speedpay Fee | 9.95 |
| Total Amount Due | 3,911.96 |

## IMPORTANT MESSAGES

Beginning 11/07/2006 make your payment through our automated phone system or online at no cost! Call 1-800-723-3004 or visit www.speedpay.com. Standard fees apply for payments made with the assistance of a Customer Service Representative.

Your mortgage payment for the current month has not been received. A late charge has been assessed. Please remit the total amount due to reinstate your account. If you cannot remit the total amount due, please contact our office at 1-800-436-7397.

We have reviewed the items included in the total amount of advances made by your previous servicer that carried over when your loan transferred to EMC. For your convience, we have initialized these amounts as shown in the Account Activity.

### IMPORTANT YEAR-END INFORMATION

In order for us to report your deductible mortgage interest paid in 2006, the Internal Revenue Service (IRS) requires that you furnish your Social Security Number(s) to us. Failure to provide this information may result in a $50 penalty assessed by the IRS. Please take a moment to update the W9 Certification form on the back of your monthly mortgage statement and return it with your mortgage payment. Or, contact our Customer Service Department at 1-800-723-3004.

Your monthly billing statement is new and improved, giving you more information about your account.

**BEAR STEARNS** | RESIDENTIAL MORTGAGE

ANNOUNCING: Bear Stearns Residential Mortgage Corporation, an affiliate of EMC, now offers mortgage refinancing. Call 1-866-658-BEAR today!

## ACCOUNT ACTIVITY

| TRANSACTION DESCRIPTION | DUE DATE | TRAN DATE | TOTAL RECEIVED | PRINCIPAL | INTEREST | ESCROW | OPTIONAL PRODUCTS | OTHER | SUSPENSE |
|---|---|---|---|---|---|---|---|---|---|
| Late Charge | | 11/16 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 177.36 | 0.00 |
| Late Charge | | 11/16 | 177.36 | 0.00 | 0.00 | 0.00 | 0.00 | 177.36 | 0.00 |
| Payment | 11/06 | 11/29 | 3,547.29 | 189.06 | 3,358.23 | 0.00 | 0.00 | 0.00 | 0.00 |

(Continued on the following page)

**Exh.226**

 IndymacBank

Property Address 1977 NE 119TH RD,
NORTH MIAMI, FL 33181

015816 RE

#BWNDXCT
#6682195851003020#

LEROY WILLIAMS
1977 NE 119TH RD
MIAMI FL 33181-3319

| | |
|---|---|
| Account information as of | 02/26/07 |
| Loan Number | 3001585912 |
| Interest Rate | 8.250% |
| Loan Balance | $1,484,924.56 |
| Escrow Balance | $8,792.21 |
| Unapplied Funds | $4,613.19 |
| Funds Advanced by IMB (1, 2) | $ .00 |
| Principal Paid YTD | $2,098.63 |
| Interest Paid YTD | $20,439.37 |
| Property Taxes Paid YTD | $ .00 |
| Hazard Insurance Paid YTD | $4,293.75 |
| | |
| Primary Phone Number | (305) 696 3505 |
| Secondary Phone Number | (305) 654 0888 |

For statement questions,
please call Customer Service at
1.800.781.7399.

**03/01/07 Payment Options**

| | | Payment Due: |
|---|---|---|
| Principal and (or) Interest | $11,269.00 | **03/01/07** |
| Escrow | $3,169.17 | |
| Optional Product (2) | $ .00 | |
| Other (2) | $ .00 | |
| | $ .00 | |
| **Payment Amount** | $14,438.17 | Unless otherwise agreed upon, additional funds may be applied to advances prior to being applied to fees/charges. |
| Past Due Payment(s) | $ .00 | |
| Total Payment Due | $14,438.17 | Itemized detail available upon request. |
| Unpaid Late Charges | $563.45 | |
| Unpaid Other Fees | $ 340.00 | Payment calculation includes Late Charge fee. |
| Other Unpaid Charges (2) | $15.00 | |
| Funds Advanced by IMB (1, 2) | $ .00 | |
| Total Amount Due | $15,056.62 | |
| Total 03/01/07 Please Pay (4) | $15,620.07 | |

| Date | Transaction | Total | Principal/Deferred Interest | Interest | Escrow | Fees/Misc. |
|---|---|---|---|---|---|---|
| 02/26/07 | Funds Applied | 14,438.17 | 1,052.91 | 10,216.09 | 3,169.17 | |
| 02/26/07 | Funds Applied | 14,453.17 | 1,045.72 | 10,223.28 | 3,169.17 | 15.00 |

**TAX SEASON IS JUST AROUND THE CORNER – ARE YOU PREPARED?**
If you already know you're getting a refund, you don't have anything to
worry about. But for many of us, tax season means that we'll owe money,
and not a small amount either. Know your options. An Indymac Bank Home
Equity Line is the perfect solution to cover a variety of expenses
including income tax. It's easy to open with no application fees or bank
related closing costs. Use only what you need, when you need it, and the
interest you pay may be up to 100% tax deductible (You may wish to consult
with your financial advisor to see how this loan may benefit you).
Call us toll free at 1.877.307.0178 to find out more.

**AS AN INDYMAC CUSTOMER, YOU GET EXTRA SAVINGS.**
For a limited time, we are offering you $500 off our already low closing
costs when you originate a new first mortgage through Indymac Bank Home
Loan Servicing (offer does not apply to home equity loans, Mod Xpress or
Indymac Xpress). To get started, just call us today at 1.866.217.2834.

**ACCESS YOUR 2006 YEAR-END INTEREST STATEMENT ONLINE!**
Did you know that by registering your mortgage loan online, not only can
you have convenient, 24/7 access to your mortgage information, but to your
2006 Year-End Interest Statement as well? Read the back of this statement
to find out more.




**IndyMac Bank**

# Exh.227

**Property Address:** 1977 NE 119TH RD,
NORTH MIAMI, FL 33181

#BWNDXCT
#66B2195851003020#
015816 RE

LEROY WILLIAMS
1977 NE 119TH RD
MIAMI FL 33181-3319

| Account Information | |
|---|---|
| Account Information as of | 02/26/07 |
| Loan Number | 3001585912 |
| Interest Rate | 8.250% |
| Loan Balance | $1,484,924.50 |
| Escrow Balance | $8,792.21 |
| Unapplied Funds | $4,613.19 |
| Funds Advanced by IMB (1,2) | $.00 |
| Principal Paid YTD | $2,098.63 |
| Interest Paid YTD | $20,439.37 |
| Property Taxes Paid YTD | $.00 |
| Hazard Insurance Paid YTD | $4,293.75 |
| | |
| Primary Phone Number | (305) 696 3505 |
| Secondary Phone Number | (305) 654 0888 |

For statement questions,
please call Customer Service at
1.800.781.7399.

## 03/01/07 Payment Options

| Payment Information | | |
|---|---|---|
| Principal and/or Interest | $11,269.00 | |
| Escrow | $3,169.17 | |
| Optional Products (2) | $.00 | |
| Other (2) | $.00 | |
| **Payment Amount** | $14,438.17 | |
| Past Due Payment(s) | $.00 | |
| Total Payment Due | $14,438.17 | |
| Unpaid Late Charges | $563.45 | |
| Deferred Payment Fees | $40.00 | |
| Other Unpaid Charges | $15.00 | |
| Funds Advanced by IMB (1,2) | $.00 | |
| **Total Amount Due** | $15,056.62 | |
| After 03/16/07 please pay (3) | $15,620.07 | |

**Payment Due:
03/01/07**

Additional Information:
1. Unless otherwise agreed upon, additional funds may be applied to advance prior to being applied to fees/charges.
2. Itemized detail available upon request.
3. Payment calculation includes Late Charge fee.

| Date | Transaction | Total | Principal/Deferred Interest | Interest | Escrow | Fees/Misc. |
|---|---|---|---|---|---|---|
| 02/26/07 | Funds Applied | 14,438.17 | 1,052.91 | 10,216.09 | 3,169.17 | |
| 02/26/07 | Funds Applied | 14,453.17 | 1,045.72 | 10,223.28 | 3,169.17 | 15.00 |

## Important Messages

**TAX SEASON IS JUST AROUND THE CORNER – ARE YOU PREPARED?**
If you already know you're getting a refund, you don't have anything to worry about. But for many of us, tax season means that we'll owe money, and not a small amount either. Know your options. An Indymac Bank Home Equity Line is the perfect solution to cover a variety of expenses including income tax. It's easy to open with no application fees or bank related closing costs. Use only what you need, when you need it, and the interest you pay may be up to 100% tax deductible (You may wish to consult with your financial advisor to see how this loan may benefit you). Call us toll free at 1.877.307.0178 to find out more.

**AS AN INDYMAC CUSTOMER, YOU GET EXTRA SAVINGS.**
For a limited time, we are offering you $500 off our already low closing costs when you originate a new first mortgage through Indymac Bank Home Loan Servicing (offer does not apply to home equity loans, Mod Xpress or Indymac Xpress). To get started, just call us today at 1.866.217.2834.

**ACCESS YOUR 2006 YEAR-END INTEREST STATEMENT ONLINE!**
Did you know that by registering your mortgage loan online, not only can you have convenient, 24/7 access to your mortgage information, but to your 2006 Year-End Interest Statement as well? Read the back of this statement to find out more.



**Exh.230**



## North Miami Police Report
### Summary

Print Date/Time: 01/31/2018 10:28
Login ID: ndesir
Case Number: 2008-00032782

ORI Number:

North Miami Police Department
FL0131800

### Case

| | | | |
|---|---|---|---|
| Case Number: | 2008-00032782 | Incident Type: | Burglary, Structure |
| Location: | 1977 NE 110TH RD | Occurred From: | 10/21/2008 14:00 |
| | NORTH MIAMI, FL 33181 | Occurred Thru: | 10/22/2008 14:30 |
| Reporting Officer ID: | 2051 - Cravero | Disposition: | |
| | | Disposition Date: | |
| | | Reported Date: | 10/22/2008 14:35 Wednesday |

### Offenses

| No. | Group/ORI | Crime Code | Statute | Description | Counts |
|---|---|---|---|---|---|
| 1 | State | 2200 | 810.02(4)(a) | Burglary of Structure | 1 |

### Subjects

| Type | No. | Name | Address | Phone | Race | Sex | DOB/Age |
|---|---|---|---|---|---|---|---|
| Suspect | 1 | Leoni, Jonathan D | 1387 CONSERVANCY DR E TALLAHASSEE | | White | Male | 03/05/1961 47 |
| Victim | 1 | Gordon, Richard Anthony | 1977 NE 110TH RD NORTH MIAMI, FL 33181 | (786)278-1235 | Black | Male | 01/22/1984 24 |
| Victim | 2 | Littlejohn, James Melvin | 1977 NE 110TH RD NORTH MIAMI, FL 33181 | (786)222-1168 | Black | Male | 12/04/1951 56 |
| Victim | 3 | Symonette, Maurice | 1977 NE 110TH RD NORTH MIAMI, FL 33181 | (786)859-0421 | Black | Male | 04/24/1959 49 |

### Arrests

| Arrest No. | Name | Address | Date/Time | Type | Age |
|---|---|---|---|---|---|

### Property

| Date | Code | Type | Make | Model | Description | Tag No. | Item No. |
|---|---|---|---|---|---|---|---|
| 10/22/2008 | Stolen | Jewelry/Precious Metal | | | EBEL WATCH | | 5 |
| 10/22/2008 | Stolen | US Currency | | | $20 | | 2 |
| 10/22/2008 | Stolen | Tools/Equipment | | | POWER TOOLS | | 3 |
| 10/22/2008 | Stolen | Wallet | | | BLACK WALLET | | 1 |
| 10/22/2008 | Stolen | Radio | | | BOSH RADIO | | 4 |

### Vehicles

| No. | Role | Vehicle Type | Year Make | Model | Color | License Plate | State |
|---|---|---|---|---|---|---|---|
| 1 | | Light Truck | 2008 Ford | | Silver | 424KJO | FL |

Miami-Dade Official Records - Print Document

# Exh.232

1977

CFN 2004R0860746
OR Bk 22698 Ps 4158; (1ps)
RECORDED 10/01/2004 14:37:03
DEED DOC TAX 0.60
HARVEY RUVIN, CLERK OF COURT
MIAMI-DADE COUNTY, FLORIDA
LAST PAGE

ared by:
rea Buckman
977 NE .19 Rd.
Miami, Florida 33181

## Quit Claim Deed

**This Quit Claim Deed** made this September 30, 2004 between **ALEXANDER MORERA**, a single man, whose post office address is 1977 NE 119 Rd., North Miami, Florida 33181 grantor, and **ALEXANDER MORERA** a single man, whose post office address is 1977 NE 119 Rd., North Miami, Florida 33181, **TANNA CARTER** a single woman, whose post office address is 1977 NE 119 Rd., North Miami, Florida 33181, **JAMES BUCKMAN** a single man, whose post office address is 1977 NE 119 Rd., North Miami, Florida 33181, grantee.

(Whenever used herein the terms "grantor" and "grantee" include all the parties to this instrument and the heirs, legal representatives and assigns of individuals, and the successors and assigns of corporations, trusts and trustees)

**Witnesseth**, that said grantor, for and in consideration of the sum TEN AND NO/100 DOLLARS ($10.00) and other good and valuable consideration to said grantor in hand paid by said grantee, the receipt whereof is hereby acknowledged, does hereby remise, release, and quitclaim to said grantee, and grantee's heirs and assigns forever, all the right, title, interest, claim and demand which grantor has in and to the following described land, situated, lying and being in Miami-Dade County, Florida, to-wit:

LOT 103, BLOCK 14, OF SANS SOUCI ESTATES, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 50, AT PAGE 86, OF THE PUBLIC RECORDS OF MIAMI-DADE COUNTY, FLORIDA

A/K/A 1977 NE 119 Rd, North Miami, Florida 33181
FOLIO NUMBER: 06-22-28-011-3400

THAT AT ANY TIME JAMES BUCKMAN OR TANNA CARTER CAN PAY OFF THE FIRST AND SECOND MORTGAGE AND BECOME THE SOLE OWNER OF THE PROPERTY WITHOUT ALEXANDER MORERA

**To Have and to Hold**, the same together with all and singular the appurtenances thereto belonging or in anywise appertaining, and all the estate, right, title, interest, lien, equity, and claim whatsoever of grantors, either in law or equity, for the use, benefit and profit of the said grantee forever

**In Witness Whereof**, grantor has hereunto set grantor's hand and seal the day and year first above written

Signed, sealed and delivered in our presence:

Witness Name: _____

Witness Name: _____

ALEXANDER MORERA

× ALEXANDER MORERA

SATE OF FLORIDA
COUNTY OF MIAMI-DADE

The foregoing instrument was sworn to, subscribed and acknowledged before me this ___ 1st day of October , 2004 by all signors, who have produced their Florida Drivers License, as identification.

[Notary Seal]

Notary Public
Print Name: Rachelle Rodriguez
Commission Expires: April 22, 2005

Book22698/Page4158    CFN#20040860746    Page 1 of 1

**Exh.236**

## QUITCLAIM DEED

THIS QUITCLAIM DEED, Executed this 8th day of July (year) 2006

by first party, Grantor, Leroy Williams

whose post office address is 1977 NE 119 Rd Miami 33181

to second party, Grantee, James Little John

whose post office address is 1977 NE 119 Rd. Miami Fla 33181

WITNESSETH, That the said first party, for good consideration and for the sum of Dollars ($ 10.00 ) paid by the said second party, the receipt whereof is hereby acknowledged, does hereby remise, release and quitclaim unto the said second party forever, all the right, title, interest and claim which the said first party has in and to the following described parcel of land, and improvements and appurtenances thereto in the County of Dade , State of Florida to wit:

Lot 103 Block 14 of SanSovci Estates, According to the Plat there of, As recorded in Plat Book 50, At Page 86, of the Public Records of Miami-Dade County, Florida. 1977 NE 119 Rd Miami Fla 33181

Folio # 06-2224011-3400

Book25192/Page3749     CFN#20061333173                    Page 1 of 2

Miami-Dade Official Records - Print Document

**Exh.237 pg.1**

Prepared by
TAL DAVIS
14000 NW 14 Ave
Miami, FL 33167

CFN 2008R0076524
OR Bk 26198 Pgs 1620 - 1621; (2pgs)
RECORDED 02/06/2008 13:11:00
DEED DOC TAX 0.60
HARVEY RUVIN, CLERK OF COURT
MIAMI-DADE COUNTY, FLORIDA

Above Space Reserved for Recording
[If required by your jurisdiction, list above the name & address of: 1) where to return this form; 2) preparer; 3) party requesting recording.]

# Quitclaim Deed

Date of this Document: **November 10, 2005**

Reference Number of Any Related Documents: _____

Grantor:

Name **James Littlejohn**

Street Address **1977 NE 119th Rd**

City/State/Zip **Miami, FL 33181**

Grantee:

Name **James Littlejohn, Robert Clark, Leroy Williams**

Street Address **1977 NE 119th Rd**

City/State/Zip **Miami, FL 33181**

Abbreviated Legal Description (i.e. lot, block, plat or section, township, range, quarter/quarter or unit, building and condo name): **28 83 82 42 Sans Souci Ests PB 50-82, Lot 103 Blk 14 Lot**

Assessor's Property Tax Parcel/Account Number(s): **06-2228-011-3400**

THIS QUITCLAIM DEED, executed this **10th** day of **November**, 20 **05**, by first party, Grantor, **James Littlejohn** whose mailing address is **1977 NE 119th Rd Miami FL 33181** to second party, Grantee, **James Littlejohn Robert Clark Leroy Williams** whose mailing address is **1977 NE 119th Rd Miami, FL 33181**

WITNESSETH that the said first party, for good consideration and for the sum of **Ten Dollars** Dollars ($ **10.00** ) paid by the said second party, the receipt whereof is hereby acknowledged, does hereby remise, release and quitclaim unto the said second party forever, all the right, title, interest and claim,

**Exh.237 pg.2**

which the said first party has in and to the following described parcel of land, and improvements and appurtenances thereto in the County of _____ DADE _____ State of _____ Florida _____
to wit: 28 33 52 42 Sans Souci Ests PB 50-86 Lot 103 BLK 14 Lot size 75000 X 125 OR 20516-4414 05 2002 1 Doc 25192-3749 07 2006 4

IN WITNESS WHEREOF, the said first party has signed and sealed these presents the day and year first written above. Signed, sealed and delivered in the presence of:

Signature of Witness

Print Name of Witness _____ Abdellas Symonette _____

Signature of Witness

Print Name of Witness _____ Carter Cornileus _____

Signature of Grantor

Print Name of Grantor _____ James Littlejohn _____

State of _____ Florida _____ )
County of _____ Dade _____ )

On _____ November 10 2005 _____ before me, _____ Andrea Chenault _____
appeared _____ James Littlejohn Robert Clark Leroy Williams _____ personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature of Notary

ANDREA M CHENAULT
MY COMMISSION # DD681796
EXPIRES December 25, 2010
Florida Notary Service.com

Affiant _____ Known ✓ _____ Produced ID
Type of ID _____

(Seal)                    DL# L 342-453-51-444-0

**Exh.239**

Exh. D__ [barcode]

CFN 2016R0123007
OR BK 29979 Pgs 2105-2106 (2Pgs)
RECORDED 02/29/2016 12:58:24
DEED DOC TAX $0.60
HARVEY RUVIN, CLERK OF COURT
MIAMI-DADE COUNTY, FLORIDA

When recorded return to: *Prepared by James Buckman*
*3320 NE 119th st RD Miami FL 33160*

# Quitclaim Deed:

**THIS QUITCLAIM DEED**, executed this _____1_____ day of _____January_____, 20_07_.

by first party, Grantor: *Janosca Littlejohn*

whose post office address is *1977 NE 119th Rd. Miami FL. 33181*

to second party, Grantee: *Maurica Symonette, Janice M Littlejohn and Mathiel Nicholson*

whose post office address is *1977 NE 119th Rd. Miami FL. 33181*

*Maurica Symonette has the right to sell the property without James Little john*

*consent. Janice Littlejohn owns only a six percent interest in the property anymore Symonette*

*for James Littlejohn her attorney to sign for anything concerning this property.*

**WITNESSETH**, that the said first party, for good consideration and for the sum of _____

_____Ten_____ Dollars ($ _10.00_ )

paid by the said second party, the receipt whereof is hereby acknowledged, does hereby remise, release and quitclaim unto the

said second party forever, all the right, title, interest and claim which the said first party has in and to the following described

parcel of land, and improvements and appurtenances thereto in the County of *Miami Dade*

State of *Florida*   to wit:   *Folio: 06-2224011-3400*

*Lot 103 Block 14 of Sansoucci Estates*

*According to the Plat Thereof As Recorded in Plat*

*Book 58 at Page 86 of the Public Records of Miami*

*Dade County Florida, 1977 NE 119th rd. Miami FL. 33181*

.2019

VOID
I-B

# Exh.240

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

ATTORNEYS' TITLE INSURANCE FUND
                Plaintiff,

Case No.: 06-14625 CA 05
Division: General Jurisdiction

vs.

JAMES BUCKMAN, ALEXANDER MORERA
& TANNA CARTER
                Defendant.

2006 NOV -3  PM 1:06

## NOTICE OF VOLUNTARY DISMISSAL

COMES NOW, Defendant/Counter Plaintiff, Tanna Carter, by and through undersigned
counsel and files a Voluntary Dismissal as to the Counterclaim against Plaintiff/Counter
Defendant, Attorney's Title Insurance Fund, without prejudice.

I HEREBY CERTIFY that a true and correct copy of the foregoing was sent by mail this
15th day of November, 2006 to: Ellen Patterson, Esquire, Rothman & Tobin, P.A.,
12514 W. Atlantic Blvd., Coral Springs, FL 33071, James Buckman 15020 S. River Drive,
Miami, FL 33167 and Alexander Morera, 410 SE 1st Street, Hialeah FL 33010.

MCFARLANE & NIXON-CALAMARI, P.A.,
7481 W. Oakland Park Blvd.
Suite 302
Ft. Lauderdale, FL 33319
(954) 742-5991
(954) 742-5992 (fax)

By:
Christine Nixon-Calamari, Esquire
FBN: 0046541

Bk 25098 Pg 2203 CFN 20061219777 11/15/2006 12:35:22 Pg 1 of 1 Mia-Dade Cty, FL

3/19/2019

Miami-Dade Official Records - Print Document

# Exh.241

Idoc

IN THE CIRCUIT COURT OF THE 11th
JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO.: 06-14625 CA 05

ATTORNEYS' TITLE INSURANCE FUND,
INC.,

     Plaintiff,

vs.

JAMES BUCKMAN; ALEXANDER MORERA;
TANNA CARTER; FLAMINGO TITLE
SERVICES, INC.

     Defendants.

_____/

08 FEB 19 PM 1: 53

## NOTICE OF VOLUNTARY DISMISSAL OF COUNT IV
## AND OF DROPPING PARTY DEFENDANT

Pursuant to Fla. R. Civ. P. 1.420(a)(1), Plaintiff hereby dismisses COUNT IV only of the Third-Amended Complaint filed in the above-styled cause and drops Defendant, FLAMINGO TITLE SERVICES, INC., as a Defendant in the instant action for the reason that the dispute subject of COUNT IV has been resolved, finalized or otherwise concluded. Each party shall bear its/his/her own fees and costs. All other counts and claims against all Defendants other than FLAMINGO TITLE SERVICES, INC., shall remain in force and shall be unaffected by this Notice of Voluntary Dismissal of Count IV.

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing was mailed this 13 day of _____, 2008 to: James Buckman, 15020 S. River Drive, Miami, Florida 33167 and 1977 NE 119th Road, North Miami, Florida 33181; Alexander Morera, 410 SE 1st Street, Hialeah, Florida 33010; Tanna Carter 2070 Reston Circle, Royal Palm Beach, FL 33411; and Michael Sastre, Esq., Wilson Elser Moskowitz Edelman & Dicker, LLP, 100 SE 2nd Street, Suite 3800, Miami, FL 33131; Edward S. Polk, Esq., Cole, Scott & Kissane, P.A., 1390 Brickell Avenue, 3rd Floor, Miami, Florida 33131.

ROTHMAN & TOBIN, P.A.
Attorneys for Plaintiff
12514 W. Atlantic Blvd.
Coral Springs, Florida 33071
Telephone: 954-510-0500
Telefax:    954-510-0440
By: _____
    Ellen Patterson
    Florida Bar No. 0520012

Bk 26235 Pg 2147 CFN 20080158607 02/27/2008 09:56:00 Pg 1 of 1 Mia-Dade Cty, FL



# COLE, SCOTT & KISSANE, P.A.

Attorneys at Law

MIAMI · WEST PALM BEACH · TAMPA · KEY WEST · FT. LAUDERDALE · NAPLES · JACKSONVILLE · SOUTH MIAMI · ORLANDO

PACIFIC NATIONAL BANK BUILDING
1390 BRICKELL AVENUE, THIRD FLOOR
MIAMI, FLORIDA 33131

TELEPHONE (305) 350-5300
FACSIMILE (305) 373-2294

WEBSITE www.csklegal.com
DIRECT LINE (305) 350-5338
EMAIL edward.polk@csklegal.com

April 4, 2008

<u>U.S. Mail and Certified Mail</u>
<u>Return Receipt Requested</u>

James Little John
1977 NE 119 Road
Miami, Florida 33181

RE:   Attorneys' Title Insurance Fund, Inc.
      v. James Buckman, Alexander Morera and Tanna Carter
      Case # 06-14625 CA 05
      Our File No.: 3467-0078-00

Dear Mr. John,

This firm represents Landmark American Insurance Company ("Landmark"). Landmark is now the owner and holder of the following interests which operate as liens against your property located at 1977 NE 119th Road, North Miami, Florida 33181:

1.   *MORTGAGE DATED SEPTEMBER 30, 2004, BETWEEN ALEXANDER MORERA AND COUNTRYWIDE HOME LOANS, INC. (copy attached)*

2.   *JUDGMENT ON THE PLEADINGS ENTERED AGAINST ALEXANDER MORERA (copy attached)*

For your convenience, please also find enclosed copies of the Assignment of Judgment, Assignment of Mortgage, and the Mortgage, which operate to transfer the assignment from Attorneys' Title Insurance Fund to Landmark.

It is important that you contact me to discuss this matter as soon as possible in order to discuss a means of resolving Landmark's claims in this matter. If we are unable to resolve this matter, it may become necessary to file mortgage foreclosure or to execute against the property on the judgment. I can be reached at the address and telephone numbers set forth above, and I look forward to hearing from you at your earliest opportunity.

Sincerely,

Edward S. Polk

L:\3467-0078-00\Ltr\Little John 001.doc

**Exh.243**



thman
&Tobin
ATTORNEYS AT LAW

Michael Rothman
Michael S. Tobin
Ellen Patterson
Reply to Coral Springs

October 4, 2007

The Honorable Judge Jon I. Gordon
Miami-Dade County Courthouse
73 W. Flagler Street
Room 400
Miami, Florida 33130

Re:    *Attorneys' Title Insurance Fund, Inc. v. James Buckman, et. al.*
       **Miami-Dade Circuit Case No.: 06-14625 CA 05**

Dear Judge Gordon:

Enclosed please find a courtesy copy of Defendant's, Flamingo Title Service, Inc., Motion to Dismiss, along with a proposed Agreed Order regarding same. Should Your Honor deem it appropriate, kindly enter the enclosed Order. Copies for conforming, along with pre-addressed and stamped envelopes, are enclosed for your convenience.

Thank you for your consideration of the enclosed. Should Your Honor have any questions or require any additional information, please do not hesitate to contact the undersigned.

Respectfully yours,

ROTHMAN & TOBIN, P.A.

Ellen Patterson, Esq.

Encl.
cc: all interested parties

**Exh.244**

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

CIVIL DIVISION

CASE NO.: 06-14625 CA 05

ATTORNEYS' TITLE INSURANCE FUND,

     Plaintiff,

v.

JAMES BUCKMAN; ALEXANDER MORERA;
and TANNA CARTER,

     Defendants.

_____/

TANNA CARTER,

     Third Party Plaintiff,

v.

FLAMINGO TITLE SERVICES, INC.,

     Third Party Defendant.

_____/

## FLAMINGO TITLE SERVICES, INC.'S MOTION TO DISMISS
## COUNT IV OF THE SECOND AMENDED COMPLAINT

Defendant, FLAMINGO TITLE SERVICES, INC. ("Flamingo"), by and through
undersigned counsel and pursuant to the Florida Rules of Civil Procedure, moves this Court to
dismiss Count IV of the Second Amended Complaint, and as grounds therefore states as follows:

    1.    Plaintiff ATTORNEYS' TITLE INSURANCE FUND (the "Fund") is a title insurer,
and Defendant Flamingo is an agent of the Fund.

    2.    In Count IV of the Second Amended Complaint (the only Count directed to
Flamingo), the Fund purports to assert a claim for breach of contract against Flamingo.

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
100 SOUTHEAST SECOND STREET · SUITE 3800 · MIAMI, FLORIDA 33131
TELEPHONE (305) 374-4400 · FACSIMILE (305) 579-0261

248307.1

**Exh.245**

CASE NO.: 06-_____ CA 05

3.   At Paragraph No. 47 of the Second Amended Complaint, the Fund alleges that Flamingo's Agency Application to the Fund constitutes the operative contract between the parties.

4.   The Fund has failed to attach a copy of the alleged contract to the Second Amended Complaint.

5.   Accordingly, Flamingo cannot properly evaluate whether or not the alleged actions complained of by the Fund constitute a breach of the terms of the alleged contract.

6.   Fla. R. Civ. P. 1.130(a) states as follows:

> **(a) Instruments Attached.**   All bonds, notes, bills of exchange, *contracts*, accounts, or documents upon which action be brought or defense made, or a copy thereof or a copy of the portions thereof material to the pleadings, shall be incorporated in or attached to the pleadings...

Emphasis added.

7.   The Fund's failure to comply in any way with Fla. R. Civ. P. 1.130(a) has made it impossible for Flamingo to formulate a meaningful response to the Second Amended Complaint.

WHEREFORE, Flamingo respectfully requests this Court to enter an Order dismissing Count IV of the Second Amended Complaint and granting such other and further relief as the Court shall deem just and proper.

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
100 SOUTHEAST SECOND STREET · SUITE 3800 · MIAMI, FLORIDA 33131
TELEPHONE (305) 374-4400 · FACSIMILE (305) 579-0261

248307.1

**Exh.246**

CASE NO.: 06-14625 CA 05

Respectfully submitted,

**WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER LLP**
*Attorneys for Third*
*FLAMINGO TITLE SER*
Bank of America Tower
100 SE Second Street - S_____
Miami, FL 33131
Telephone:    (305) 374-4400
Facsimile:    (305) 579-0261

By: _____
        WILLIAM H. STROP
        Florida Bar No. 052477

## CERTIFICATE OF SERVICE

**WE HEREBY CERTIFY** that a true and complete copy of the foregoing was furnished via U.S. Mail this 20 day of August 2007, to: **ELLEN PATTERSON ESQ.**, Rothman & Tobin, P.A., *Counsel for Attorneys' Title Insurance Fund*, 12514 West Atlantic Blvd., Coral Springs, FL 33071; **TANA CARTER**, 2070 Reston Circle, Royal Palm Beach, FL 33411; **JAMES BUCKMAN**, 15020 South River Drive, Miami, FL 33167; and **ALEXANDER MORERA**, 410 S.E. 1st St., Hialeah, FL 33010.

By: _____
        WILLIAM H. STROP

- 3 -

248307.1

**Exh.252 pg.1**

# Chapter 10 - JUNKED, WRECKED, STOLEN, ABANDONED PROPERTY[1]

**Footnotes:**

--- (1) ---

*Editor's note—* Ord. No. 1387, § 1, adopted March 25, 2014, amended chapter 10 in its entirety to read as herein set out. Formerly, chapter 10 pertained to similar subject matter, and derived from the Code of 1958, §§ 20-3 - 20-37; Ord. No. 817, § 4, adopted July 11, 1989; Ord. No. 1214, § 1, adopted November 28, 2006, and Ord. No. 1335, § 1, adopted May 22, 2012.

*Cross reference—* Administration, Ch. 2; code enforcement by special magistrates, § 2-98 et seq.; health facilities authority, § 2-136 et seq.; police department created, § 2-231; buildings and building regulations, Ch. 5; private property lot cleaning violation abatement fund, § 7-88 et seq.; fire prevention, Ch. 8; garbage and trash, Ch. 9; nuisances, Ch. 12; parks and recreation, Ch. 14; public places, Ch. 16; streets and sidewalks, Ch. 17; zoning, App. A.

*State Law reference—* Seized, abandoned, wrecked or derelict property, F.S. Ch. 705; junkyards, F.S. § 339.241; reporting of unclaimed motor vehicles, F.S. § 715.05; claims on found property, F.S. § 705.01.

## ARTICLE I. - IN GENERAL

### Sec. 10-1. - Definitions.

The following words, terms and phrases, when used in this article, shall have the meanings ascribed to them in this article, except where the context clearly indicates a different meaning:

*Abandoned property* means:

(1) Any article which lacks evidence of ownership.

(2) Any article that has less than nominal salvage value.

(3) Any article not in sufficient repair to perform its intended function.

(4) Any article exhibiting physical damage incurred to the property in a collision or other incident that has not been repaired.

(5) Any article which is derelict and has been left unprotected from the elements, as exhibited by growth of vegetation, direct exposure to the elements, or vandalism.

*Abandoned vehicle* means:

(1) Any vehicle located on public property that does not have displayed thereon a valid unexpired license plate, decal or registration.

(2) Any vehicle or part thereof that is left on public property continuously without being moved for a period of twenty-four (24) hours or more.

(3) Any vehicle located on public property illegally or in such a manner as to constitute a hazard or obstruction to the movement of pedestrian or other vehicular traffic on a public right-of-way, street or highway.

(4) Any vehicle or part thereof that has remained on private property without the consent of the owner or person in control of such private property, for

**Exh.252 pg.2**

a continuous period of twenty-four (24) hours or more.

(5) Any vehicle which is inoperable or cannot move under its own power due to defective or missing parts.

*Derelict or junk property* means inoperative, dilapidated, abandoned as further defined in this section or wrecked materials or parts thereof, including but not limited to automobiles, trucks, tractors, wagons, boats and other kinds of vehicles, scrap materials, scrap building material, scrap contractors' equipment, tanks, casks, containers, cans, barrels, boxes, drums, piping, bottles, glass, old iron, machinery, rags, paper, excelsior, hair, household appliances or furniture, tree clippings other than for immediate pickup, and any other kind of scrap or waste material.

*Code compliance inspector* means the designated employee of the code compliance division responsible for enforcement of the provisions of this chapter or the City Code.

*Private property* means all property that is not included in the definition of public property.

*Public property* means lands and improvements owned by the federal government, the state, the county or municipalities lying within the county and includes buildings, grounds, parks, playgrounds, streets, sidewalks, parkways, rights-of-way, waterways, canals and other similar property.

(Ord. No. 1367, § 1, 3-25-14)

## Sec. 10-2. - Provisions supplemental and cumulative.

The rights, powers and procedures set forth in this chapter shall be supplemental to and cumulative to the rights, powers and procedures set forth elsewhere in this Code, the general law and any amendment thereto.

(Ord. No. 1367, § 1, 3-25-14)

## Sec. 10-3. - Authority of police to seize.

The police department is hereby authorized and directed to seize and reduce to the possession of the police department any lost, captured, abandoned, stolen or wrecked property which may be found upon any of the public streets and highways of the city and to store such property as provided herein.

(Ord. No. 1367, § 1, 3-25-14)

## Sec. 10-4. - Storage.

The city shall keep and maintain adequate storage such as safes, storage rooms, a storage garage or warehouse where the property seized under the provisions of this article shall be stored and kept for a period of at least forty-five (45) days from the date of such seizure.

(Ord. No. 1367, § 1, 3-25-14)

## Sec. 10-5. - Notice to owner; redemption.

Exh.252 pg.3

## Sec. 10-6. - Lien for storage and keeping.

The costs and charges for storage and keeping of all property seized pursuant to this article shall constitute a lien in favor of the city against such property.

(Ord. No. 1367, § 1, 3-25-14)

## Sec. 10-7. - Sale of unclaimed property.

After the expiration of the period of forty-five (45) days provided in section 10-4, the chief of police shall publish in a newspaper of general circulation a description of vehicles and other unclaimed property, together with the date of seizure or taking possession thereof, and shall give notice that any property not claimed or reduced to possession by the owner thereof, within thirty (30) days from date of publication shall be sold at a public sale, at such place and in such manner prescribed by the chief of police.

(Ord. No. 1367, § 1, 3-25-14)

## Sec. 10-8. - Disposition of proceeds of sale.

The proceeds of any sale of unclaimed property so made after deducting the costs of storage, advertising, and other expenses incident to the selling of unclaimed property, shall be turned over to the general fund of the city.

(Ord. No. 1367, § 1, 3-25-14)

## ARTICLE II. - DERELICT OR JUNK PROPERTY

## Sec. 10-9. - Storage prohibited; exceptions.

(a) *Prohibited storage.* No person shall keep, store or allow to remain on any residential property within the city any abandoned, derelict or junk property, except as allowed in subsection (b) or (c) of this section. Abandoned, derelict or junk property which would be visible at ground level from a street, public or private property, or waterway, but for the concealment of such junk property by the use of plastics, fabrics or other materials to form a tent, curtain, partition or similar makeshift structure or device, shall be subject to the same restriction that is applicable to junk property which is so visible; provided, however, that nothing in this section shall prohibit the use upon motor vehicles of commonly used car covers which are maintained in good repair.

(b) *Residential property exceptions.* This section shall not apply to vehicles which are classified as antiques; provided, however, that any antique car on private property not having a current valid license plate shall be either in a garage or carport or covered with a form-fitting car cover with clips or drawstrings.

(c) *Commercial property exceptions.* A commercially zoned establishment may keep visible, at ground level, from a street or other private or public property, for a period not to exceed thirty (30) days, one (1) piece of machinery, one (1) vehicle, or one (1) boat while being repaired, painted, or

**Exh.252 pg.4**

otherwise put into operative condition by the owner or occupant of the premises.

(d) *Minor repair of automobiles in residential districts.* Major automobile repair is not permitted in residential districts. However, in residential zoning districts, a property owner or tenant may repair or otherwise put into operative condition an automobile on his/her property, only if all of the following requirements are met:

(1) The property owner or tenant of the relevant property owns the automobile being repaired; and

(2) The repair activity takes place only during daylight hours; and

(3) While under repair the automobile shall not be parked in front of the principal building on the property unless the side yard and/or rear yard are not accessible; and

(4) The work shall be limited to minor repairs only. The term "minor repair" includes any work which is completed within twenty-four (24) hours including but not limited to, change of tires and replacement of batteries. Any other work including work wherein the vehicle engine or transmission is removed or lifted from the vehicle for repair or replacement, where the vehicle is placed on blocks with the tires removed or involves the use of heavy equipment is prohibited.

(5) No commercial activity concerning the repair of automobiles shall be conducted on residential property.

(Ord. No. 1367, § 1, 3-25-14)

## Sec. 10-10. - Storage of junk and derelict articles in M-1, industrial districts.

For the protection of the public's health, safety and welfare, storage of junk and derelict articles in the M-1, industrial districts shall be permitted, only as long as such articles are in an enclosed structure, as a fenced-in area, or in an area not readily accessible to the general public.

(Ord. No. 1367, § 1, 3-25-14)

## Sec. 10-11. - Removal from property.

(a) Whenever the code compliance inspector ascertains that derelict, junk, or abandoned property is present on public or private property within the city limits which does not fall under the exceptions outlined in section 10-9, the officer shall cause a notice to be placed upon such article in the following form:

NOTICE TO THE OWNER AND ALL PERSONS INTERESTED IN THE ATTACHED PROPERTY. This property, to wit. (setting forth brief description) is unlawfully upon property known as (setting forth brief description of location) in violation of (setting ordinance violation), and must be removed within ten (10) days from the date of this notice. A request for a hearing before the special magistrate by the owner or any person interested in the attached must be made in writing to: (setting forth address for hearing requests) before the expiration of the (10) ten-day period, otherwise such property shall be presumed to be derelict, junk, or abandoned property and will be removed and destroyed by order of the city. Dated this: (setting forth the date of posting of notice). Signed: (setting forth name, title, address, and telephone number of the code compliance inspector).

**Exh.252 pg.5**

Such notice shall not be less than eight (8) inches by ten (10) inches and shall be sufficiently weatherproof to withstand normal exposure to the elements. In addition to posting, the code compliance inspector shall make a reasonable effort to ascertain the name and address of the owner of the real property upon which the derelict, junk, or abandoned property is located, and if such is reasonably available to the code compliance inspector, shall mail a copy of such notice to the owner on or before the date of posting by certified or registered mail with a five-day return receipt requested. If the notice is returned undelivered by the United States Post Office, official action to abate such violation shall be continued to a date not less than ten (10) days from the date of such return.

(b) A public hearing prior to the removal of the derelict, junk, or abandoned property is to be held before the special magistrate when such a hearing is requested by the owner of such property or other interested party within ten (10) days after service of notice to abate the violation. Any decision by the special magistrate requiring the removal of derelict, junk, or abandoned property from public land shall include a description of such property. In the case of a derelict vehicle, the order shall include correct identification and license number, if available at the site.

(c) If a hearing is not requested, and if at the end of ten (10) days after posting such notice the owner or any person interested in the article described in such notice has not removed the article from public property or shown reasonable cause for failure to do so, the code compliance inspector may cause the article to be removed and destroyed, and the salvage value, if any of same shall be retained by the city government to be applied against the cost of removal and destruction thereof.

(d) The state department of motor vehicles shall be notified of vehicle removal from public property pursuant to the terms of this section.

(e) In addition, the city attorney may apply for a court order for the removal of derelict, junk or abandoned property from private property.

(Ord. No. 1367, § 1, 3-25-14)

## Sec. 10-12. - Immunity of code compliance inspector from prosecution.

Any code compliance inspector, or any person authorized by the code compliance inspector, shall be immune from prosecution, civil or criminal, for reasonable, good faith trespass upon real property while in the discharge of the duties imposed by this article.

(Ord. No. 1367, § 1, 3-25-14)

## Sec. 10-13. - Penalties for obstruction.

It shall be unlawful for any person to oppose, obstruct or resist any code compliance inspector, or any person authorized by the code compliance inspector, in the discharge of his duties as provided in this article.

(Ord. No. 1367, § 1, 3-25-14)

Sec. 9-40. - Right to appeal.                    Chapter 11 - LICENSES AND BUSINESS REGULATIONS

**Exh.253**

# Florida Contraband Forfeiture Act

The Florida Contraband Forfeiture Act, found in Sections 932.701-932.706, F.S., authorizes the seizure of property used in violation of the Act for civil forfeiture.

According to reports from Florida's Office of Inspector General, the most common types of primary offenses in forfeiture cases include:

- Chapter 893 – Drug Abuse Prevention and Control;
- Chapter 895 – Offenses Concerning Racketeering and Illegal Debts;
- Chapter 817 – Fraudulent Practices;
- Chapter 316 – State Uniform Traffic Control;
- Chapter 812 – Theft, Robbery, and Related Crimes;
- Chapter 896 – Offenses Related to Financial Transactions;
- Chapter 322 – Driver Licenses;
- Chapter 849 – Gambling;
- Chapter 787 – Kidnapping; False Imprisonment; Luring or Enticing a Child; Custody Offenses;
- Chapter 796 – Prostitution;
- Chapter 810 – Burglary and Trespass; and



Submit ►

**SCHEDULE A CONSULTATION**

Call us to schedule a time to talk with the attorneys in the office or over the phone.

Office: 813.250.0500
Fax: 813.276.1600

**CONTACT OUR OFFICE**

Sammis Law Firm
1005 N. Marion St.
Tampa, FL 33602
» Get Directions

**MEET THE ATTORNEYS**

**Exh.252**



### NORTH MIAMI
### FLORIDA

776 Northeast 125th Street, P.O. Box 610850, North Miami, FL 33261-0850

## Code Enforcement Special Magistrate

Case #:   **CENUS-2016-00001**

City of North Miami
       Plaintiff,

vs.                                    **Order To Comply**

JAMES LITTLEJOHN & ROBERT CLAR, LEROY WILLIAMS
1977 NE 119 RD
MIAMI, FL 33181-1331

             Defendant.

Having heard testimony at the Code Enforcement Special Magistrate hearing held the **04/06/2016**
and based upon the evidence, the Code Enforcement Special Magistrate enters the following findings of
fact, conclusions of law and orders:

JAMES LITTLEJOHN & ROBERT CLAR, LEROY WILLIAMS is (are) found guilty of violating Ordinance
12-19 City Codes, to wit:

    12-19        (NUS) NUISANCE HEALTH & SAFETY

    NO PERSON OWNING, LEASING, RENTING OR OCCUPYING LAND IN THE
    CITY SHALL PERMIT OR MAINTAIN ANY NUISANCE WHICH TENDS TO
    ANNOY THE COMMUNITY OR INJURE THE HEALTH OF THE CITIZENS.

upon the following real property: **1977 NE 119 RD**

    28 33 52 42SANS SOUCI ESTS    PB 50-86LOT 103        BLK 14LOT SIZE   75.000 X  125OR
    20516-4414 05 2002 1COC 26198-1620 11 2005 5

**It Is Therefore Ordered That** the above-described violation shall be abated by no later than 12:00 noon on
  Tuesday, May 3, 2016

**It Is Further Ordered That** the defendant(s) pay a fine up to $250.00 per day if the violation continues
beyond the time and date set for compliance in this Order. The specific fine shall be set by the Code
Enforcement Special Magistrate at a hearing to be set at a future date. Said defendant(s) shall be required to
appear at said hearing if they desire an opportunity to be heard on the amount of said fine or the quesiton of
compliance.

**It Is Further Ordered That** upon notification by the Code Enforcement Officer and upon findings by the
Code Enforcement Special Magistrate that the same violation has been repeated by the same violator, the
Special Magistrate may order the violator to pay a fine not to exceed $500.00 per day for each time the
violation has been repeated, beginning with the date the repeat violation is found to have occurred by the
Code Enforcement Officer, and a hearing shall not be necessary for issuance of the order so providing.

**It Is Further Ordered That** since the City has prevailed in prosecuting this case before the Code
Enforcement Special Magistrate, the City is entitled to recover costs of prosecution due within ten (10)
days of the date of this Order to comply.

**Exh.255**

# CONDITION & VALUATION SURVEY

FILE NO. S – 030106AAugust 1, 2011

CONDITION AND VALUATION SURVEY ALUMINUM MOTOR YACHT

"VICTORY" OFFICIAL NUMBER D- 656976 NORTH MIAMI, FLORIDA

THIS IS TO CERTIFY THAT THE UNDERNAMED MARINE SURVEYOR DID, at

the request of Mr. Maurice

Symonette, attend the aluminum motor yacht "Victory", Official Number

656976, while vessel was moored at North Miami, FL in order to ascertain

the current condition and value of vessel.

SUMMARY OF VALUES      In the opinion of the Undersigned Marine

Surveyor and Appraiser, the aluminum motor yacht Victory is estimated to

have the following values:                    Current Market Value

$1,000,000.00                      Replacement   Value

$ 2,000,000.00    These values are considered effective as of date of this

report and are subject to conditions and assumptions set forth below.

FILE NO. S – 030106AAugust 1, 2011      VESSEL PARTICULARS

NAME:                                   M/V Victory

OWNER:   Mr. Maurice Symonette

HOME PORT:                        North Miami, FL

OFFICIAL NUMBER:                  656976

DIMENSIONS:                        Length

United States Bankruptcy Court
Southern District of Florida

**Exh.272**

## Notice of Bankruptcy Case Filing

A bankruptcy case concerning the debtor(s) listed below was
filed under Chapter 13 of the United States Bankruptcy Code,
entered on 03/21/2016 at 4:02 PM and filed on 03/21/2016.

**Kurt Marin**
10290 SW 58 ST
Miami, FL 33173
SSN / ITIN: xxx-xx-7450

FILED
03/21/2016
3:59 PM

The bankruptcy trustee is:

**Nancy K. Neidich**
www.ch13miami.com
POB 279806
Miramar, FL 33027
954-443-4402

The case was assigned case number 16-13958-AJC to Judge A. Jay Cristol.

In most instances, the filing of the bankruptcy case automatically stays certain collection and other actions against
the debtor and the debtor's property. Under certain circumstances, the stay may be limited to 30 days or not exist at
all, although the debtor can request the court to extend or impose a stay. If you attempt to collect a debt or take
other action in violation of the Bankruptcy Code, you may be penalized. Consult a lawyer to determine your rights
in this case.

If you would like to view the bankruptcy petition and other documents filed by the debtor, they are available at our
*Internet* home page www.flsb.uscourts.gov or at the Clerk's Office, . .

You may be a creditor of the debtor. If so, you will receive an additional notice from the court setting forth
important deadlines.

**Joseph Falzone**
**Clerk, U.S. Bankruptcy Court**

| PACER Service Center |
| :---: |
| Transaction Receipt |
| 10/12/2018 14:39:51 |

| PACER Login: | mv3320:4202789:0 | Client Code: | |

**Your CUSIP Results are as follows:**

**Exh.311pg.1**

**LEROY WILLIAMS (ACCT 100176105062733202 [MIN])**
**Fidelity Advisor Strategic Real Return Fund**
Symbol:                          FSRAX
CUSIP:                           315912873

Inception Date:              9 7 2005
Net Assets:                   $462,624,000.00 as of
                                     12 3 2021
Portfolio Assets:           $462,624,000.00 as of
                                     12 3 2021

**A little about the Fund:**

Fidelity Strategic Real Return Fund seeks real return consistent with reasonable investment risk by investing in domestic and foreign issuers using a neutral mix of approximately 30% of inflation-protected debt securities, 25% floating-rate loans and 20% REITs and other real estate related investments.

**Exh.312 pg.2**

## <u>AFFIDAVIT OF FACT</u>

STATE: OHIO
COUNTY: FAIRFIELD

The undersigned, Wesley Jarvis, Trustee for CUSIPONE Trust, hereby states and confirms that he is of legal age and competent to state on belief and personal knowledge that the facts set forth herein, as duly noted below are true, correct, complete and presented in good faith, establish that:

      1.      The CUSIP numbers attached for LEROY WILLIAMS, for an account bearing number *100176105062733202*, were searched through independent databases, confirmed with trading desks, and at least one interest was confirmed as per the reports issued and attached as a result.

      2.      The Fund Manager, or other custodian(s) of the accounts of the fund(s) may have access to internal records indicating detailed data about the percentage of interest as held for the account of LEROY WILLIAMS.

      3.      More than one fund may have an interest in the accounts of LEROY WILLIAMS.

FURTHER AFFIANT SAYETH NOT.

Signed and sealed this ___30___ day of ___January___, in the Year of our Lord, two thousand twenty-two (2022).

All Rights Reserved,

For WESLEY JARVIS

Wesley J. Jarvis, Trustee

Page 1 of 2

**Exh.313 pg.3**

## JURAT

State of ___Ohio___                              )

Subscribed and Affirmed                          )

County of ___Fairfield___                        )

On ___February 3___, 2022 before me. ___Nia Tarrace___ (notary public) personally appeared __Wesley J. Jarvis__ [ ] personally known to me or [x] proved to me on the basis of satisfactory evidence, to be the person whose name is subscribed to above and acknowledged to me that he executed the same in his authorized capacity.

I now affix my signature and official seal to these affirmations.

_____ (Signature)

Notary Public State of ___Ohio___                        Seal:

My Commission Expires: ___5/16/24___

Page 2 of 2

**Exh.313 pg.2**

# MASTER KEY OF EXPLANATION FOR CUSIP REPORT

The following is a brief explanation of the report you received for your CUSIP searches. Please keep in mind that there can be MANY different securities inside the Fund itself. The value of the fund does not necessarily reflect the amount of your individual security.

*As listed on your report:*

Your name (or name of recipient).

The name of the fund in which the subject security was found to reside.

The Symbol is the Ticker Symbol of the fund which was found.

The CUSIP is the CUSIP number of the fund.

The Inception Date is the date the **FUND** was created. It has nothing to do with the specific case or issue.

Net Assets and Portfolio Assets usually are the same but can be different. These give an amount of value held by the Fund trust. This amount can and usually does change on a daily basis in coordination with the markets in which it trades.

Description of what the fund does in the market place. It also shows what sectors it trades in.

We always encourage that you do deep studies in securities and the relations around the industry before doing anything with them. It's a highly-regulated market.

**Exh.320**

CFN 2005R1193499
OR Bk 23966 Pgs 3463 - 3464; (2pgs)
RECORDED 11/16/2005 16:44:20
DEED DOC TAX 17,000.00
HARVEY RUVIN, CLERK OF COURT
MIAMI-DADE COUNTY, FLORIDA

Prepared by and return to:

Flamingo Title Services, Inc.
1236 SE 4th Avenue
Fort Lauderdale, FL 33316
352-374-4888
File Number: 05a-138
Will Call No.:

_____[Space Above This Line For Recording Data]_____

## Warranty Deed

**This Warranty Deed** made this 26th day of October, 2005 between Morera Alexander, a single woman and Tanza Carter, a single woman and James Buckman, a single man whose post office address is 15010 S. River Drive , Miami, FL 33167, grantor, and Leroy Williams, a single man whose post office address is 1977 NE 119 Road, Miami, FL 33161, grantee:

(Whenever used herein the terms "grantor" and "grantee" include all the parties to this instrument and the heirs, legal representatives, and assigns of individuals, and the successors and assigns of corporations, trusts and trustees)

**Witnesseth,** that said grantor, for and in consideration of the sum of TEN AND NO/100 DOLLARS ($10.00) and other good and valuable considerations to said grantor in hand paid by said grantee, the receipt whereof is hereby acknowledged, has granted, bargained, and sold to the said grantee, and grantee's heirs and assigns forever, the following described land, situate, lying and being in Miami-Dade County, Florida to-wit:

LOT 113, BLOCK 14, SANS SOUCI ESTATES, according to the Plat thereof as recorded in Plat Book 50, Page 86 of the Public Records of Miami-Dade County, Florida

Parcel Identification Number: 062228011 3400

**Together** with all the tenements, hereditaments and appurtenances thereto belonging or in anywise appertaining.

**To Have and to Hold,** the same in fee simple forever.

**And** the grantor hereby covenants with said grantee that the grantor is lawfully seized of said land in fee simple; that the grantor has good right and lawful authority to sell and convey said land; that the grantor hereby fully warrants the title to said land and will defend the same against the lawful claims of all persons whomsoever; and that said land is free of all encumbrances, except taxes accruing subsequent to December 31, 2004.

**In Witness Whereof,** grantor has hereunto set grantor's hand and seal the day and year first above written.

Signed, sealed and delivered in our presence:

Witness Name: _____

Witness Name: _____

Morera Alexander                    (Seal)

Witness Name: _____

Witness Name: _____

Tanza Carter                    (Seal)

Witness Name: _____

Witness Name: _____

JAMES BUCKMAN                    (Seal)

**Exh.318**

IN THE CIRCUIT COURT OF THE ELEVENTH
JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

**Exh. Z**

CASE: 07-1822CA01

Emc mortgage Corp.
Indy Mack Bank Plaintiff
Vs
James Littlejohn and
Mack Wells Defendants

Certified Mail No. _____

Re: Qualified Written Request, Formal Protest, and Dispute of Alleged Debt
Validity of Alleged Loan                    and Alleged Loan

Dear Sir / Madam

This letter shall serve as my formal Qualified Written Request to obtain all records and
documents pertaining to this loan and my Formal Protest / Dispute of alleged Debt
Validity.
Pursuant to RESPA ♦ 6(e)(1)(B) and Reg. X ♦ 3500.21 (f) 2, this letter is a "qualified
written request". I have reason to believe certain Truth in Lending disclosures may have
been withheld and loan-servicing errors may have occurred. Consequently, please send:

1.  Certified copy of my Promissory Note, including assignment Allonge.
2.  The security instrument, any modifications, endorsements, extensions,
    addenda, and all information related to items (1) and (2) above.
3.  The complete pay history from date of origination, including any portion
    of the pay history that originated with prior servicer(s).
4.  Promissory Note Deposit, and Transaction Account records.
5.  Name, address, and contact information of the Promissory Note Document
    Custodian.

Retention of payment history records are sometimes stipulated by states ranging from
seven years to complete life of the loan. If you do not have a portion of the pay history or
records requested related to a prior servicer(s). Please forward a copy of this notice to
said prior servicer(s), and provide me with the name, address, and phone number of the
prior servicer(s)

The above information may be sent by regular mail to the address provided.

Thank you for your cooperation. Please send a letter if you are unable or unwilling to
send me this information or if you cannot send it within the twenty business day response
requirements.

Very truly yours,

Larry Williams
1620 S River Dr
Miami, Fla 33145

James L. Littlejohn
1977 NE 119th Rd
Miami, Fla 33181

Mack Wells
15620 S River Dr
Miami, FL 33167

2/12/2019

Miami-Dade Official Records - Print Document

# Exh.326

CFN 2007R0615640 OR BK 25716 Pg 1859; (1pg)
RECORDED 06/20/2007 08:57:58
HARVEY RUVIN, CLERK OF COURT, MIAMI-DADE COUNTY, FLORIDA
LAST PAGE

## IN THE CIRCUIT COURT OF THE ELEVENTH
## JUDICIAL CIRCUIT IN AND FOR DADE COUNTY, FLORIDA
## CIVIL ACTION

DEUTSCHE BANK NATIONAL TRUST COMPANY AS TRUSTEE
UNDER THE POOLING AND SERVICING AGREEMENT SERIES
EAST 2006-A3 (CSFB),

    Plaintiff

vs.                              DIVISION

07 - 18226 CA 02

                                        (SPACE FOR RECORDING ONLY FLA BAR#)

JAMES LITTLE JOHN A/K/A JAMES LITTLEJOHN;  THE UNKNOWN SPOUSE OF JAMES LITTLE
JOHN  A/K/A  JAMES  LITTLEJOHN;  LEROY  WILLIAMS;  MACK  WELLS;  CYNTHIA  L.
WILCOXSON;  ANY AND ALL UNKNOWN PARTIES CLAIMING BY, THROUGH, UNDER, AND
AGAINST THE HEREIN NAMED INDIVIDUAL DEFENDANT(S) WHO ARE NOT KNOWN TO BE
DEAD OR ALIVE, WHETHER SAID UNKNOWN PARTIES MAY CLAIM AN INTEREST AS SPOUSES,
HEIRS, DEVISEES, GRANTEES, OR OTHER CLAIMANTS; ATTORNEYS' TITLE INSURANCE FUND,
INC.; LANCASTER MORTGAGE BANKERS, LLC; FIRST COMMERCIAL CORP.; CITY OF NORTH
MIAMI;  STATE OF FLORIDA - DEPARTMENT OF REVENUE;  CAPITAL ONE BANK; TENANT #1,
TENANT #2, TENANT #3, and  TENANT #4 the names being fictitious to account for parties in possession
    Defendant(s).

## NOTICE OF LIS PENDENS

To the above-named Defendant(s) and all others whom it may concern:

You are notified of the institution of this action by the above-named Plaintiff, against you seeking to foreclose a
mortgage recorded in Official Records Book 23966, Page 3465, on the following property in DADE County, Florida:

LOT 103, BLOCK 14 OF THE SANS SOUCI ESTATES, ACCORDING TO THE PLAT THEREOF,
AS RECORDED IN PLAT BOOK 50, AT PAGE 86, OF THE PUBLIC RECORDS OF MIAMI-DADE
COUNTY, FLORIDA

Dated this 14th day of June, 2007.

                                Echevarria, Codilis & Stawiarski
                                P.O. Box 25018
                                Tampa, Florida 33622-5018
                                (813) 251-4766

                                By: _____
                                E. Tyler Samstag
                                FLORIDA BAR NO. 0028386
                                Andrea D. Pidala
                                FLORIDA BAR NO. 0022848

INDYMAC-CONV-R-sheyla

FILE_NUMBER: F07016631                          DOC_ID: M000105

https://www2.miami-dadeclerk.com/Public-Records/PrintDocument.aspx?QS=YsoUfOzxry0XTIdiSMPdfxnBj4VqTFkTlu%2b%2fH7CDMZDwo2JIZ3ItNOH7qtP...   1/1

Exhibit 434 891.

Corporate Bond Overview | Fidelity Investments

https://fixedincome.fidelity.com/ftgw/fi/FIBondDetails?requestType=...

| Accounts & Trade | News & Insights | Research | Guidance & Retirement | Investment Products |

# WAMU MTG CERT SER 2006-AR12
CL 1-A1 2.431125% 10/25/2036 2006-AR12 BOND

Overview   Price & Performance

## Details

| | |
|---|---|
| CUSIP | 93363NAA3 |
| ISIN | -- |
| SEDOL | -- |
| Pay Frequency | MONTHLY |
| Coupon | 2.431 |
| S'Coupon Rate | 10/25/2036 |
| Moody's Rating | NR |
| S&P Rating | D |
| Fitch Rating | NO |
| Secured Status | N/A |
| Bond Type | Corporate |
| Sector | NA |
| Original Award Date | 08/01/2006 |

## Redemptive Features

| | |
|---|---|
| Call Protection | YES |
| Continuously Callable | -- |
| Extra Redlie | NO |
| Make Whole Call | NO |
| Decline Event Protection | YES |
| Sink Defeased | NO |
| Extraordinary Redemption | -- |
| Special Mandatory Redemption | NO |
| Special Optional Redemption | NO |
| Put Option | NO |
| Pre Ref Under? | -- |
| Escrow End Date | -- |

## Security Features

| | |
|---|---|
| Minimum Investment Qty | 25 |
| Incremental Investment (US) | -- |
| Nonrefundable | NO |
| Original Issue Discount (OID) | N/A |
| Current Factor | 0.05798875 |
| Current Factor Effective Date | 12/26/2015 |
| Previous Factor | 0.05851893 |
| Previous Factor Effective Date | 11/25/2015 |
| 2nd Previous Factor | 0.05851164 |
| 2nd Previous Factor Effective Date | 10/25/2015 |
| Tranche Type | SEQUENTIAL |
| Tranche | BOOK ENTRY |
| Listed | NO |
| Optional | -- |
| Exchange | OTC |
| TRACE Eligible | YES |

## Issuer Information

| | |
|---|---|
| Issue Date | 08/22/2006 |
| Dated Date | 08/01/2006 |
| First Coupon Date | 10/25/2006 |
| Next Coupon | -- |
| Last Coupon | -- |
| Maturity Date | 10/25/2036 |
| Original Issue Amount | $429,491,000.00 |
| Issue Price | -- |

## Coupon Information

| | |
|---|---|
| Coupon Type | FLOATING |
| Current Rate Effective Date | 11/01/2015 |
| Day Count Basis | 30/360 |
| Reset Frequency | ONE TIME |
| Benchmark Reference | -- |
| Benchmark Spread | -- |
| Next Reset Date | -- |
| Next Reset Rate | -- |
| Maximum Rate | -- |
| Minimum Rate | -- |

## Convertible Information

| | |
|---|---|
| Convertible | NO |
| Strike Amount | -- |
| CUSIP (Underlying security) | -- |
| Date (Convertible Information) | -- |

## Foreign Information

| | |
|---|---|
| Global Intuition | NO |
| Foreign | NO |
| International | NO |
| Primary Country | -- |
| Domicile Country | -- |

## Latest Company Reports
There are currently no reports available.

## Latest Industry Reports
There are currently no reports available.

1/12/2016 5:45 PM

Exhibit 4/34 Pg2

CUSTOMER SERVICE   OPEN AN ACCOUNT   REFER A FRIEND   LOG OUT     Search or get a quote

| Accounts & Trade | News & Insights | Research | Guidance & Retirement | Investment Products |
|---|---|---|---|---|

- Research >
- Fixed Income >
- Individual Bonds >
- Search Results

- Help/Glossary

# Bond Results

View other important information and risks of investing in fixed income securities.

- Table View

- Price/Yield Calculator
- Taxable Equivalent Yield Calculator

**Attributes Legend**

| | | | | **Your Key Search Criteria** | |
|---|---|---|---|---|---|
| LE: Lesser Event | SFP: Sinking Fund Protection | CP: Call Protection | HY: High Yield | Search Name | All to All All to All |
| | | | SO: | Maturity Date | All |
| D: Depth of Book Available | ER: Extraordinary Redemption | | | Moody's Rating | All to All |
| | | | | S&P Rating | All to All |
| | | | | Call Protection | All |
| | | | | Sinking Fund Protection | All |

As of 01/12/2016 at 05:44 p.m.

## Total Bonds Found: 1

⬜ Select Action [ Go ]

| Description | Coupon | Maturity Date | Rating Moody's/S&P | Yield | Bid Price (Qty/min) | Price (Qty/min) | Ask Yield to Worst | Yield to Maturity | Depth of Book | 3rd Party Price / Recent Trades | Attributes and Issuer Events | Action |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fidelity is not currently offering this security. WAMU MTG CERT SER 2006-AR12 CL1-A1 2.431175% 10/25/2036 2006-AR12 BOND | 2.431 | 10/25/2036 | NR | D | --(-) | --(25) | -- | -- | -- | 88.377 | CP SFP HY | • Buy • Sell |

⬆ Select Action [ Go ]

Bond and CD prices, yields, and availability are time sensitive and subject to change based upon market conditions and other factors.

Bonds and CDs with higher yields generally carry greater risk than lower yielding bonds.

The yields displayed are estimates based on the lowest prices quoted and do not reflect commissions charged by Fidelity Brokerage Services LLC. Prices and yields are subject to change and for your review prior to placement of an order.

Ratings, if provided, are opinions and not measures of likelihood to purchase, hold or sell securities, and they do not address the relative value of securities or their suitability for investment purposes. Ratings should not be relied on as investment advice. Please read important credit rating information.

© 1998 - 2016 FMR LLC.

pg # 17

Exhibit 434 pgs

Corporate Bond Overview | Fidelity Investments                    https://fixedincome.fidelity.com/ftgw/fi/FIBondDetails?requestType=...

Bond Details and related items is compiled by various third party credit rating that are not affiliated with Fidelity or its affiliates. Fidelity does not explicitly or implicitly endorse or approve such content. Content is provided for informational timely, educational purposes only. You must make your own evaluation of how the information may influence your investment decision. Although content is continuously supplied, it is only valid as of the date published and may become unreliable because of subsequent market conditions or other reasons.

Consult the security's prospectus for more complete information regarding the issuer listed.

Recent trade information and transaction price data as reported to the Financial Industry Regulatory Authority (FINRA)'s Trade Reporting and Compliance Engine (TRACE) for Corporate Bonds, and other fixed income securities. Recent transaction price data is as reported by the dealers. The prices quoted provide insight into recent historical transaction levels, and are not necessarily reflective of current market value. Fidelity reports TRACE and MSRB information as a real-time basis.

Fidelity

© 1998 - 2014 FMR LLC.
All rights reserved.
Terms of Use  Privacy  Sitemap  Site Map

pg# 18



EXhibit 435

pg. 2

## AFFIDAVIT OF FACTS

STATE OF ILLINOIS     )
                      )
                      ) vs.: AFFIDAVIT
COUNTY OF COOK        )

RE: KURT MARIN

I, ELAYSHRUWA SHAPHAT YISRAEL, a citizen of the United States and the State of Florida over the age of 21 years, and declare as follows under penalty of perjury that the facts stated herein are true, correct and complete. The undersigned believes them to be true and admissible as evidence in a court of law, and if called upon as a witness, will testify as stated herein.

1.   That I am a subscriber of the Bloomberg Professional Service, certified and to use such service. I have completed the required training and engaged in continuing education with Bloomberg – both online and at Bloomberg live training events, to stay abreast with Bloomberg's latest progress and developments. I have the requisite knowledge and the trained ability to navigate and perform effective searches on the Bloomberg terminal.

2.   I am a Certified Mortgage Securitization Auditor and my qualifications, expertise and experience provide me with the background necessary to certify the audit services and to be qualified as an expert in this field. I have produced approximately one hundred Securitized Analysis Reports in residential real estate mortgage investigation in 15 states and in United States. I have Not testified as an expert witness in Any Court I have Completed auditors in California, Florida, New Jersey, Nevada, New York and Virginia and via the internet in webinar format.

3.   I have the trained skills and qualifications to navigate and perform searches on the Bloomberg terminal in regards to the automated tracking and determination of mortgage and loan related documents and information.

4.   The contents of this report are factual but it is provided for information purposes only and is not to be construed as "legal advice."

5.   On DECEMBER 8, 2015, I researched the Bloomberg online Database at the request of KURT MARIN Whose property address is 3320 NE 165 STREET NORTH MIAMI BEACH.

6.   Based on the information I was provided, Kurt Marin signed a Promissory Note in favor of Federal Saving Bank, Home Loan on July 14, 2006.

7.   Loan was identified in the WAMU MORTGAGE PASS- THROUGH CERTIFICATE TRUST 2006-AR12.

8.   The basis of the identification of Loan in WAMU MORTGAGE PASS-THROUGH CERTIFICATE TRUST 2006-AR12 was made from the following factors/information that exactly corresponds with Kurt Marin loan documents provided: Loan Number: ███████████ ; Original Amount: $2,150,000.00; Origination Date: July 14, 2006; Location of Property: MD; Property Type: Single Family Residence; Occupancy: Owner Occupied; Zip Code: █████ ; Type Loan: 30 Year Fixed Rate Mortgage.

Exhibit 435 pg3

9. Kurt Martin Note was split-apart or fractionalized a Seperate accounting entries and deposited separately into Classes. Each Class is insured up to 3Times the face value of each Note therein which is permissible under the Federal Reserve System.

10. Pursuant to my extensive research, I have found the Loanin **TWENTY FOUR (29)Classes** of the WAMU MORTGAGE PASS THROUGH CERTIFICATE TRUST 2006-AR12.These classes represent the Securities that the WAMU MORTGAGE PASS THROUGH CERTIFICATE TRSUT 2006-AR12 is divided into. Individuals invest in these Classes based ontheir desired maturities, yield, credit rating and other factors. The WAMU MORTGAGE PASS THROUGH CERTIFICATE TRUST 2006-AR12pays interest, usually monthly, to investors and principal payments are paid out in the order of the maturity and as specifiedin trust agreements.

11. Below are the classes the WAMU MORTGAGE PASS THROUGH CERTIFICATE has been divided into and their CUSIP number which is a nine (9) character alphanumeric codeidentifying any North American security for the purpose of facilitating clearing and settlement oftrades

12. There are a total of TWELVE FOUR(29) classes in the WAMU MORTGAGE PASS THROUGH CERTIFICATE TRUST 2006-AR12

13. There are TWENTY NINE (29) classes.  Four (1) classes out of the TWENTY NINE (29) have been paid (Pd) Therefore it is in the all collateral group and group 2.

14. Generally, if the Mortgage and the Note are not together with the same entity, there can be no legal enforcement of the Note. The Mortgage enforces the Note and provides the capability for the lender to foreclose on the property. Thus, if the Mortgage and the Note are separated, foreclosure legally cannot occur. The Note cannot be enforced by the Mortgagee, each contains a different mortgage instrument, and if the Mortgage is not itself a legally enforceable instrument, there can be no valid foreclosure on the homeowners' property.

15. No Entity can be a CREDITOR if they do not hold/own the asset in question (i.e. the NOTE and/or the property) a Mortgage Pass Through Trust (i.e. the R.E.M.I.C as defined in Title 26, Subtitle A, Chapter 1, Subchapter M Part II §§ 850-862) cannot hold assets, or if they do, their tax exempt status is violated and the Trust itself is void ab initio. This is an indication that either the Trust has either voided surrendered Tax Free Status or the assets on the assets are not in fact owned by it.

16. In the event that the loan was sold, pooled and turned into a security such event would indicate that the alleged holder can no longer claim that it is a real party of interest, as the original lender has been paid in full.

17. Further still, once the Note was converted into a stock, or stock equivalent, that event would indicate that the Note is no longer a Note. If both the Note and the stock, or stock equivalent, exist at the same time, that is (known as) double dipping. Double dipping is a form of securities fraud.

18. Once a loan has been securitized, which the aforementioned loan may have been done many times, that event would indicate that the loan forever loses it security component (i.e. the Mortgage), and the right to foreclose through the Mortgage is forever lost

19. The findings of this report indicate that the Promissory Note has been converted into a stock as a permanent fixture. As a stock it is governed as a stock under the rules and regulations of the SEC. hence, the requirement for the filings of the registration statements, pooling and servicing agreements (form 424-B-5 etc.)There is no evidence on Record to indicate that the Mortgage was ever transferred concurrently with the purported legal transfer of the Note such that the Mortgage and Note has been irrevocably separated thus making a nullity out of the purported security in a property as claimed.

20. Careful review and examination reveals that this was a securitization. The Assignment of Mortgage purported to be an A to D transaction when in fact the foreclosing party was hiding the A to B, B to C, and C to D facts of true sales, where A is the original lender B the sponsor/dealer. C the bankruptcy-remote depositor and D, the issuing mortgage-backed securities trust. They also hid the legal SEC filings. By governing the transaction according to our findings. But to be controlled By those SEC filings, the true obligation. Note and Mortgage had to be provided by the Document Custodian certified to have been in possession of them by them on or about Aug 14, 2006. Because it was not, the claim of ownership by the Trust cannot be substantiated and the loan servicing rights not established allow by agreement, to supply this report as written testimony and am available for oral testimony.



Exhibit 435

STATE OF ILLINOIS )
                  )  vs.: **ACKNOWLEDGEMENT**
County of COOK )

On ___ ___ this before me, *Eliyahu Shaphat Yisrael*
                                    (Notary Public)

personally appeared **ELIYEHUWA SHAPHAT YISRAEL**, who proved to me on the basis of satisfactory evidence to be the man whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument under the penalty of perjury.

I certify under PENALTY OF PERJURY under the laws of the State of Florida that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____

"OFFICIAL SEAL"
TARA BLAKE
Notary Public - State of Illinois
My Commission Expires December 03, 2016

My commission Expires   12/03/2016



Exhibit 435 pg 6



Marin

No findings in any publicly reporting trust. Exact identification of securitization trust or corporate bank portfolio may be gotten through a QWR, Request for Information under Regulations X and Z, a FOIA request, voluntary lender disclosure or discovery through litigation.

The following is a Washington Mutual Bank trust meeting the qualifications for securitization:

**Prospectus Supplement form 424(b)5**

http://www.sec.gov/Archives/edgar/data/xxxxxx/xxxxxxxxx170n0x39/wamu470.htm

**Pooling and Servicing Agreement**

http://www.sec.gov/Archives/edgar/data/1374832/000127777050000721/exh1to8kpswamu2005_ar 12.pdf





Exhibit 435 pg 9





Exhibit 435 Pg 12



Prospectus Supplement to Prospectus Dated January 6, 2006

# WaMu Mortgage Pass-Through Certificates, Series 2006-AR12

### WaMu Asset Acceptance Corp.
Depositor

### Washington Mutual Bank
Sponsor and Servicer

## $1,694,778,749
(Approximate)

Consider carefully the risk factors beginning on page S-16 in this prospectus supplement and page 5 in the accompanying prospectus.

The certificates will represent interests only in the issuing entity, which is WaMu Mortgage Pass-Through Certificates Series 2006-AR12 Trust and will not represent interests in or obligations of Washington Mutual Bank, WaMu Asset Acceptance Corp., Washington Mutual, Inc., or any of their affiliates.

Neither these certificates nor the underlying mortgage loans are guaranteed by any agency or instrumentality of the United States.

This prospectus supplement may be used to offer and sell the offered certificates only if accompanied by the prospectus.

The WaMu Mortgage Pass-Through Certificates Series 2006-AR12 Trust will issue twenty-three classes of offered certificates and six classes of privately placed certificates. Each class of offered certificates will be entitled to receive monthly distributions of interest, principal or both, beginning on October 25, 2006. The certificate interest rate for some classes of offered certificates will be variable. The table on page S-6 of this prospectus supplement contains a list of the classes of offered certificates, including the initial class principal balance, certificate interest rate, and special characteristics of each class.

The primary asset of the Trust will be a pool of first-lien single-family residential mortgage loans whose interest rates (after an initial fixed-rate period) adjust annually. The Trust will also contain other assets, which are described on page S-29 of this prospectus supplement.

## Offered Certificates

| | |
|---|---|
| Total principal amount (approximate) | $1,694,778,749 |
| First payment date | October 25, 2006 |
| Interest and/or principal paid | Monthly |
| Last payment date | October 25, 2036 |

Credit enhancement for the Class 1-A1, Class 1-A2, Class 1-A3, Class 1-A4, Class 1-A5, Class 2-A1, Class 2-A2, Class 2-A3, Class 2-A4, Class 3-A, Class 4-A, Class 4-B1, Class 4-B2 and Class 4-B3 Certificates is being provided to these classes of privately offered certificates, which have an aggregate principal balance of approximately $... Credit enhancement for the Class 3-A1, Class 3-A2, Class 3-A3, Class 3-A4, Class 4-A1, Class 4-B2 and Class 4-B3 Certificates is being provided by three classes of privately offered certificates, which have an aggregate principal balance of approximately $24,098,83... Additional credit enhancement for the offered senior certificates is being provided by the related classes of offered subordinate certificates classes otherwise allocable to some senior certificates will instead be allocated to other senior certificates.

The underwriter listed below will offer the offered certificates at varying prices to be determined at the time of sale. The proceeds to WaMu Asset Acceptance Corp. from the sale of the offered certificates will be approximately ...% of the principal balance of the offered certificates, plus accrued interest, before deducting expenses. The underwriter's commission will be the difference between the price it pays to WaMu Asset Acceptance Corp. for the offered certificates and the amount it receives from the sale of the offered certificates to the public.

Neither the SEC nor any state securities commission has approved or disapproved of the offered certificates or determined that this prospectus supplement or the prospectus is accurate or complete. Any representation to the contrary is a criminal offense.

Underwriter

## WaMu Capital Corp.

September 22, 2006

[illegible] Fixed Income Search Results https://fixedincome.fidelity.com/ftgw/fi/FIIndividualBond[illegible]

Exhibit 435 pg 13

CUSTOMER SERVICE OPEN AN ACCOUNT REFER A FRIEND LOG OUT

Accounts & Trade | News & Insights | Research | Guidance & Retirement | Investment Products

- [illegible]
- [illegible]
- [illegible]
- Search Results
- Help/Glossary

# Bond Results

[illegible]

- Table View
- [illegible]
- [illegible]

[illegible]

Your Key Search Criteria

| | |
|---|---|
| Search Name | All to All All to All |
| Maturity Date | All |
| Moody's Rating | All to All |
| S&P Rating | All to All |
| Call Protection | All |
| Sinking Fund Protection | All |

IE: [illegible] SFP: Sinking Fund Protect[illegible] CP: [illegible] HY: High Yield SO: [illegible]

D: [illegible] ER: [illegible]

As of 01/12/2016 at 04:44 p.m.

## Total Bonds Found: 1

Select Action

| Description | Coupon | Maturity Date | Rating Moody's | Rating S&P | Bid Yield | Bid Price (Quantity) | Ask Price (Quantity) | Ask Yield to Worst | Yield to Maturity | Depth of Book | 3rd Party Prices/ Recent Trades | Attributes and Issuer Events | Action |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fidelity is not currently offering this security. [illegible] 2006-AR12 [illegible] 93[illegible] 10/25/2036 [illegible] (2006-AR12 [illegible]) | 2.431 | 10/25/2036 | NR | D | -- | --(--) | --(25) | -- | -- | | $8.377 -- | CP SFP HY | Buy Sell |

Select Action

Bond and CD prices, yields, and availability are time sensitive and subject to change based upon market conditions and other factors.

[illegible]

[illegible]

[illegible]

© 1998 - 2014 FMR LLC

35FL
M55

3010276954-001

Exhibit 435 pg 17

# ADJUSTABLE RATE NOTE
## (12-MTA Index - Payment and Rate Caps)

3010218954

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. MY MONTHLY PAYMENT INCREASES WILL HAVE LIMITS WHICH COULD RESULT IN THE PRINCIPAL AMOUNT I MUST REPAY BEING LARGER THAN THE AMOUNT I ORIGINALLY BORROWED, BUT NOT MORE THAN __110%__ OF THE ORIGINAL AMOUNT (OR $ __2,388,000.00__ ). MY INTEREST RATE CAN NEVER EXCEED THE LIMIT STATED IN THIS NOTE OR ANY RIDER TO THIS NOTE. A BALLOON PAYMENT MAY BE DUE AT MATURITY.

__JULY 14, 2006__                          __MIAMI__                          __FLORIDA__
                                            CITY                              STATE

__1820 NE 191TH STREET, NORTH MIAMI BEACH, FL  33160__
                        PROPERTY ADDRESS

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ __2,180,000.00__ plus any amounts added in accordance with Section 4 (G) below, (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is __WASHINGTON MUTUAL BANK, FA__. I will make all payments under this Note in the form of cash, check or money order. I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder".

## 2. INTEREST

Interest will be charged on unpaid Principal until the full amount has been paid. Up until the first day of the calendar month that immediately precedes the first payment due date set forth in Section 3 of this Note, I will pay interest at a yearly rate of __7.946__ %. Thereafter until the first Change Date (as defined in Section 4 of this Note) I will pay interest at a yearly rate of __1.250__ %. The interest rate required by this Section 2 and Section 4 of this Note is the Rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

(A) Time and Place of Payments

I will pay Principal and interest by making payments every month. In this Note, "payments" refer to Principal and interest payments only, although other charges such as taxes, insurance and/or late charges may also be payable with the monthly payment.

I will make my monthly payments on __1ST__ day of each month beginning on __SEPTEMBER, 2006__. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied to interest before Principal. If, on _____ the

**(A) Change Dates**

The interest rate I will pay may further change on the 1st day of
SEPTEMBER, 2006 , and on that day every month thereafter. Each such day is called a
"Change Date".

**(B) The Index**

On each Change Date, my interest rate will be based on an Index. The "Index" is the Twelve-Month
Average, determined as set forth below, of the annual yields on actively traded United States Treasury
Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the
Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The
Twelve-Month Average is determined by adding together the Monthly Yields for the most recently
available twelve months and dividing by 12.

The most recent Index figure available as of 15 days before each interest rate Change Date is called
the "Current Index". If the Index is no longer available, the Note Holder will choose a new index which is
based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding
THREE AND 218/1000
2.218 % ("Margin") to the Current Index. The Note Holder will then round the result of this addition
to the nearest one thousandth of one percentage point (0.001%). Subject to the limits stated in Section
4(D) below, this rounded amount will be my new interest rate until the next Change Date. In the event a
new index is selected, pursuant to paragraph 4(B), a new Margin will be determined. The new Margin will
be the difference between the average of the old Index for the most recent three year period which ends
on the last date the Index was available plus the Margin on the last date the old Index was available and
the average of the new Index for the most recent three year period which ends on that date (or if not
available for such three year period, for such time as it is available). This difference will be rounded to
the next higher 1/8 of 1%.

**(D) Interest Rate Limit**

My interest rate will never be greater than TEN AND 513/1000
percentage points 10.513 % ("Cap"), except that following any sale or transfer of the property which
secures repayment of this Note after the first interest rate Change Date, the maximum interest rate will
be the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of such
sale or transfer.

**(E) Payment Change Dates**

Effective every year commencing SEPTEMBER 01, 2007 , and on the same
date each twelfth month thereafter ("Payment Change Date"), the Note Holder will determine the amount
of the monthly payment that would be sufficient to repay the projected principal balance I am expected to
owe as of the Payment Change Date in full on the Maturity Date at the interest rate in effect 45 days
prior to the Payment Change Date in substantially equal payments. The result of this calculation is the
new amount of my monthly payment, subject to Section 4(F) below, and I will make payments in the new
amount until the next Payment Change Date unless my payments are changed earlier under Section
4(H) of this Note.

**(F) Monthly Payment Limitations**

Unless Section 4(H) and 4(I) below apply, the amount of my new monthly payment, beginning with a
Payment Change Date, will be limited to 7 1/2% more or less than the amount I have been paying. This
payment cap applies only to the principal payment and does not apply to any escrow payments Lender
may require under the Security Instrument.

32251 (11-01)

Page 2 of 5

less or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the maturity date in substantially equal payments. For each month that the monthly payment is less than the interest portion, the Note Holder will subtract the monthly payment from the amount of the interest portion and will ad the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the current interest rate. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the excess towards a principal reduction of the Note.

(H) Limit on My Unpaid Principal; Increased Monthly Payment

My unpaid principal can never exceed a maximum amount equal to _____110%____ of the principal amount original borrowed. In the event my unpaid Principal would otherwise exceed that ___110%____ limitation, I will begin paying a new monthly payment until the next Payment Change Date notwithstanding the 7 1/2% annual payment increase limitation. The new monthly payment will be an amount which would be sufficient to repay my then unpaid Principal in full on the maturity date at my interest rate in effect the month prior to the payment due date in substantially equal payments.

(I) Required Full Monthly Payment

On the ___FIFTH___ anniversary of the due date of the first monthly payment, and on that same day every ___FIFTH___ year thereafter, the monthly payment will be adjusted without regard to the payment cap limitation in Section 4(F).

(J) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

(K) Failure to Make Adjustments

If for any reason Note Holder fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time. I also agree not to hold Note Holder responsible for any damages to me which may result from Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies which I may have paid to partial Prepayment of unpaid Principal.

**5.   BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment". When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full prepayment or partial prepayments without paying any prepayment charge. The Note Holder will apply all of my prepayments to reduce the amount of principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the principal amount of the Note. If I make a partial prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial prepayment may have the effect of reducing the amount of my monthly payments, but only after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.



limits will be refunded to me. This Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**Miscellaneous Fees:** I understand that the Note Holder will also charge a return item charge in the event a payment that I make in connection with repayment of this loan is not honored by the financial institution on which it is drawn. The current fee is $ 15.00 . Lender reserves the right to change the fee from time to time without notice except as may be required by law.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of FIFTEEN calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000 % of my overdue payment of Principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 10 days after the date on which the notice is delivered or mailed to me (or, if the Federal National Mortgage Association or the Federal Home Loan Mortgage Corporation buys all or part of Lender's rights under the Security Instrument, in which case the notice will specify a date, not less than 30 days from the date the notice is given the Borrower).

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note, whether or not a lawsuit is brought, to the extent not prohibited by Applicable Law. Those expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

Unless Applicable Law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety, or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety, or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.



Exhibit #35 Pg 21

3010215559

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

[illegible] in the Property is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) the request to assume is made after one year following recordation of the Deed of Trust, (b) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (c) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument or other obligations related to the Note or other loan document is acceptable to Lender, (d) Assuming party executes Assumption Agreement acceptable to Lender at its sole choice and discretion, which Agreement may include an increase to Cap as set forth below and (e) payment of Assumption Fee if requested by Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption and Lender may increase the maximum rate limit to the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of the transfer. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender has entered into a written Assumption Agreement with transferee and formally releases Borrower.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**12. MISCELLANEOUS PROVISIONS**

In the event the Note Holder at any time discovers that this Note or the Security Instrument or any [illegible] (collectively the "Loan Documents") contains an error which was caused by a clerical or ministerial mistake, calculation error, computer error, printing error or similar [illegible] the Note Holder to reexecute any Loan Documents

PURCHASE AND ASSUMPTION AGREEMENT
AMONG
FEDERAL DEPOSIT INSURANCE CORPORATION,
Receiver of Washington Mutual Bank
Henderson, NV
and
JPMorgan Chase Bank, National Association, Seattle, WA
DATED AS OF
September 25, 2008

AMENDMENT TO ARTICLE I
FINAL SETTLEMENT DATE

Pursuant to Article I: "means the first Business Day immediately prior to the day which is one hundred eighty (180) days after Bank Closing, or such other date prior thereto as may be agreed upon by the Receiver and the Assuming Bank. The Receiver, in its discretion, may extend the Settlement Date."

The purpose of this Amendment is to extend the time period for the Final Settlement to August 30, 2010.

FEDERAL DEPOSIT INSURANCE CORPORATION,
Receiver of Washington Mutual Bank

BY: _____  6/16/10
    John B. Eveland        Date
    Manager
    Receivership Oversight

Exhibit 436



CFN 2007R0438403
OR Bk 25590 Pgs 1174 - 1175? (2pcs)
RECORDED 05/04/2007 11:03:59
HARVEY RUVIN, CLERK OF COURT
MIAMI-DADE COUNTY, FLORIDA

space reserved for recording information

## IN THE CIRCUIT COURT OF THE 11th JUDICIAL CIRCUIT
## OF FLORIDA, IN AND FOR MIAMI-DADE COUNTY

Washington Mutual Bank

Plaintiff,

-vs-

Kurt Maria; George Garcia; Jeffrey Levitin,
As Trustee; Wexford High Yield Debt Fund I,
LLC; Simi Hadad; Unknown Parties in
Possession #1; Unknown Parties in
Possession #2; If living, and all Unknown
Parties claiming by, through, under and
against the above named Defendant(s) who
are not known to be dead or alive, whether
said Unknown Parties may claim an interest
as Spouse, Heirs, Devisees, Grantees, or
Other Claimants

Defendant(s).

Case #:
Division #:   07-12402 CA 02

UNC:

## NOTICE OF LIS PENDENS

TO:   THE ABOVE NAMED DEFENDANT(S) AND ALL OTHERS WHOM IT MAY
CONCERN:

YOU are hereby notified that suit was instituted by the above-named Plaintiff against the
above-named Defendant(s) on April 25, 2007, in the above styled cause, involving the following
described property, situated, lying and being in Miami-Dade County, Florida, to-wit:

Exhibit 43.6 Pg 2

OR BK 25580 PG 1175
LAST PAGE

LOT 8, BLOCK 6, EASTERN SHORES 1ST ADDITION, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 65, PAGE 39, OF THE PUBLIC RECORDS OF MIAMI-DADE COUNTY, FLORIDA.

Relief sought as to such property is for foreclosure of mortgage held by Plaintiff against the premises.

YOU will, therefore, please govern yourselves accordingly.

By: _____
COLLEEN M. COLTON
FL Bar #0015167

SHAPIRO & FISHMAN, LLP
Attorneys for Plaintiff
2424 North Federal Highway
Suite 360
Boca Raton, Florida 33431
Telephone: (561) 998-6700
Fax: (561) 998-6707

07-76750B

-vs-

Kurt Marin; George Garcia; Jeffrey Levitin,
As Trustee; Wexford High Yield Debt Fund I,
LLC; Sima Hadad; Unknown Parties in
Possession #1; Unknown Parties in
Possession #2; If living, and all Unknown
Parties claiming by, through, under and
against the above named Defendant(s) who
are not known to be dead or alive, whether
said Unknown Parties may claim an interest
as Spouse, Heirs, Devisees, Grantees, or
Other Claimants

Case #:

DIV/CLK #:

UNC:

_____ Defendant(s).

## COMPLAINT

Plaintiff, Washington Mutual Bank sues Defendant(s); Kurt Marin; George Garcia;
Jeffrey Levitin, As Trustee; Wexford High Yield Debt Fund I, LLC; Sima Hadad; Unknown
Parties in Possession #1; Unknown Parties in Possession #2; If living, and all Unknown Parties
claiming by, through, under and against the above named Defendant(s) who are not known to be
dead or alive, whether said Unknown Parties may claim an interest as Spouse, Devisees,
Grantees, or Other Claimants, and states:

## GENERAL ALLEGATIONS

1.     On July 14, 2006, there was executed and delivered a promissory note and a
mortgage securing payment of said note to the payee named thereon. The mortgage was
recorded in Official Records Book 24735, Page 2788, of the Public Records of Miami-Dade

0



Exhibit 43/pg2

County, Florida, and mortgage the property described therein, then owned by said in possession of mortgagor, a copy of the mortgage is attached thereto as composite Exhibit "A".

2.    Plaintiff is the owner and holder of the subject note and mortgage;

3.    The mortgage of the Plaintiff is a purchase money mortgage being a lien superior in dignity to any prior or subsequent right, title, claim, lien or interest arising out of mortgagor or the mortgagor's predecessors in interest.

4.    There has been a default under the covenants, terms and agreements of the note and mortgage in that the payment due January 1, 2007, and all subsequent payments, have not been paid.

5.    Plaintiff declares the full amount payable under the note and mortgage to be due;

6.    A principal balance of $2,195,601.68 is due and owing to the Plaintiff, with interest from and after December 1, 2006, and title search expenses for ascertaining necessary parties to this action.

7.    In order to protect its security, the Plaintiff may have advanced and paid Ad Valorem taxes, premiums on insurance required by the mortgage and other necessary costs, or may be required to make such advances during the pendency of this action. Any such sum so paid will be due and owing Plaintiff;

8.    All conditions precedent to the acceleration of this mortgage note and to foreclosure of the mortgage have been fulfilled or have occurred.

9.    The record legal title to said mortgage property is now vested in Defendant(s) Kurt Marin.

10.    For purposes of collection and foreclosure, the Plaintiff has retained the undersigned attorney and is obligated to pay said attorney a reasonable fee for services rendered.

12.     Plaintiff realleges and reincorporates paragraphs 1 through 10 above as is fully set forth herein.

13.     That the Defendant, George Garcia, might have some claim or demand in the subject property by virtue of a Mortgage, in the amount of $155,000.00, dated July 14, 2006, filed in Official Records Book 24735, Page 2810, of the Public Records of Miami-Dade County, Florida and all other rights, claims, liens, interest, encumbrances and equities, either recorded or unrecorded, if any in the subject real property.  The above-described interest of said Defendant(s) in the subject property is inferior to the interest of the Plaintiff in said property.

14.     That the Defendant, Jeffrey Levitin, As Trustee, might have some claim or demand in the subject property by virtue of a Lis Pendens, filed in Official Records Book 25143, Page 1399, of the Public Records of Miami-Dade County, Florida and all other rights, claims, liens, interest, encumbrances and equities, either recorded or unrecorded, if any in the subject real property.  The above-described interest of said Defendant(s) in the subject property is inferior to the interest of the Plaintiff in said property.

15.     That the Defendant, Wexford High Yield Debt Fund I, LLC, might have some claim or demand in the subject property by virtue of a Lis Pendens, filed in Official Records Book 25466, Page 1809, of the Public Records of Miami-Dade County, Florida and all other rights, claims, liens, interest, encumbrances and equities, either recorded or unrecorded, if any in the subject real property.  The above-described interest of said Defendant(s) in the subject property is inferior to the interest of the Plaintiff in said property.

Exhibit 437 Pg4

16.     That the Defendant, Sina Hadad, might have some claim or demand in the subject property by virtue of a all interest, if any in the subject mortgage herein as to marital interest or homestead interest and as signatory therein, and by virtue of a Lis Pendens, filed in Official Records Book 25466, Page 1803, of the Public Records of Miami-Dade County, Florida and all other rights, claims, liens, interest, encumbrances and equities, either recorded or unrecorded, if any in the subject real property. The above-described interest of said Defendant(s) in the subject property is inferior to the interest of the Plaintiff in said property.

17.     That the Defendants, UNKNOWN PARTIES IN POSSESSION #1 AND UNKNOWN PARTIES IN POSSESSION #2, might have some claim or demand in the subject real property by virtue of possession, whether by tenancy from the record title holder or more post-sale only.

WHEREFORE, Plaintiff respectfully request this Honorable Court enter a judgment of foreclosure, award attorney fees, costs, interests, advances and for such other and further relief that this court deems just and proper.

## COUNT II (REESTABLISHMENT OF LOST NOTE)

18.     This is an action to reestablish a Promissory Note under F.S. 673.3091.

19.     Plaintiff hereby realleges and reasserts all the allegations contained in Paragraphs 1 through 10 herein.

20.     On July 14, 2006, at Miami-Dade County, Florida, there was executed and delivered to Washington Mutual Bank, F.A. a Promissory Note and Mortgage in favor of Washington Mutual Bank, F.A., in the principal amount of $2,185,000.00.

21.     The original Note was lost, and said document is no longer within the custody or control of the Plaintiff.

22.     Plaintiff knows of no parties except the Plaintiff and Defendants who are interested in the reestablishment of said document.

WHEREFORE, Plaintiff demands judgment foreclosing the mortgage; and demands an Order reestablishing said lost documents; and if the proceeds of the sale are insufficient to pay Plaintiff's claim, a deficiency judgment, unless any defendant personally liable shall have been discharged from liability under the subject note pursuant to the provisions of the Bankruptcy Code 11 U.S.C. Section 101, et. seq.

By: _____
COLLEEN M. COLTON
FL Bar # 0015167

SHAPIRO & FISHMAN, LLP
Attorneys for Plaintiff
2424 North Federal Highway
Suite 360
Boca Raton, Florida 33431
Telephone: (561) 998-6700
Fax: (561) 998-6707

THIS IS AN ATTEMPT TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.
07-767305

Ms. Penny Marshall
Office of Thrift Supervision
101 Stewart Street, Suite 1010
Seattle, WA 98101

Re:   Change of Corporate Title

Dear Ms. Marshall:

Washington Mutual Bank, FA (the "Association") proposes to change its corporate title to "Washington Mutual Bank." The Association is providing this notice to the OTS under OTS regulations as codified at 12 C.F.R. § 543.1(b), 12 C.F.R §552.4(b)(1) and 12 C.F.R. §552.5(b)(2).

Responding to the Association's October 15, 2004, notice about an amendment of the Association's bylaws to state specifically that the Association may do business under the name, "Washington Mutual Bank," Mr. Dyer of the OTS confirmed in his October 21, 2004, letter that the OTS would not object to the bylaw amendment as proposed. On December 21, 2004, the Association's board of directors approved the bylaw amendment, to become effective upon the merger between the Association's acquisition, by merger, of its sister federal savings bank, which had the corporate title of Washington Mutual Bank. This merger was consummated on January 1, 2005.

The Association now proposes to take the additional step of actually changing its corporate title to Washington Mutual Bank. A copy of certain resolutions to be submitted to the Association's board of directors for this purpose is enclosed. The first resolution would amend Section 1 of the Association's Federal Stock Charter (No. 4539) to read as follows:

Section 1.   Corporate Title.  The corporate title of the savings bank is Washington Mutual Bank.

The second resolution, as shown on the enclosure, would amend Article I, Section 1 of the Association's bylaws to read as follows:

Section 1.   Corporate Title and Name.  The corporate title of the savings bank is Washington Mutual Bank. The savings bank also may do business under the name Washington Mutual Bank, FA.

Both of these amendments would become effective as of April 4, 2005.

Thank you for your consideration. If you have any questions or comments, please do not hesitate to call me at 461-3140.

Sincerely,

William Lynch

cc:   John Robinson
Enclosure

Exhibit 439

# William J. Paatalo

Private Investigator – Oregon PSID# 49411

BP Investigative Agency, LLC

P.O. Box 838

Absarokee, MT 59001

(406) 328-4075

Bill.bpia@gmail.com

## Curriculum Vitae

William Paatalo has been a licensed private investigator since September of 2009. He has 17 years combined experience in both law enforcement and the mortgage industry which he has utilized to become a leading expert in the areas of chain of title analysis and securitization. He was a police officer with the St. Paul, Minnesota Police Department from 1990-1996 where he was assigned "Field Training Officer" duties in only his second year on the job, and also received multiple commendations.

Mr. Paatalo worked in the mortgage industry as a "loan officer" with Conseco Home Finance from 1999 – 2000, followed by two years of being a branch manager for multiple mortgage brokering firms. From 2002 – 2008, he became the President of Midwestern Mortgage, LLC f/k/a Wissota Mortgage, LLC in Wisconsin and Minnesota. As President of Wissota Mortgage, LLC, Mr. Paatalo was responsible for overseeing the origination, processing, and underwriting of mortgage loans, as well as managing a staff of 17 employees.

Mr. Paatalo has worked exclusively since 2010 investigating foreclosure fraud, chain of title, the securitization of residential and commercial mortgage loans, and accounting issues relevant to alleged "defaults." Mr. Paatalo is also a Certified Forensic Mortgage Loan Auditor through ("CFLA"), and has spent more than 10,000 hours conducting investigatory research specifically related to mortgage securitization and chain of title analysis. He has performed such analyses for residential real estate located in many states, including but not limited to, Washington, Oregon, California, Nevada, Florida, Montana, Texas, Arizona, Ohio, New Jersey, and several other states. To date, Mr. Paatalo has conducted nearly 900 investigations and has provided written

Exhibit 439 pg. 2

expert testimony in the form of affidavits and declarations in approximately 99 -100 cases nationwide. Mr. Pastalo has been qualified in both state and federal courts as an expert, and personally appeared and testified at trial in the four cases outlined below. This experience has lead to Mr. Pastalo becoming one of the leading experts in this relatively new field.

Mr. Pastalo's specific areas of expertise allowed by the courts in the cases referenced below are as follows:

- Knowledge of the "Pooling & Servicing Agreements" and various Securities & Exchange Commission (SEC) filings associated with mortgage-backed securitized trusts.
- Specific language in the PSA's and Prospectus / Prospectus Supplement involving securitization participants, key dates, "Servicer Advances," sources of third-party payments, and transfer and conveyancing requirements to name a few.
- Knowledge and use of ABSNet, and the interpretation of its internal accounting data showing "advance payments" made to the certificateholders / investors, as well as other information specific to accounting, chain of title, and other aspects of securitization.
- Chain of Title analysis based upon publicly recorded documents, documents produced in discovery, and documents attached as exhibits to foreclosure complaints. Documents typically include mortgages, deeds of trust, assignments, notes, and allonges, in addition to documents filed under penalty of perjury with the SEC.

**Relevant Experience:**

- Police Officer / "Field Training Officer" – St. Paul, MN 1990-1996.
- Oregon Licensed private investigator under ORS 703.430; and has met the necessary requirements under ORS 703.411. To obtain his PI license, Mr. Pastalo met the requirement of 5,000 hours of investigation experience in the law enforcement field, and passed a thorough background investigation and criminal history check.
- Member of the "Oregon Association of Licensed Investigators" (OALI)
- President of Midwestern Mortgage, LLC f/k/a Wissota Mortgage, LLC in Wisconsin and Minnesota from 2002 – 2008.

Exhibit 439 Pg3

**Education:**

A.A.S. – Law Enforcement – Normandale C.C., Bloomington, MN – 1986
Marketing Management Certificate – Concordia University, St. Paul, MN 2001
Forensic Loan Auditor Certification Training Course (CFLA) – 32 hrs. – San Diego, CA 2011

**Expert Testimony (Trial):**

### FEDERAL CASES

*Robert T. Ranstrom, Debtor – U.S. Bankruptcy Court, District of Montana – BK Case No. 10-61660*

*Rivera v. Deutsche Bank National Trust Company, U.S. BK Court, Northern CA – Oakland – Case No. 14-34193-MEH-13.*

### STATE CASES

### OHIO

*Washington Mutual Bank fka Washington Mutual Bank, F.A. v. Jon A. Smetana, et al. In The Court of Common Pleas, Cuyahoga County, Ohio Case No. CV-08-582392.*

### OREGON

*U.S. Bank, N.A. as Trustee v. Natasha D. Rinehard-Guirma, et al. – Circuit Court For The State Of Oregon, County Of Multnomah – Case No. 1112-16030*

Exhibit 440

# JPMorgan Chase & Co.

Press Release | Next Release

September 25, 2008

## JPMorgan Chase Acquires the Deposits, Assets and Certain Liabilities of Washington Mutual's Banking Operations

Highly attractive, strategic transaction significantly strengthens consumer franchise

Deal expected to be accretive to earnings immediately. Adds large, stable deposit base and recurring earnings stream to company.

Company intends to raise additional capital in conjunction with this transaction to maintain strong capital position.

- Acquisition creates largest U.S. depository institution, with over $900 billion of customer deposits
- Expands branch network in California, Florida and Washington State and creates the second-largest branch network in the U.S.
- Strengthens existing presence in New York, Texas, Florida, Arizona, New Jersey, Colorado, Connecticut and Utah
- Larger branch footprint will allow company to further extend and grow commercial banking, business banking, credit card, consumer lending and wealth management efforts

New York, Sept. 25, 2008 — JPMorgan Chase & Co. (NYSE: JPM) today announced it has acquired deposits, assets and certain liabilities of Washington Mutual's banking operations from the Federal Deposit Insurance Corporation (FDIC), effective immediately. Excluded from the transaction are the senior unsecured debt, subordinated debt, and preferred stock of Washington Mutual's banks. JPMorgan Chase will not be acquiring any assets or liabilities of the banks' parent holding company (WMI) or the holding company's non-bank subsidiaries. As part of this transaction, JPMorgan Chase will make a payment of approximately $1.9 billion to the FDIC.

The acquisition expands Chase's consumer branch network into the attractive states of California, Florida and Washington State and adds many banking centers to the nation's encouraging branch network, with locations adding 42% of the U.S. population. The combined 5,400 branches in 23 states will also create the nation's largest branch banking network, and will also serve as an excellent base to extend the reach of the business banking, commercial banking, credit card, consumer lending and wealth management businesses. The acquisition also extends Chase's retail branch network to additional states, including Georgia, Idaho, Nevada and Oregon.

The acquisition of Washington Mutual's banking operations is expected to be immediately accretive to earnings and to add more than $50

JPJ investor/price Agency
9-25-08

Exhibit 440 pg2

Exhibit 7 440 pgs

## What Washington Mutual Customers Should Know and Do

Branch data is as of September 18, 2008

| Branches | 25.5% | 83.0% | 44.9% |
|---|---|---|---|
| US Population in Footprint | 76.0mm | 94.1mm | 139.8mm |
| By US Population Growth Rate ('07-'12) | 3.3% | 5.6% | 4.9% |
| % of Population Growth in Footprint | 18.0% | 37.0% | 45.2% |

- Feel confident that their deposits are secure.
- Continue banking as you have — assured that your bank is now backed by the strength and security of JPMorgan Chase
- Continue to use the same checks. All checks will be processed as usual
- Continue to use the same account numbers
- Continue to use the same ATM card and credit card
- Continue to use the same ATMs
- Continue to use the same branches
- Continue paying your mortgage and credit card as you have. Checks should be made payable the same as they have been in the past, and payment amounts remain unchanged
- Continue using the same contact phone numbers, online service and websites
- Know that you will learn of a series of improvements, additional conveniences and other changes

Copyright 2008 JPMorgan Chase & Co.

cents per share in 2009. JPMorgan Chase expects to incur pretax merger costs of approximately $1.5 billion, cost savings of approximately $1.5 billion by 2010, net of significant investments in the business. The bank integrations and rebranding by year-end 2010, closing less than 10% of branches in the combined network.

In conjunction with this acquisition, JPMorgan Chase will be marking down the acquired loan portfolio by approximately primarily represents our estimate of remaining credit losses related to the impaired loans. JPMorgan Chase in connection with this transaction to maintain the company's strong capital position.

"This deal makes excellent strategic sense for our company and our shareholders. Our people have worked and balance sheet – making this compelling transaction possible," said Jamie Dimon, Chairman and CEO. "increasing our regional banking presence not only strengthens our Retail business, but also benefits other including our commercial banking, business banking, credit card, and asset management groups."

"JPMorgan Chase is strongly committed to both a strong banking system and our responsibility as a good the states and local communities where we do business," Dimon said. In July, the bank earned an outstand Comptroller of the Currency for the company's work helping families buy homes, financing small business better.

"We look forward to welcoming Washington Mutual's employees to JPMorgan Chase and working with the together," Dimon added.

"This acquisition makes us more convenient and valuable to our customers and meets our strategic goal our current and future customers better," said Charlie Scharf, head of Chase's Retail business. He added Mutual customers will be able to take advantage of Chase's broader network and a wider product range - security of JPMorgan Chase." Over time, Chase will provide more personal bankers, business bankers, to serve the needs of Washington Mutual customers and to expand their relationship with Chase.

Customers of both companies may continue banking as usual, and feel confident that their deposits are and security of JPMorgan Chase. Employees and vendors should continue to operate business as usual.

Chase expects to convert Washington Mutual's consumer banking, home lending and credit card business technology platforms over the next two years. Chase and Washington Mutual customers should be able 14,000 ATMs without fees in the coming months.

About JPMorgan Chase

JPMorgan Chase & Co. (NYSE: JPM) is a leading global financial services firm with assets of $2.0 trill countries. The firm is a leader in investment banking, financial services for consumers, small business transaction processing, asset management, and private equity. A component of the Dow Jones Industrial millions of consumers in the United States and many of the world's most prominent corporate, institution JPMorgan and Chase brands. Information about the firm is available at www.jpmorganchase.com.

JPMorgan Chase will host a conference call at 9:15 a.m. (Eastern Time) today, September 26, 2008, t

Exhibit 441

**In Re:**

*JAMES MADISON KELLEY v.*

*JPMORGAN CHASE BANK*

*DEPOSITION OF CRYSTAL DAVIS*
*August 13, 2014*



Toll Free   866.760.DEPO
Main        408.371.0484
Fax         408.371.0402
www.torreano-depos.com
torreano-depos@sbcglobal.net

BP Investigative Agency
Exhibit 2

IN THE UNITED STATES BANKRUPTCY COURT
[illegible] DISTRICT OF CALIFORNIA - DIVISION 5

In Re:
[illegible] ) Chapter 11
) BK. Case No.
Debtor, ) 10-[illegible]

[illegible] ) Hon. [illegible]
Plaintiff, )
vs. )
JPMORGAN CHASE BANK, NA, )
[illegible], )
[illegible] )
Defendants. )

DEPOSITION
OF CRYSTAL DAVIS

Taken at [illegible]
[illegible] Road
[illegible], Ohio
on August [illegible], [illegible], at [illegible] a.m.

Reported by: [illegible]

-o0o-

APPEARANCES:

[illegible] Kelley
[illegible] Lane
[illegible], CA [illegible]
[illegible]
[illegible]@ymail.com

Pro Se,

[illegible]
[illegible]
[illegible] Plaza, Suite [illegible]
[illegible], California [illegible]
[illegible]
[illegible].com

on behalf of the Defendants.

-o0o-

STIPULATION

It is stipulated by and between counsel for the respective parties that the deposition of CRYSTAL DAVIS, the witness herein, called by the Plaintiff under the applicable Rules of Federal Civil Court Procedure, may be taken at this time by the notary pursuant to notice; that said deposition may be reduced to writing in stenotypy by the notary, whose notes thereafter may be transcribed out of the presence of the witness; and that the proof of the official character and qualification of the notary is waived.

-o0o-

INDEX OF EXAMINATION

| | PAGE |
|---|---|
| BY MR. KELLEY: | [illegible] |

INDEX OF EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Excerpts from Purchase and Assumption Agreement | 17 |
| 2 | [illegible] report | [illegible] |
| 3 | Accounting for [illegible] Loans or Debt Securities | 27 |
| 4 | 10-Q | [illegible] |
| 5 | Office of Thrift Supervision Fact Sheet | [illegible] |
| 6 | Notes to Consolidated Financial Statements | [illegible] |
| 7 | [illegible] | [illegible] |
| 8 | [illegible] guidelines | [illegible] |
| 9 | [illegible] [redacted] | [illegible] |
| 10 | Loan history | [illegible] |
| 11 | Loan Transfer [illegible] | [illegible] |
| 12 | Account activity | [illegible] |
| 13 | Summary of [illegible] transactions | [illegible] |
| 14 | Spreadsheet | 57 |

**Page 5**

1  
2          CRYSTAL DAVIS
3  being first duly sworn, as hereinafter
4  certified, deposes and says as follows:
5          EXAMINATION
6  BY MR. KELLEY:
7     Q.  This is the deposition of Crystal Davis
8  in the Kelley versus JPMorgan Chase Bank in a
9  case.  Court?
10         My name is James Kelley, and I'm the
11 plaintiff in the case.  I guess we have
12 Christopher Yeo from Alvarado Smith, outside
13 attorney for Chase, and Crystal Davis -- right?
14    A.  Yeah.
15    Q.  -- present.  So I'm just going to start
16 out by just asking you a little bit about your
17 background.  You don't have to go back to grade
18 school.
19    A.  Okay.
20    Q.  So your -- first of all, what's your
21 educational background?
22    A.  I graduated high school.
23    Q.  Okay.
24    A.  And I had some college.  I studied
25 English at OSU Newark.  Did not graduate, did

**Page 6**

1  not get a degree.
2     Q.  Okay.  Did you take any courses in
3  accounting?
4     A.  I did not.
5     Q.  You did not.  Okay.
6         What is your current job function?
7     A.  Associate controller.
8     Q.  Okay.
9     A.  Well, that's the title.
10    Q.  And what are -- what does that entail?
11    A.  I supervise a department of accountants
12 who manage the corporate advance reconciliation.
13    Q.  How many people do that?
14    A.  I have -- under me, I have eight
15 employees.
16    Q.  Eight.
17    A.  Accountants.
18    Q.  And this is at the Polaris facility?
19    A.  No, Easton.
20    Q.  Easton facility.  Okay.
21         And how did you come to that position
22 with an English background?
23    A.  So I worked at Harry & David Corporation
24 for seven years where I learned accounting and

**Page 7**

1  did payroll.
2     Q.  Okay.  So you have a practical
3  background?
4     A.  Yes.
5     Q.  Okay.  And when did you join Chase?
6     A.  2005.
7     Q.  2005.  Okay.
8         So you've been there for a while?
9     A.  Nine years.
10    Q.  Nine years.  Okay.
11         And what position did you start in at
12 Chase?
13    A.  I started at an entry-level treasury
14 accounting position.
15    Q.  Okay.
16    A.  So I managed just cash flow in the fed.
17    Q.  And how did you progress from there?
18    A.  I was in that position about two years,
19 and then I got an offer for a different position
20 within the REO accounting group, and I went to
21 that accounting group, and then got another
22 position in the corporate advance accounting
23 several years after that.
24    Q.  Okay.  So how long have you been in

**Page 8**

1  corporate advance accounting?
2     A.  I have been there for two years.
3     Q.  Two years.
4     A.  Uh-huh.
5     Q.  Okay.  So how long were you -- so prior
6  to corporate advance accounting, what were
7  you -- what were you doing?  I'm not quite
8  clear.
9     A.  REO accounting, so real estate owned.
10 We managed all the accounting for that, all the
11 REO sales.
12    Q.  And what kind of software do you use for
13 your accounting?
14    A.  Mainly MSP.
15    Q.  So you are using MSP?
16    A.  Uh-huh.
17    Q.  Any other?
18    A.  We use SAP.
19    Q.  SAP.  Okay.  That's a pretty well known
20 software brand.
21    A.  Yes.
22    Q.  Anything else?
23    A.  That's it for accounting.
24    Q.  Pretty much it?

DEPOSITION OF CRYSTAL DAVIS

JAMES MADISON HOLDING v.
JPMORGAN CHASE BANK

**Page 9**

```
 1    A.  Correct.
 2    Q.  Okay.  So just that I know general ledger
 3    experience?
 4         MR. YONO:  Objection.  Vague and
 5    ambiguous.
 6    Q.  General ledger meaning?
 7    A.  Well, you know, starting from the
 8    general ledger down to the sub-ledger.
 9    A.  So all of our sub-ledgers are part of
10    the general ledger.
11    Q.  Sure.
12    A.  So I do have experience within specific
13    accounts of the general ledger.
14    Q.  Probably characterized as RBO -- the 745
15    subaccounts are -- you consider those RBO?
16    A.  Together in.  So 745 is any kind of
17    suspense adjustment.
18         So -- I'm guessing a little bit more
19    than that is correct.
20    Q.  So are you the only group doing that
21         MR. YONO:  Objection.  Vague and
22    ambiguous as to "doing this."
23    Q.  Are you the only operational group doing
24    corporate adjustments in this area --
```

**Page 10**

```
 1    A.  No.
 2    Q.  -- or are there other groups like
 3    yours?
 4    A.  There are other groups like mine.
 5    Q.  That you know of, right?
 6    A.  Yes.
 7    Q.  Okay.
 8    Q.  How many other groups?
 9    A.  I don't specifically know.  Scores.
10    Q.  Is that?
11         MR. YONO:  Objection.  Asked and
```

**Page 11**

```
 1    A.  Yes.
 2    Q.  I'm going to -- one reason for this
 3    deposition is that Ms. Smith, who was a 30(b)(6)
 4    witness in this case, indicated that she spoke
 5    with you probably several months ago.  Do you
 6    recall talking to Ms. Smith?
 7    A.  I do.
 8    Q.  Okay.  Could you tell me approximately
 9    how much time you spent talking with her?
10    A.  It was very brief.  Our phone
11    conversation was brief.  So probably five, ten
12    minutes.
13    Q.  Okay.  And what did he want to know?
14    A.  He was asking me specifically about the
15    reason codes on the DDA/GL section and what they
16    represented.
17    Q.  And that would be codes like LBO and
18    stuff like that?
19    A.  Correct.
20    Q.  And we'll get back to those.
21         Did you talk with anyone in preparation
22    for this deposition today?
23    A.  Anyone within Chase?
24    Q.  Well, anyone, about this deposition.
```

**Page 12**

```
 1    A.  Yes.
 2    Q.  Okay.  Like who?
 3    A.  I spoke to Thomas Yono from the --
 4    Q.  Thomas Yono?
 5    A.  Yes.
 6    Q.  Okay.
 7    A.  And I spoke to Amee Fike -- I forget
 8    what her last name is.  Fitzpatrick.
 9    Q.  Is that an Amanda Smith employee?
10         MR. YONO:  She's in-house counsel with
```

Page 12

1   what they were for?
2       A.  Only certain transactions he asked
3   about.
4       Q.  Okay.  Well, yeah, there are several
5   different types of transactions.  We'll get in
6   the details later.
7           So how much time did you spend speaking
8   with Mr. Yoo in preparation for the deposition?
9       A.  I got here at 8:15.
10      Q.  This is the first time?
11      A.  Yes.
12      Q.  Okay.  Sometimes they do it over the
13  phone.
14          The other thing is, did you review any
15  documents in preparation for this deposition?
16      A.  I did.
17      Q.  Okay.  Could you tell me which ones they
18  were?
19      A.  There were a lot.  I don't know
20  specifically.  I did review the transcript.
21          MR. YOO:  She's talking the deposition
22  transcript.
23      Q.  You mean Smith?
24      A.  Mr. Smith, yeah.

Page 13

1          MR. YOO:  I don't recall that, so my
2   objection stands.  I'm not instructing her not
3   to answer.  I'm just simply inserting objections
4   as to the general legal conclusions you're
5   making as to what all those entities are or are
6   not and whether those entities were under
7   receivership or not.
8          MR. KELLEY:  Those are legal
9   conclusions.  I think they're statements of
10  fact.  It's well known.
11         MR. YOO:  All right.  According to you.
12         MR. KELLEY:  Okay.
13  BY MR. KELLEY:
14      Q.  So anyway --
15         MR. YOO:  I think it would be -- I think
16  it would speed up the deposition -- I'll let you
17  ask any questions that you have for my witness,
18  and just let me insert any objections without
19  going back and forth.  Because they're
20  ultimately for the Court to decide at the time
21  of trial.  Whenever you intend to introduce
22  Ms. Davis' testimony, the Court will have to
23  determine whether my objection is valid or not.
24  So why don't we simply --

Page 14

1       Q.  I've got one here.  I got the brief
2   form.
3       A.  And then the print screens, DDCH
4   history, and I think that's all I reviewed.
5       Q.  Okay.  Did you look at the payee codes?
6       A.  Uh-huh.  I did.
7       Q.  Are you familiar with the payee codes?
8       A.  I am.
9       Q.  Okay.  Good.
10          Because there's been some ambiguity in
11  the previous depositions, a little confusion --
12  it's not just here.  It's everywhere -- I'm
13  going to ask that when we refer to a -- that we
14  escape the term WAMU, because WAMU is a logo.
15  It's not a corporation.  So I'll refer to
16  Washington Mutual Bank when I mean Washington
17  Mutual Bank.  I'll refer to Washington Mutual
18  Bank FA when I mean Washington Mutual Bank FA.
19  And similarly, Washington Mutual Bank FSB, which
20  was not a subject of a receivership.
21         MR. YOO:  Objection.  Assumes facts not
22  in evidence.
23         MR. KELLEY:  I believe it is in evidence
24  in the Smith deposition already.

Page 15

1          MR. KELLEY:  I understand.
2          MR. YOO:  I'm not going to interrupt
3   you and it will probably help me if you don't
4   retort my objection.  Because it's really
5   irrelevant to the deposition of Ms. Davis.  That
6   way it will go faster.  Ask your questions.
7   I'll object.  If I have think that she shouldn't
8   answer something, I'll instruct her not to
9   answer.  We'll let the Court decide.  I have no
10  intention of instructing her not to answer any
11  questions at this time unless the question is
12  improper.  But if you simply ask your questions,
13  let me insert my objections for the record.  If
14  I don't say anything more than objection, I'm
15  not instructing her not to answer.  So it will
16  go much quicker.  Rather than retorting whether
17  my objection is proper or improper.  We're
18  wasting more time, you and me, cluttering the
19  record rather than you simply retorting to my
20  objections.
21         MR. KELLEY:  Okay.  Let's move on.
22  BY MR. KELLEY:
23      Q.  I'm going to introduce into evidence
24  some documents here.  This is part of the -- to

Page 17

1  make things clearer, these are excerpts from the
2  purchase and assumption agreement between the
3  FDIC receiver and JPMorgan Chase Bank.
4        --o--
5      (Deposition Exhibit 1 marked.)
6        --o--
7  Q.  On page 1 of the exhibit the term "book
8  value" is defined.  And could you read that over
9  and see if--
10      MR. YOO:  Let the record reflect that
11  page 1 of Exhibit 1 appears -- is identified by
12  page 3.
13      MR. KELLEY:  Of the purchase and
14  assumption agreement, yes.
15      MR. YOO:  What Mr. Kelley represents is
16  that a portion of the purchase and assumption
17  agreement, and the book value is the first
18  paragraph of page 1 of Exhibit 1 -- or page 3,
19  which is the first page of Exhibit 1.
20      MR. KELLEY:  You're right.
21  A.  Okay.
22  Q.  So the main interest here, I guess, is
23  they're saying book value means with respect to
24  any asset or any liability assumed.

Page 18

1      MR. YOO:  Objection.  The document
2  speaks for itself.
3  Q.  So I want to make the distinction
4  between assets with book value and liabilities
5  with book value, just for precision.
6  Okay.  Page 2.
7      MR. YOO:  Of Exhibit 1.
8  Q.  Yes.  Exhibit 1, which is page 5 of the
9  purchase and assumption agreement.  I
10  highlighted loans, and here they're defining
11  what loans the agreement applies to.  And could
12  you read that over and just make sure you got
13  it.
14  A.  Uh-huh.
15  Q.  Under 2, which is a subparagraph to
16  loans, it says, "Loans (including loans which
17  have been charged off the Accounting Records of
18  the Failed Bank in whole or in part prior to
19  Bank Closing)..."
20  And then it goes on and it says,
21  "participation agreements, interest in
22  participations, overdrafts of customers,"
23  et cetera.  I'm not so much interested in

Page 19

1  "-- revolving commercial lines of
2  credit, home equity lines of credit,
3  Commitments," and so on.
4  So do you understand what a
5  participation agreement is?
6      MR. YOO:  Objection.  Calls for a legal
7  conclusion.  Calls for testimony beyond this
8  person's knowledge.
9  If you understand what that means.
10  A.  I don't know specifically what they're
11  speaking of there.
12      MR. YOO:  Also, Ms. Davis is not the
13  person with the most knowledge regarding the
14  purchase and assumption agreement.
15  Q.  So you don't know what a participation
16  agreement is?
17      MR. YOO:  Asked and answered.
18  She works as an associate counsel for the
19  escrow advances.  She may not have that much
20  knowledge about the purchase and assumption
21  agreement.  So the document speaks for itself.
22  I'm going to give you some leeway to ask
23  her questions about it, but also clearly it here
24  based upon a short conversation that she had

Page 20

1  with Mr. Smith.  She's not here as the person
2  most knowledgeable of Chase regarding the
3  purchase and assumption agreement.
4      MR. KELLEY:  You've already said that.
5      MR. YOO:  So again, I would caution you
6  to ask the types of questions that you're going
7  to ask her, because they're really -- at some
8  point it may become harassing.
9      MR. KELLEY:  I'm not harassing her.
10      MR. YOO:  I said at some point it might
11  become harassing as you keep on asking her
12  questions.
13      MR. KELLEY:  I would ask you --
14      MR. YOO:  Let me --
15      MR. KELLEY:  -- to stop interrupting my
16  deposition.  This is my deposition.  I'm paying
17  for it.  And you're running off at three or four
18  minutes a shot on your objections.  That's
19  ridiculous.
20      MR. YOO:  I'm entitled to it.  I feel
21  comfortable.
22      MR. KELLEY:  All you have to do is say
23  objection.
24      MR. YOO:  Mr. Kelley, let me finish.

DEPOSITION OF CRYSTAL DAVIS

JAMES TALENTI KELLEY v.
FUNDING BY CHASE BANK

**Page 20**

```
 1   seriously.
 2        BY MR. KELLEY:
 3        Q.  The next page, please.  Borrower's
 4   claims.  That would be page 9 of this purchase
 5   and assumption agreement.  A little bit further
 6   down the page I've highlighted assets purchased
 7   by the assuming bank.  And they're saying that
 8   they're subject to all the liabilities
 9   associated with them.
10        A.  Yes.
11        Q.  And then finally, we get down to asset
12   purchase price, and could you read that over.
13        A.  Yes.
14        Q.  So it states that the assets purchase
15   price will be the book value if there's no
16   Schedule 12.  And I'll represent that there is
17   no Schedule 3.2.
18        MR. YOO:  Objection.  The document
19   speaks for itself.
20        MR. KELLEY:  And there is no Schedule
21   3.2 there in the document.
22        MR. YOO:  Can you please just — you
23   don't have to respond to any objections.
24        MR. KELLEY:  I don't have to.
```

**Page 21**

```
 1   All right?  Otherwise this deposition will be
 2   over pretty soon.  Let me finish, then you can
 3   ask your next question.
 4        At some point, if you keep asking her
 5   questions relating to the purchase and
 6   assumption agreement it will become harassing.
 7   I'm going to give you leeway to ask questions.
 8   But understand that she's here —
 9
10        MR. KELLEY:  It is — it is necessary to
11   ask these questions, and under Rule 26, I am
12   allowed to ask any question I want, as long as
13   it leads to or has the possibility of leading to
14   admissible evidence.
15        MR. YOO:  Ready.
16        MR. KELLEY:  You can't necessarily
17   deposition ultimately like you're trying to do.
18        MR. YOO:  I told you that at some point
19   it's going to become harassing.  Once it become
20   harassing, I'm going to instruct her not to
21   answer.
22        BY MR. KELLEY:
23        Q.  Down the page it defines obligor.  Could
24   you read that over and let me know if you
25   understand what that means?
```

**Page 22**

```
 1        MR. YOO:  Objection.  Document speaks
 2   for itself.  And calls for a legal conclusion.
 3        Q.  I'm just asking you if you understand
 4   what it is?
 5        A.  Yes.
 6        Q.  You do?  Okay.  So it indicates that
 7   there are different types of obligors, right?
 8        A.  Yes.
 9        Q.  Direct, indirect, primary, secondary,
10   joint — ...
```

**Page 24**

```
 1        BY MR. KELLEY:
 2        Q.  Then the next page, which is page 20 of
 3   the purchase and assumption agreement, I have,
 4   "The Assuming Bank has submitted to the Receiver
 5   "$1.888 billion for the Assets purchased and
 6   Liabilities Assumed hereunder," right?
 7        A.  It is.
 8        Q.  I'm going to skip one page of the
 9   exhibit and go to page 29 of the purchase and
10   assumption agreement.  These are indemnification
```

---

**(Deposition Exhibit 1 marked.)**

Q. That's just another form of securitization?

A. Securitization?

Q. That's just another form of securitization?

   MR. YOO: Document speaks for itself.

Q. Do you understand that?

A. Yes.

Q. And limited guaranty of a corporation?

A. Yes.

Q. I'm sorry, where is that?

A. Bottom. It says the corporation guarantees the receivables. By corporation, I presume they mean FDIC.

A. Yes.

Q. That is for corporation, not Chase.

   MR. YOO: Objection. Document speaks for itself.

Q. Calls for legal conclusion.

   MR. YOO: Objection. Document speaks

   MR. KELLEY: This will be Exhibit 2.

Q. ...and then the next page -- oh, there it is.

---

**(Deposition Exhibit 2 marked.)**

Q. On Exhibit 2, this is a page -- page 199 from the JPMorgan Chase annual report in 2009. And the term of interest is purchased credit-impaired loans. And they're setting the purchased credit-impaired loans at $1.2 billion.

   MR. YOO: Objection. Document -- lacks foundation as to the document.

Q. The document is the JPMorgan Chase & Company 2009 annual report.

---

Q. Accounting for Certain Loans or Debt Securities acquired in a transfer.

   MR. YOO: Do you have a copy for each?

   MR. KELLEY: Yes.

   MR. YOO: If you could, just for ease of this deposition, as you're introducing exhibits, if you can provide me a copy as well.

   MR. KELLEY: I have been providing you with copies.

   MR. YOO: Thank you.

BY MR. KELLEY:

Q. So are you familiar with this statement?

A. I have not seen this statement.

Q. Okay. This governs the recognition of loans?

A. Okay.

---

   MR. YOO: Objection. Assumes facts not in evidence.

Q. Okay. I left the first page on here -- just to identify the document. Could you turn to page 2. And its showing the accounting to page 2. And it has been purchased. Is there anything with this, or are you familiar with it?

   MR. YOO: Objection. Vague and ambiguous.

A. I don't understand.

Q. Let's back up. Are you familiar with the purchase method of accounting?

A. It's really outside of my accounting scope, so I'm not familiar.

Q. Okay. All right. So I'm going to give a little background here. The purchase method of accounting is dictated by FASB 141, which it accounting is dictated by FASB 141. A the Federal Accounting Standards Board 141. A loan that's acquired, whether its impaired or not, has to be accounted for individually. In other words, each one has to be individually accounted for. If you have a pool of loans, If you acquire a pool of loans, you have to record each one of those loans, you'd have to record each of those both, finally. And then once those loans, then...

DEPOSITION OF CRYSTAL DAVIS

JACOB HARDON KELLEY v.
JPMORGAN CHASE BANK

**Page 29**

```
 1   the loans could be aggregated into a pool of
 2   loans, but it can't be done -- it can't be
 3   segregated into a pool of loans until the
 4   accounting is done. And then once that's done,
 5   then the SOP governs the rest of it, the actual
 6   accounting for the stuff.
 7        In this case, they're using a single
 8   Then, but that could be a pool of loans. And
 9   when you're saying here, if you look at this
10   page, is the payments amount has to be
11   determined, and they start it at the beginning
12   carrying amount. So this has been was purchased at
13   under prime. So $4 million was paid for. And
14   then they calculate what they think the future
15   cash flows are going to be and create a basis
16   for that.
17        MR. YOO: Objection. Assumes facts not
18   in evidence.
19        Q. All right. So anyway -- so this page 2
20   gives the actual accounting -- SOP accounting
21   for a single loan, but it would also apply to a
22   pool of loans.
23        MR. YOO: Objection. The document
24   speaks for itself.
```

**Page 30**

```
 1        Q. Okay. So lets go to page 3. And on
 2   page 3, if you go to B33, it reiterates what I
 3   just kind of paraphrased earlier, and that was
 4   individually and in pools, and arm's length
 5   loans subject to this SOP are required
 6   individually and in pools, should be recorded at their
 7   transactions should be recorded at their
 8   acquisition price presumed to be fair value.
 9        The document speaks for
10        MR. YOO: The document speaks for
```

**Page 31**

```
 1        Do you have an Exhibit 4 for me?
 2        THE WITNESS: This is all part of
 3   Exhibit 1. This is a portion.
 4        MR. KELLEY: Oh, is that part of 3?
 5        MR. YOO: I assume they're not part of
 6   3, right?
 7        MR. KELLEY: So you got one.
 8        MR. YOO: This was attached as part of
 9   Exhibit 1. Did you mean to include this?
10        MR. KELLEY: Well, just wait a minute,
11   will you? I've got to look at this stuff.
12        MR. YOO: Well, I wish you had come
13   better prepared.
14        MR. KELLEY: Could you keep your
15   personal remarks to yourself, Mr. Yoo.
16        MR. YOO: If you keep your personal
17   remarks to yourself, maybe I'll do the same.
18        MR. KELLEY: I don't make personal
19   remarks, Mr. Yoo; you do.
20        MR. YOO: Just let us know: because I
21   think what Ms. Davis has is the actual Exhibit
22   3. So if you believe it needs to be part of
23   Exhibit 3 then give it back to us.
24        MR. KELLEY: I understand all that. You
```

**Page 32**

```
 1   don't have to explain. Okay. Let's forget
 2   about all that. It's not necessary. So this is
 3   not part of Exhibit 3.
 4   4?
 5        MR. KELLEY: Yeah, could you--
 6        MR. YOO: That is already Exhibit 4.
 7        MR. KELLEY: Oh, you want to make that
 8   Exhibit 4?
 9        MR. YOO: She's already done that. Do
10   you have a copy for me of this particular
```

DEPOSITION OF CRYSTAL DAVIS

JAMES MADISON KELLEY v.
JPMORGAN CHASE BANK

**Page 32**

1 transaction data including adjustment for credit
2 impairment. So the credit impairment adjustment
3 they're referring to is SOP-3.
4
5 MR. YOO: Objection. Lacks foundation.
6 Objection; document speaks for itself.
7 Objection, also, assumes facts not in evidence.
8
9 ---
10 (Deposition Exhibit 5 marked.)
11 ---
12 Q. Exhibit 4 is obtained from the Senate
13 Permanent Subcommittees and investigations.
14 That's the Senate Subcommittees and
15 investigations. And it is an OTS fact sheet on
16 Washington Mutual that is issued on September 25th
17 of 2008, which was a bank close date.
18 MR. YOO: Objection. Document speaks
19 for itself. Lacks foundation.
20 Q. Okay. We may refer back to this. So I
21 don't have any questions for you.
22 ---
23 (Deposition Exhibit 6 marked.)
24 ---
25 MR. KELLEY: Did I give you two pages or
one?

**Page 34**

1 MR. YOO: Two pages.
2 MR. KELLEY: Yeah, this is a separate
3 one.
4 MR. YOO: Exhibit 6 appears in a
5 document that indicates Washington Mutual, Inc.
6 and Subsidiaries, Notes to Consolidated
7 Financial Statements (Unaudited).
8 MR. KELLEY: Oh, because me. They do go
9 add.  ___ ___ (unintelligible)
10 together. Sorry. They actually do go together.
---

**Page 33**

1
2 ---
3 (Deposition Exhibit 7 marked.)
4 ---
5 MR. KELLEY: I've highlighted the areas
6 of interest. This has to do with mortgage
7 repurchase liability. And if you take a look at
8 the highlighted footnotes, it shows the type of
9 payments and other issues surrounding the
10 repurchase of loans. So the purpose of this
11 exhibit is to highlight that the acquisition of
12 the loans by Chase was not necessarily through
13 the purchase -- through the receiver, but
14 through are liabilities acquired by Chase when
15 it purchased certain assets and certain
16 liabilities. So the loans could be acquired
17 through the liabilities and not be transferred
18 as assets. So that is the purpose of this
19 exhibit.
20 MR. YOO: For the record, Exhibit 7
21 appears to be a portion of some type of a
22 filing. It's identified by the date number on
23 top May the 5th for Corp. 10K, 2013, and this
24 appears in the page 79 of that document. If it
25 is what it is, again, as to Mr. Kelley's
statement, assumes facts not in evidence, insist

**Page 35**

1 for itself.
2 MR. KELLEY: Let me highlight that's
3 here in line. At the bottom of the page 7
4 indicates where this is from, it's JPMorgan
5 Chase & Company 2013 annual report.
6 Why don't we take a five-minute break.
7 MR. YOO: Okay.
8 (Recess.)
9 BY MR. KELLEY:
10 Q. Do you understand the difference between
11 the value you're told values?

two things, one is whatever was on the books on September 25, 2008 -- yeah, '8, and then something thereafter they do a fair value calculation. Do you know how they do the fair value calculation?

A. I do not.

Q. So they could, I guess, appraise the property or they could -- if it's a security or something, they could see what it trades for.

MR. YOO: She said she doesn't know.

Q. So you're not familiar with the actual fair value calculation?

A. No.

MR. YOO: Asked and answered.

Q. But I do agree with your definition. Are you familiar with pool accounting?

A. I'm not.

Q. You're not? Okay. So your activities are pretty much loan level activities?

A. Yes.

Q. And then somebody else would aggregate?

A. Yes.

Q. Are you familiar with the FFIEC, the Federal Financial Institutions Examinations

Q. Okay. Before we move on going through some of these things, I wanted to ask you a few questions. There was a -- I think Mr. Smith in his deposition referred to a MSP conversion. Are you familiar with that?

A. Yes.

Q. Could you explain to me exactly what was going on with the so-called conversion?

MR. YOO: Objection. Vague and ambiguous.

If you understand his question, go ahead and respond.

A. So I think you're speaking about the conversion of the MSP servicing system. So when we acquired -- when Chase acquired the WAMU Bank loans, they were on an MSP servicing system and Chase was also on an MSP servicing system, so it was really just meshing those two systems into one, into our servicing system.

Q. Did you participate in that?

A. Just related to corporate advances.

Q. So they asked you to check things over, make sure they were coming out --

A. Yes.

Council, guidelines?

A. I'm not. I've heard that term, but I'm not familiar.

Q. So you haven't -- maybe we should just define it. It shows up in the comments field.

A. Okay.

--0--

(Deposition Exhibit 5 marked.)

--0--

Q. Here's another page from the JPMorgan Chase --

MR. YOO: Do you have a copy for me?

MR. KELLEY: Actually, no. We're going to have to clarify that. So this defines the FFIEC cross-border disclosure requirements.

MR. YOO: Objection. Document speaks for itself. Assumes facts not in evidence. Lacks foundation.

Q. Okay. The document is relevant to the contents held in some of the 745 transactions. Anyway, I'll just put that in there.

Does that make sense? Read it over. Is it clear?

Q. -- the same?

A. We had to make sure they balanced. Once everything was brought over, that it balanced to the beginning and ending balances.

Q. And was that all done within the same program, or was it --

A. Yes.

Q. -- two different programs?

A. Just the one program.

Q. Okay. Anything remarkable about that?

MR. YOO: Objection. Vague and ambiguous.

Q. Different chart of accounts?

A. I mean, I guess I don't understand specifically the question. But there were different accounts that we housed, yes.

Q. So you put them in the right box?

A. Yes.

Q. Make sure they add up at the end of the day?

A. That's right.

Q. When was that completed?

A. Around December 2009.

Q. Did you then begin to use the system?

DEPOSITION OF CRYSTAL DAVIS

JAMES KELLEY v.
JPMORGAN CHASE et al.

**Page 43**

Q. Yeah, they're hybrid. Okay. Thanks.
You're the first person who's known what that
is. I was in -- just at wit's end, I was in
it and a judge said -- he was looking at a
court shot, not from Chase, but from Bank of
New York, and he said, I never had anyone that
could explain a screen shot before in court. So
congratulations.

Do you happen to recall what the number
would be for Fannie Mae, Ginnie Mae?

MR. YOD: Objection. Completely
irrelevant to the subject matter of this
lawsuit. Not likely to lead to discoverable
evidence.

Q. Do you know?
A. Generally, Freddie Mac are in a 5
series, a 500 series, would be 5 ...
Q. I see an line?
A. Yeah, and then Fannie is in a 1 series
and Ginnie Maes are in, I believe, 7 and 6
series.
Q. ... you ever seen a 1 or 2?
A. Not that I can recall.
Q. Okay. How about a 3?

**Page 44**

A. No, I don't recall.
Q. How'd highlight the numbers up?
A. I'm sure that's m for my numbers, and so
they can go all the way up to like the 900
series.
Q. So basically three digits?
A. Yes. Three characters.
Q. Okay. The other thing, this has come up
a number of times and people don't seem to know
whether ... times and people provide an investor ID, like 201/0008,
... is if it's like an investor ID ... part of the inventory
... that's the 000087 is that part of the inventory

**Page 41**

Q. ... that the corrected system?
A. Yes.
Q. But only when it was finished, right?
A. Yes.

(Deposition Exhibit 9 marked.)

MR. YOD: For the record, Exhibit 9 is
document identified by Bates stamp number
... 91790.

MR. KELLEY: That's right.

MR. KELLEY: So I've highlighted 91790. Which is
91790?
A. It is corporate advance pay.
Q. And what corporate advance pays?
A. ... the T of the ...
91790 indicates that it's a third-party payee.
Q. Okay.
A. And it's used to house private investor
claims... So when Chase makes a claim to the
claimant... fees are too deep pay per claim, funds would be
taken in as a page o.
Q. Okay. So they sent them a bill?
A. Yeah.

**Page 42**

Q. Tally 21? ... Say. Now, if you look in
the X -- if that, it says that the claim --
the investor IDs begin with an A through X, is
that correct?
A. In the current 745F platform, yes
indicates private investor loans.
Q. And it's an A, 2d, X, 2 indicate?
A. those would indicate bank-owned assets.
Q. Okay. So X, Y, Z. Have you ever...

Q. Okay. Are you familiar with the LPS desktop system? You may not be.
A. [illegible] with MSP, I don't know [illegible] those interchangeably, but specifically I've never logged into an LPS desktop.
Q. It's usually external, I think, to Chase, but it's done between — out in the LPS third-party providers for the banks.
MR. YOO: Objection. Assumes facts not in evidence. Lacks foundation.
MR. KELLEY: Why don't we take a little break, because I need to get a couple copies made.
-o0o-
(Deposition Exhibit 10 marked.)
-o0o-
MR. KELLEY: Can you share that?
MR. YOO: I have no choice.
MR. KELLEY: It turns out you do have a choice. I do have a copy of it.
MR. YOO: For the record, Exhibit 10 is a three-page document identified as JPM[redacted] and 47.

BY MR. KELLEY:
Q. You might want to look that over a little bit. I've kind of highlighted some of the areas of interest, but there may be more.
Have you seen this type of report before?
A. [illegible]
Q. Okay. [illegible] appears that it's a — some sort of MSP [illegible] report, right?
MR. YOO: Objection. Lacks foundation. Assumes facts not in evidence.
Go ahead and respond, if you can. If you know what it is.
A. [illegible] may be a screen that I'm [illegible] wide.
Q. Okay. [illegible] look at the top you see the [illegible] and INV 801 cat 13, and then investor number. That's the loan number. [illegible] that that is the loan number. And there is a date there. Do you know what [illegible] things are, T13, for example, [illegible]
A. [illegible] Cat 13, [illegible]

reside on the balance sheet, and typically a cat 13 indicates an arm loan.
Q. Okay. So the balance sheets are segregated by loan type?
A. Correct.
Q. Okay. And if you look down there a little bit further, it says HLGD-LN.
A. Okay.
Q. Have you run across the pledged loans in your dealings?
A. No, I have not.
Q. You might not. It's more of an investor thing.
Let's go to the next page. There's some payee numbers there at the bottom. Are you familiar with that? 95821.
A. Somewhat, yes.
Q. Okay. Could you explain? I guess I was third party, I don't know what R is.
A. So it would indicate that it's a recoverable balance, meaning recoverable to the borrower.
Q. Okay.
A. I [illegible] know that 95821 was a payee used

pre-Chase. Chase no longer uses this payee. It would have been converted over.
Q. So [illegible] like a Washington Mutual payee code?
A. That's correct. Yes.
Q. What code would they use now?
A. I don't know for this specific payee.
Q. Okay. Do you have any idea what in IV means?
A. [illegible] That's a user ID, but it's used by the [illegible] team, so it's new invoice.
Q. [illegible] refer to a specific person, or just a group that does this function?
A. [illegible] specific user is referencing a group, but users can be specific to a person.
Q. [illegible] could be — they could be specific, or it could be a small group of people using this code to identify their group?
A. Yes.
Q. [illegible] Okay. [illegible]
[illegible] what's the AR over here at the [illegible] on these entries?
A. [illegible] don't know.
Q. [illegible] is the [illegible], some of it

DEPOSITION OF CRYSTAL DAVIS

JAMES MADISON KELLEY v.
[...] CHASE BANK

---

**Page 49**

1   left. Down on the third page they have a list
2   of things that look like kind of definitions.
3   Okay.
4   A. Okay.
5   Q. ... have you ever seen stuff like this?
6   These are kind of like codes. Do you use those
7   now, or did you ever use them?
8   A. None of these codes look familiar.
9   They're probably specific to this screen, and
10  that's one that I use.
11  Q. Okay. All right.
12
13  (Deposition Exhibit 11 marked.)
14
15  Mr. [...]: Exhibit 11 is identified by
16  JPM, Bates stamp number 00/2035.
17  Q. It says this is sister screen, and then
18  we have at the top -- if you go down there's
19  headers making the list further, it says client 156.
20  Who is client 156?
21  A. Which, 156 is, as, an platform where
22  Heritage WAMU [...] are housed on MSP. So MSP
23  has two platforms, [...] being 456, which is the
24  Heritage Chase, and the other platform or client
     is 156, which is [...] business WAMU.

---

**Page 50**

1   Q. And what does it mean?
2   A. What means for those loans on client
3   156, [...]
4   Q. So it does not indicate how they were
5   acquired?
6   A. No.
7   Q. [...]
8   liability respectively -- they're just
9   Washington [...] loans or Washington
10  Mutual loans [...] client?

---

**Page 51**

1   before conversion, WAMU had its own MSP, they
2   had platforms. So like Chase today has client
3   468 and 156, they had their own separate
4   platforms or clients on MSP. That's just
5   referring to one of those.
6   Q. So is 906 a Washington Mutual Bank
7   number, or is it a Chase number?
8   [Was. Y.O.] asked and answered.
9   Q. I didn't understand.
10  A. It's WAMU.
11  Q. And then it says pre-9-1-09. Does that
12  sound like a conversion date?
13  A. Presumably.
14  Q. And then after that they use something
15  like which day codes indicates here on this
16  screen, I guess. Let's go down to the bottom
17  because the, or in no sense order date-wise.
18  When we're looking since we're date 8-7-02. Could
19  you explain that? The captions are at the top
20  differ. I see 03 date and then we have loan date
21  and then a date past. Could you explain in detail
22  8/02 in my transaction date?
23  ... I appreciate that a transaction that
24  happens such as a conversion, so that happened

---

**Page 52**

1   ... if we weren't something to say. I can explain it
2   ... at the time Chase would currently -- what
3   ... is not present in Chase today, but I
4   ... don't know what they were doing here.
5   Typically when you see these transfers and they
6   justify, it the names indicating it could be that
7   they will use [...] a different GL, so
8   they had to do to have a different invoice
9   number [...] a flat GL account
10  ... the names apparently ...

Page 57

1   those are paid out through an invoice system.
2   So the vendor submits an invoice, the invoice is
3   paid through a third-party firm and is booked into
4   MSF.   What my team does is we reconcile the
5   activity within the payee to ensure if the payee
6   is for inspections that we're only getting
7   inspection transactions in that payee.
8       Q.   So every 745 transaction will have,
9   what, an invoice?
10      A.   No.  A 745 is a non-monetary
11  transaction.  It's an adjusting entry.  It could
12  just be us moving it from one payee to another.
13  Invoices are booked with a 600 series
14  transaction code.
15      Q.   I think we're onto something on that.  So
16  how would you know to move to a different payee
17  code?
18      A.   We would see transaction with reason
19  codes that do not apply to that payee.  So if a
20  payee is set up as an inspection payee, we
21  specifically use inspection reason codes.  So if
22  we saw we have a code for that was not
23  inspection-related, we would know that it didn't
24  belong.

Page 58

1       Q.   So the very 745s there going to be a
2   602 or 503?
3       A.   No.  A 745 is going to be offset with
4   another 745.  So in order to do a 745
5   transaction, there has to be a debit and a
6   credit, but there's no invoice.  So it's moving
7   things internally on our books.  There's no cash
8   going in and we're not paying cash out.
9       Q.   As an example, then appraisal was
10  ordered by Chase by an outside firm, then that
11  firm would send Chase an invoice, it would be
12  recorded as a 600?
13      A.   600 series, yes.
14      Q.   And would that also possibly be a 745
15  entry?
16          MR. YOO: Objection.  Asked and
17  answered.  Twice.
18      A.   Only if funds needed to be moved
19  into a different payee.
20          MR. KELLEY: I want to take a
21  five-minute break.
22          (Recess.)
23

Page 59

1           —0—
2       MR. YOO: Exhibit 13 appears to be a —
3       MR. KELLEY: This is a summary.
4       MR. YOO: That's something that you
5   generated, right, Mr. Kelley?
6       MR. KELLEY: Right.
7       MR. YOO: Summary of 745 transactions is
8   the title of the document.
9       MR. KELLEY: Yes.  And it's a summary of
10  the Chase discovery referencing the Chase Bates
11  number in the first column.  So that would be
12  the go-to page.  And it has a user column, a
13  date, it's got its payee codes, and the comments
14  field is extracted from those documents.
15      MR. YOO: Again, this document was
16  generated by Mr. Kelley.  This is not a Chase
17  document.
18      MR. KELLEY: No, it's not.
19  BY MR. KELLEY:
20      Q.   Take a look at that for a minute.
21      A.   Okay.
22      Q.   I guess starting at the top, the 10 and
23  14, do you know what that is?
24      A.   I do.

Page 60

1       Q.   What is it?
2       A.   So the 10 and 14 is a contra payee.
3       Q.   Is there a real payee?
4       A.   By payee, I mean that it's a number
5   assigned to a GL.
6       Q.   General ledger?
7       A.   Yes.
8       Q.   So we don't have any further
9   identification?
10      A.   No, other than it would just indicate a
11  general ledger account that this activity would
12  be hitting.
13      Q.   Okay.  So it's booked that way?
14      A.   Yes.
15      Q.   All right.  And when it goes over there,
16  then somebody else does something with it,
17  right?
18      A.   Yes.
19      Q.   So it's a partitioning of the accounting
20  function, I take it?
21      A.   Yes.
22      Q.   And then 16 and 17?
23      A.   That is the — it's a credit loss, GL.
24      Q.   What is a credit loss?

**Page 61**

2  A. It's just where we record potential
3  losses on our books.
4  Q. So if it's minus, is that a loss?
5  A. None of these will specifically be
6  losses, they're just kind of paper accounting,
6  where we're saying a credit is typically a —
7  I'm sorry, a minus would indicate a credit, and
8  something that was just a positive number would
9  be a debit.
10  Q. So the bottom there's a 435 number as
11  positive?
12  A. Uh-huh.
13  Q. There's a debit?
14  A. On the right, yes.
15  Q. So is that — so which one is the right
16  one?
17      MR. YOO: Object.
18  A. All of these appear to be.
19  Q. Well, they're plus and minus.
20  A. Some of them are just changing the
21  reason code, so if you look over to the right,
22  that 435 transaction —
23      MR. YOO: Let the record reflect that
24  the witness is pointing to numbers 9 and 10.

**Page 62**

1  LTCO.
2      A. So that — they're actually just
3  changing a reason code there from LTCO to CMYC.
4  During conversion, WAMU had their own reason code
5  system. Chase has our reason code system. So
6  they're just doing an entry to change the reason
7  code in how it's recorded.
8  Q. So the LT stands for what?
9  A. That was a WAMU reason code showing
10  their conversion balance.
11  Q. Why are there — if you notice, these
12  are three sets of entries under 9-24-2009.
13  That's only one loan. Why are there three sets
14  of entries?
15  A. Again, that goes back to if they were
16  doing an entry, they're just flipping the reason
17  code. So it's not truly a write-down. It's
18  adjusting that reason code. In order to do that
19  they have to reverse what was done on the other
20  reason code and then do an entry for the new
21  reason code.
22  Q. And the reason code is LTCO?
23  A. Well, that was the old reason code, so.

**Page 63**

1  Q. What's CMVC mean?
2  A. That's a contra conversion balance.
3  Q. Does this relate to the fair value of
4  the loan?
5  A. It does.
6  Q. You're not familiar with fair value
7  calculations. I think we asked that one.
8      MR. YOO: Asked and answered.
9  Q. Some other group does that, is that
10  correct?
11  A. That's correct.
12      MR. YOO: Asked and answered.
13  Q. Do you know what group does it? Do they
14  have a name?
15  A. I don't know.
16  Q. There's over 150,000 employees.
17  A. Right.
18  Q. So the CAMV on the line 7, what's that
19  refer to?
20  A. CAMV refers to a contra anniversary.
21  Q. So sounds like a drug deal, contras. So
22  what's that all about? Why do they have to do
23  this on anniversary dates?
24  A. Because a loan can depreciate over time.

**Page 64**

1  So they have to keep their value, their fair
2  value analysis current. So they make these
3  adjusting entries.
4  Q. But a loan might not depreciate over
5  time, it might appreciate, right?
6      MR. YOO: Objection.
7  Q. Is that correct?
8  A. That's correct.
9  Q. So what do you do in that circumstance?
10  A. They could do a write-up on the loan.
11  Q. Okay. All right. So what are these?
12  Are these write-ups or write-downs?
13  A. Which one?
14  Q. I'm talking about the CAMV on 6 and 7.
15  A. Those would be write-downs.
16  Q. So these guys are write-downs.
17  A. Uh-huh.
18  Q. Okay. And then if we go to lines 3 and
19  4, it says CAMV?
20  A. Again, that's anniversary contra.
21  Q. So they're adjusting them annually, is
22  that what that means?
23  A. They could be, yes.
24  Q. Because those are 9-25 and the other

those were 9-24-09. Okay. Anyway, are those write-ups or write-downs?

A. Lines 3 and 4?

Q. Uh-huh.

A. Those are -- those appear to be write-downs. They are going -- I'm sorry, write-ups.

Q. So the loan is appreciating in value?

A. It appears that way.

Q. That's quite a bit. And then we have the mysterious line 2. It just shows the one entry. This is the actual document production from Chase. So there is no 10 and 14 in line 2. So I'm not sure what that means.

A. If this was at 145 mm, there would have to be an offsetting entry.

Q. So why isn't it there, I wonder?

A. I'm not sure where this came from. It would have to be there. If we looked probably through the system.

Q. You guys may have to fix that.

A. In my review of the loan, I believe that there was the offset because my balance on 10 and 14 and 16 were, you know, equal offsets.

Q. That's kind of what I was expecting. Then it's a write -- so is 463 -- excuse me, line 2, the 463,000, is that a write-up or write-down?

A. Assuming that there was an offset of the 463, that looks like it would be a write-down.

Q. Do you know how they obtain this write-up or write-down, or do they just hand it to you?

A. I do not.

Q. So they give you the number and you see it's put in right?

A. Those payees are managed by another group in accounting outside of what my group does.

Q. Okay. When you were looking at these, did you look at any adjustments made prior to September 25, 2008?

A. I don't recall specifically what the transactions were, but I reviewed all of the DDCH screens.

Q. There's a little mystery here.

Okay. I probably need to make a copy of

this -- I know this by heart anyway.

--0--

(Deposition Exhibit 14 marked.)

--0--

MR. YOO: Obviously, you don't have a copy for me?

MR. KELLEY: Share, and then I'll use this thing here, which I don't want to put into evidence because it's missing the origin.

MR. YOO: All right. Exhibit 14 appears to be some type of a spreadsheet. It's identified by filing date with the court on September 11, 2012, page 18 out of 30.

BY MR. KELLEY:

Q. Okay. And this is the lawsuit between LSI -- that the FDIC receiver made against LSI Appraisal Company asserting that the loans were made grossly negligent. And on that page you'll notice that the loan in question, 3018113559, is there. It's about 11 above the bottom. It says, Saratoga, gives the address, 14590 Douglass Lane.

A. Okay.

MR. YOO: On the bottom, right?

Q. From the bottom, yeah. And if you move over to column 3, it --

MR. YOO: The loss amount?

Q. The loss amount is stated as $436,586.26, is that right?

MR. YOO: All right.

Q. In this case they're claiming that this is a natural loss --

MR. YOO: Okay.

Q. -- that apparently Washington Mutual incurred prior to the receivership. Otherwise, the receiver wouldn't be able to bring this suit.

MR. YOO: Okay. Assumes facts not in evidence. Lacks foundation.

MR. KELLEY: Well, foundation, or I'll take judicial notice of this elsewhere in the case.

MR. YOO: This is a spreadsheet that was created by the FDIC, correct?

MR. KELLEY: By their attorneys.

MR. YOO: Right.

MR. KELLEY: Yes.

MR. YOO: Again, not by Chase, not by

JAMES MADISON KELLEY v.
JPMORGAN CHASE BANK

DEPOSITION OF CRYSTAL DAVIS

Page 69

1  Washington Mutual.
2      MR. KELLEY: That's correct. It was
3  created by the --
4      MR. YOO: Counsel --
5      MR. KELLEY: -- counsel for the
6  receiver.
7      MR. YOO: FDIC?
8      MR. KELLEY: Right.
9  BY MR. KELLEY:
10     Q. And I was wondering if you saw any
11  reference to this loss amount in there.
12  Incidentally, if there was a loss, how would
13  that be reported? Would that be reported
14  through your group in any way?
15     A. No, my group doesn't directly handle
16  losses.
17     Q. So if a -- if a loss occurred based on
18  they bought the loan for a million and they sold
19  it for half a million, they take a -- record a
20  half-a-million-dollar loss, you wouldn't see any
21  of that in your group?
22     A. Not my team directly, no.
23     Q. You might get some sort of thing --
24  order to move things around or whatever. Okay.

Page 71

1  of them or 20 of them?
2     A. No, there's --
3     Q. 99?
4     A. It can go the whole spectrum.
5     Q. So it could be X99 -- there could be 99
6  different Xs?
7     A. That's correct.
8     Q. And you work with how many of those?
9     A. It would be all of them.
10     Q. Sooner or later, right?
11     A. Yeah.
12     Q. Thank you. You answered a question that
13  Mr. Smith couldn't answer. He didn't know who
14  client 902 was.
15     A. Good.
16     Q. I'm going to ask you this: I've never
17  seen any document production relating to the
18  HELOC that's in this case. Do you also handle
19  HELOCs?
20     A. If they're outside of the MSP servicing
21  system, I would not.
22     Q. So they could be outside the MSP
23  servicing system?
24     A. There are other systems that service

Page 70

1  Okay. That's it on that one.
2      We see in the documents -- I'm just
3  going to ask you some questions -- that the
4  investor number or IDX99 appears on the loan
5  transfer screen. Actually, X02 appears on the
6  loan transfer screen. And my question to you
7  is: How many -- and it refers to a pool, I
8  think, investor pool.
9      MR. YOO: Objection. Lacks foundation,
10  assumes facts not in evidence.
11     Q. How many numbers -- Xs are there? Have
12  you seen an X01 and X7 or 13?
13     A. Yes, there are multiples.
14     Q. There's lots of them?
15     A. Uh-huh.
16     Q. And is there -- what are these
17  categories?
18     A. The investor -- it can represent
19  different kinds of things, but all Xs are Chase
20  owned, so they're bank-owned loans.
21     Q. And they're consistent with that code
22  that we discussed earlier?
23     A. Yes.

Page 72

1  HELOC loans, yes.
2     Q. Could you explain what other systems
3  might be.
4     A. I believe they're VLS for Fortracs,
5  F-O-R-T-R-A-C-S.
6     Q. Anything else?
7     A. Just VLS. So those are the systems that
8  are outside MSP. Not knowing specifically what
9  this loan -- if it would be on MSP or these
10  other systems.
11     Q. I was just curious as to why they would
12  account -- wouldn't MSP be able to handle a
13  HELOC, or is this just a legacy thing?
14     A. No, there are issues with that servicing
15  system that they can't do everything that's
16  required, so they use another servicing system.
17  I don't know what those things are.
18     Q. So they need to use another servicing
19  system?
20     A. Yes.
21     Q. Okay. You also answered a question
22  Mr. Smith couldn't answer with the A through B.
23  Okay. What does Q1 refer to? It says

## DEPOSITION OF CRYSTAL DAVIS

## JAMES MADISON KELLEY v. JPMORGAN CHASE BANK

**Page 73**

1 A. That refers to credit impaired.
2 Q. Oh, okay. So these the stuff we were
3 talking about earlier, credit impaired loans?
4 A. Yes.
5 Q. They call these PCI loans in the second
6 moment?
7 A. Yes.
8 Q. So parts of the loans that were acquired
9 apparently were/credit impaired. It's not
10 clear from the annual report whether they were
11 included -- you know, they mixed their altogether
12 or what, but I think they didn't.
13 DMK: So she said you are all about the
14 corporate science adjustments, the fourth
15 accounts? Do you recall first taking
16 MR. YOO: Objection. Vague and
17 ambiguous.
18 If you understand his question, you can
19 answer.
20 A. I don't specifically recall him asking
21 anything other than what those revenue codes mean
22 in a KERY, and then I explained the contra.
23 Q. So he didn't ask it a more detail
24 I think I asked you earlier, you don't

**Page 74**

1 do anright/Washington Mutual, PCH loans?
2 MR. YOO: Asked and answered.
3 A. I don't remember so.
4 Q. Sure, probably not.
5 Q. On these 745 transactions, they indicate
6 the transfer of the flow of money, whether it's
7 internal and, right?
8 A. (Nods)
9 Q. If it could go A to B or B to A, right?

**Page 75**

1 and I found they had a $570,000 loan and he had
2 $700,000 in his 745 transactions, and they
3 weren't blamed as contra, they were just --
4 A. It's possibly, because Jose could
5 compound over time.
6 Q. Well, that would lose a lot of
7 compounding. Okay. So if they had a standing
8 where's insurance came in and blew down the
9 garage and there was 745 insurance, would that be
10 handled as a 745 adjustment?
11 MR. YOO: Objection. Improper
12 hypothetical. Irrelevant to the subject matter
13 of the lawsuit and not likely to lead to the
14 discovery of admissible evidence.
15 A. I don't know how she would work and how
16 it would be recorded.
17 Q. I'm just looking at these huge amounts
18 of money having loan and Ferdie. Okay. Let's
19 see what else we have here.
20 Do you ever work -- you don't work
21 directly with any of the subsidiaries of Chase,
22 do you?
23 A. No.
24 Q. You're just totally internal?

**Page 76**

1 A. Internal.
2 Q. So you've never promoted something for
3 Washington Mutual Securities Corporation?
4 A. No.
5 Q. Washington Mutual cases?
6 A. No.
7 Q. Do you ever use LSTA?
8 A. No. I've never heard of it.
9 Q. You don't need it?
10 A. Huh-uh.

## JAMES MADISON EX RELAY v. JPMORGAN CHASE BANK

**Page 77**

1  procedures under GAAP.
2  Q. So you're not familiar with the GAAP?
3  A. With that portion of the GAAP.
4  Q. Okay. What portions of the GAAP are you
5  familiar with?
6  A. Anything that would be related to
7  corporate advance accounting, accounts
8  receivable, those type of A/R policies.
9  Q. I think I know... let you read that. Okay.
10  So if I understand you correctly, you
11  usually don't work with FHLMC?
12  A. Correct.
13  Q. You don't work with Wolf either?
14  Probably don't need to?
15  A. No.
16  Q. Do you know about it?
17  A. (Nods)
18  Q. Have you ever looked at it?
19  A. Yes.
20  Q. Okay. Are the loan documents displayed
21  in color?
22  A. I don't recall.
23  Q. So she got that one card. He said they are.
24  Q. So...

---

## DEPOSITION OF CRYSTAL DAVIS

**Page 79**

1  Q. Great. So the FDIC, of course, applies
2  to everything to that entity. Apparently,
3  this is rather huge. I mean, an institution
4  nobody's ever heard of. My understanding is it
5  says between the federal reserve, the OCC, the
6  FDIC, and the treasury department. Both the
7  write-up rules to a report regarding the
8  FDIC. They do have a reporting mechanism. See,
9  would you be writing -- is that a write-up or
10  write-down there?
11  A. Based on the signature, it looks as if
12  it's a write-up.
13  Q. So it's a write-up going to -- reporting
14  a write-up to the FDIC. I guess this question
15  is, place they require foreign reporting, what
16  that has to do with anything. So maybe
17  mystery.
18  A. Yeah.
19  Q. Okay. Is there any group at Chase that
20  handles these FDIC write-up/write-downs or
21  whatever?
22  A. It would be the same group that does the
23  write-downs, but I don't know who specifically
24  that group is.

---

**Page 78**

1  I mean, ask you, is there -- do you have
2  enhanced disclosure guidelines and procedures,
3  instructions for what you do, or do you
4  know what work it is that's accounting standards?
5  A. Just work, if that is accounting standards?
6  MR. VITO: Objection. Vague and
7  ambiguous as phrased.
8  A. I'm not sure you -- you're asking them.
9  Q. Do you have a book that they give you of
10  procedures, how that you need to do, you can
11  specify it that way?

---

**Page 80**

1  Q. So the C150, you said it was 150 days?
2  A. Uh-huh.
3  Q. That's an odd number of days. Do you
4  know any reason about that sort of thing?
5  A. I don't.
6  Q. Have you ever seen C390 or --
7  A. I believe there's a C390.
8  Q. That would be like annual, or something,
9  right?
10  So you have a C180, C120?
11  A. I think it's just the 150.

JAMES MADISON KELLEY v.                                    DEPOSITION OF CRYSTAL DAVIS
JPMORGAN CHASE BANK

Page 81

1      MR. KELLEY: Okay. And now you're
2   representing that you're going to look into it?
3      MR. YOO: I'm going to look into it.
4   But that's all I'm representing to you.
5      MR. KELLEY: Okay. And that refers to
6   Chase Exhibit number document JPM0002000.
7      While we're on the record with this
8   stuff, I want to make note that no documents
9   were produced today. Documents were requested
10  at the deposition. They were not produced.
11     MR. YOO: Ms. Davis is appearing in her
12  individual capacity as an employee. She's not a
13  custodial record of Chase. She has no
14  obligation to produce any documents, especially
15  the document that was requested. That's not in
16  her possession. She has no obligation to look
17  for them.
18  BY MR. KELLEY:
19     Q. I might ask you, have you ever run
20  across the initials FNFS in the comment fields
21  of some of these documents?
22     A. I don't recall that, no.
23     Q. You might not because I generally shows
24  up in LPS documents.

Page 82

1      In connection with the payee code 16 and
2   14, the comment field they have CI. What does
3   that indicate?
4      MR. YOO: Asked and answered.
5      A. Credit impaired.
6      Q. Oh, okay. Got it.
7      MR. YOO: Do you need time to gather
8   your thoughts? It seems like it's not conducive
9   to wait five minutes for you to ask one
10  question.
11     MR. KELLEY: Be patient.
12     MR. YOO: That's not how a deposition
13  should be given.
14     MR. KELLEY: Well, that's your opinion.
15     MR. YOO: Let the record reflect that
16  Mr. Kelley's browsing through the deposition of
17  Mr. Smith to generate a question, and, in fact,
18  we've been here waiting five, six minutes for
19  each question to be asked.
20     MR. KELLEY: That's not true.
21     MR. YOO: I've been counting the time.
22  In fact, one question was posed to me, and in
23  seven minutes only one question has been asked
24  to the deponent.

Page 83

1      MR. KELLEY: The purpose of the
2   deposition is to determine the facts in the
3   case. It doesn't matter if it takes one minute
4   or five minutes.
5      MR. YOO: All right. So admitted by
6   you.
7      MR. KELLEY: Okay. I'm done. Thank you
8   very much, Crystal. I appreciate it.
9      THE WITNESS: No problem.
10     MR. KELLEY: Your responses were very
11  clear.
12     MR. YOO: She answered every question
13  she knew.
14            -oOo-
15     Thereupon, the testimony of August 15,
16  2014, was concluded at 11:23 p.m.
17            -oOo-
18
19
20
21
22
23
24

Page 84

(illegible certification page)

Exhibit #4
INVESTOR Codes

CONFIDENTIAL

JAMES MADISON KELLEY v.
JPMORGAN CHASE BANK

**$**

%ales (2)
24:5

$K (1)
29:19

$40,586,26 (1)
68:5

$570,000 (1)
73:1

$700,000 (1)
75:2

**#**

#806 (1)
44:11

**=**

=0=: (58)
15:14;16:12,14;
27:6,14;19:21;42:25;
30:22;34:24;35:2;36:7;
0:11;3;7;9;15,17;
49:11,13;50:10, 12,
23;57:18;66:1;67:2,4

=0=: (1)
43:14,17

**A**

A61 (2)
24:2,11;34:16

A11 (2)
29:3,14

able() (1)
69:12;73:12

above (1)
67:20

accepted (1)
76:11

According (1)
13:11

account (5)
44:16;52:9;58:19;
60:11;32;12

accountholm (2)
9:11,17

account-nn (2)
28:20;36:20

accounting (58)
6:9;20;3;14,20,21;
...;24:1,13;31:3;23;
0:15;10;34;41;23;5;
12:1;12:13,17;12:2;
6:20;20;3;23;57:6;
33:24;40;19;61;5;
58:14;23;13;7;64

accounts (5)
...

acquired (12)
27:10;28:10,22;30:4;
33:12,14;36:22;39:15;
15:20;57;73:8

acquisition (3)
27:22;36:3;35:9

acquisition-date (1)
36:13

acres (2)
4:79;61:10

acting (1)
29:20

activation (2)
37:18,19

activity (2)
57:60:11

actual (6)
26:5;20;51:21;37:11;
63:12;74;19

actually (7)
30:18;34:9;36:24;
35:12;62:2;20:3;77:11

add (5)
40:19

address (1)
67:21

adequately (1)
58:20

adjusting (6)
57:11;62:13;64:8,21

adjustment (4)
5:17;33:1,2;75:10

adjustments (2)
56:17;33:14

administer (3)
21:15;75:14;36:21

adventind (1)
19:5

advance (11)
6:12;22;2,3,5,6;
41:14,15;56;13,17,24;
73:14;77:9

advances (6)
9:15;24;12;22;19:19;
34:16;39:21

again (11)
20:9;22:1;35:23;
45:3;53;15;54:15;
50:16;67;15;64:20;
68:20;80:17

against (1)
67:16

agency (1)
50:21

aggregate (1)
37:3

aggregated (1)
29:13

ago (1)
14:5

agree (1)
37:15;

17:2,14,17;18:9,11,
19:5,14,16,21;20:3;
21:6;23:5;24:3,11,26:6

agreements (1)
15:21

ahead (4)
39:11;46:12;53:11;
56:22

allowed (1)
21:11

altogether (1)
73:11

Alvarado (2)
5:11;12:9

always (1)
44:14

ambiguity (1)
14:10

ambiguous (10)
9:3;22;28:9;36:12;
38:11;40:12;56:21;
73:17;74:22;78:6

around (6)
28:10;32:20;11;
32:19;53;4;79;11;
74:19

amounts (1)
75:12

analysis (1)
64:2

Anne (1)
13:7

anniversary (3)
53:20;25;64:10

annoying (1)
24:20

annual (6)
26:16;23;34:5;73:5;
10;10:8

annually (1)
64:21

answered (12)
39:11;19:17;37:14;
31:1;56:17;63;4,12;
31:12;72:21;78:3;12;4;
48:12

Apparently (7)
32:13;50:16;52:10;
55:20;58:10;73:9;79:2

appear (2)
51:10;65:5

appearing (1)
81:11

appears (15)
17:11;24;4;35:19;22;
46:8;51:23;53:1,6;
55:18;59;2;65:9;67:10;
70:8;5;79:1

applied (1)
41:22

applies (1)
18:11

29:21;56:17;24;
57:18

aspraisal (2)
58:9;67:17

appraise (1)
57:7

appreciate (2)
64:5;83:8

appreciating (1)
65:4

approximately (2)
10:12;11:8

AR (1)
48:21

arbitrarily (1)
21:14

area (1)
9:24

areas (2)
35:3;46:4

arm (1)
47:2

arm's (1)
30:5

Around (3)
40:23;69:24

aside (1)
49:3

apart (1)
24:14

asserting (2)
22:15;67:17

asset (5)
17:24;23:11,14;
36:19;76:5

assets (5)
18:4;23:6;24:5;
35:13,16;42:8

assigned (2)
60:5

Associate (2)
6:7;19:18

associated (1)
23:9

assume (1)
33:5

assumed (2)
17:24;24:5

Assumes (12)
54:21;5;1;20;17;
33:6;34;23;25;24;
38:17;45:10;40:11;
50:19;58:14;70:10

assumption (13)
17:2,14,16;18:9;
19:14;20;20:3;21;6;
23:5;24:3,11;26:6

attached (1)
33:9

attorney (1)
8:12

attorneys (1)
68:21

August (1)
85:15

AX01 (1)
54:15

**B**

B33 (1)
30:2

back (16)
5:16;11;20;15;19;
28:11;32;17;41:23;
33:18;54:24;52:45;
75:18

background (5)
5:16;20;22;27;5;
28:16

backwards (1)
54:1

bailed (1)
56:9

balance (7)
44:19;67:13;22;
62:10;63:2;64:23

balanced (1)
40:2;3

balances (1)
40:4

bank (22)
5:7;14;16;17;18;13,
19;17:3;18;14;19:23;7;
34:4;33:14;37;36;19;
39:15;42:2;3;9;10;16;
51:8;72:16;76:3

bank-owned (2)
42:2;70:20

banks (2)
42:9

based (4)
19:14;24:21;63:17;
79:11

basically (1)
34:6

basis (5)
29:15

Bates (5)
51:9;29;14;34:17;
58:10;81;6

because (4)
20;8;11;21;6;18

becomes (1)
21:18

begin (5)
40:24;42:3

beginning (3)
29:11;40:4

belong (1)
57:24

below (3)
33:18

best (1)



cross-border (1)
38:15
CRYSTAL (4)
3:1;5:5,12;83:8
curious (1)
72:11
current (3)
6:6;42:3;64:2
currently (1)
52:4
custodial (1)
81:13
customary (1)
18:22

D

data (12)
33:1,13;35:20;46:17,
20;51:12,15,20,20,21;
72:20;73:15;77:5;
56:8;59:12;67:12
dates (2)
53:18;63:23
date-wise (1)
51:17
David (1)
6:20
DAVIS (7)
5:1,6,12;16:4;19:18;
31:21;81:11
Davis' (1)
15:22
day (1)
46:20
days (5)
78:22,23,24;80:1,3
DDCH (3)
11:13;14:3;66:21
deal (2)
63:21;74:1
dealings (1)
47:10
debit (3)
38:5;61:9,13
Debts (1)
37:9
December (1)
40:23
decent (2)
15:28;16:9
decline (1)
59:5
defined (1)
17:8
defines (2)
21:22;38:14
defining (2)
18:10;22:13
definition (1)
37:12
degree (1)
6:1
department (2)
6:11;79:6
depend (1)
82:24
deposits (1)
5:9
deposition (35)
5:6;11:5,22,24;13:8,
13,21;14:24;15:16;
18:5;19:13;20:16,16;
21:1,16;26:19;23:7,14;
30:20;33:8,21;35:1;
36:8;39:4;41:6;45:16;
49:12;53:11;56:11;
58:24;67:3;81:10;
82:12,16;83:2
depositions (1)
14:11
depreciate (1)
63:24;64:4
depth (1)
78:15
description (1)
78:10
desktop (2)
45:5,6
detail (1)
78:23
details (1)
13:6
determine (2)
15:23;80:2
determined (1)
59:11
dictated (1)
28:17
difference (3)
36:10;50:14,15
different (18)
7:10;13:5;22:7;
30:12,24;40:8,13,18;
44:18,19;52:7,8,13,17;
57:16;68:19;70:19;
71:6
digits (1)
44:5
Direct (1)
22:9
direction (1)
74:6
directly (3)
69:15,22;75:21
disclosure (1)
38:15
discoverable (1)
43:13
discovery (3)
35:10;55:14;76:21
discussed (1)
80:15
displayed (1)
77:20
distinction (1)
18:3
divided (1)
10:23
document (34)
18:1;19:21;22:1,11;
23:1,8,21,24;24:7;25:3,7,
22;26:4,20,21,22,23,24;
29:23;30:8;32:12;33:3,
16;34:5;35:22;36:16,
19;41:9;44:23;59:8,15,
13;65:13;71:17;78:2;
81:6,15
documents (10)
13:15;16:24;59:14;
70:8;77:20;81:8,9,14;
21:24
done (12)
20:9;28:5;24:29:2,4,
4;32:10;40:5;46:8;
56:2;68:19;83:7
Douglas (1)
67:22
down (11)
9:8;21:22;23:6,11;
47:6;48:1,17,18;51:16;
75:8;76:16
drive (1)
44:15
driven (1)
44:19
driver (3)
44:21;46:24;54:15
drug (1)
63:21
due (1)
30:13
duly (1)
5:2
During (1)
62:4

E

earlier (6)
30:3;36:21;52:10;
79:22;73:3,24
ease (1)
27:13
easier (2)
6:19,20
educational (1)
5:20
EFF (1)
51:20
effect (1)
54:1
effective (2)
53:2;56:8
6:14,16
either (1)
77:13
else (7)
8:22;37:21;51:15;
56:14;60:16;72:6;
75:19
else's (1)
74:24
elsewhere (1)
68:17
employee (2)
12:9;31:12
employees (2)
6:13;63:10
end (2)
34:10;40:19
ending (1)
40:4
English (2)
5:24;6:22
ensure (1)
57:5
entail (1)
6:10
entirely (1)
54:12
entities (2)
15:5,6
entitled (1)
20:20
entity (1)
79:2
entries (4)
48:22;62:12,14;64:3
entry (8)
51:22;57:11;58:15;
62:6,16,20;65:12,16
entry-level (1)
7:13
equal (1)
65:24
equity (1)
19:2
escrow (1)
19:19
especially (1)
81:14
estate (1)
8:9
et (1)
18:23
even (1)
55:22
everywhere (2)
14:12;27:4
evidence (13)
14:22,23;16:23;
21:13;28:2;30:4;33:8;
34:23;35:24;38:17;
43:14;43:11;46:11;
50:20;67:9;68:15
Exactly (2)
21:14;30:7
EXAMINATION (1)
5:4
Examinations (1)
37:24
examine (1)
28:23
examined (1)
28:21
example (2)
46:20;58:9
exceed (1)
74:19
Excellent (1)
44:22
excerpts (1)
17:1
excuse (2)
34:8;66:2
Exhibit (47)
17:5,8,11,18,19;18:7,
8;24:10;26:7,9,11,13,
15;27:7;30:18,20;31:1,
3,8,11,21;32:3,4,7,9;
33:8,16,21;34:4,19;
35:1,9,17,18,20;36:1,6,
8;45:16;52:9;62:12,16;
55:11;56:7;58:24;59:2;
67:3,10
exhibits (1)
27:14
exists (1)
80:24
expected (1)
30:15
expecting (1)
66:1
experience (3)
9:3,12
expert (1)
76:18
explain (8)
32:1;39:3;45:7;
47:18;51:19,21;52:1;
72:2
explained (2)
32:20;73:22
explanation (2)
36:1,5
exposure (1)
34:16
external (1)
45:7
extracted (1)
59:14

F

FA (3)
14:18,18;50:10
face (1)

Case 0:23-cv-61804-AHS Document 7-2 Entered on FLSD Docket 10/06/2023 Page 111 of 120

JAMES MADISON KELLEY v.
JPMORGAN CHASE BANK







79:2
refer (7)
54:1,6;63:20;70:7;
73:1;79:3;81:3
reflect (4)
17:10;58:4;61:23;
82:13
regarding (2)
19:13;20:2
reference (1)
30:2
relate (1)
63:3
related (2)
39:21;77:6
relating (2)
21:5;71:17
relevant (1)
38:19
remarkable (1)
40:10
remarks (3)
31:15,17,19
REO (5)
7:20;8:9,11;9:14,15
report (10)
26:16;23:3;65:3;65:5,
9;75:18;79:7;80:20,21,
24
reported (2)
69:13,15
reporting (3)
79:8,14,15
represent (4)
23:16;62:18;82:3;
70:18
representation (1)
80:17
represented (1)
11:16
representing (3)
22:24;81:24
represents (1)
17:15
reputable (2)
35:5,8;38:8
requested (6)
81:9,15
require (1)
79:13
required (2)
32:16;79:7
requirements (1)
58:15
reserve (1)
79:5
reside (1)
47:1
resides (1)
46:16
respect (1)
23:23;24:19;39:12;
46:15;56:23;73:18
responses (1)
83:10
rest (1)
29:5
restrict (1)
24:15
retort (1)
16:4
returning (5)
18:16,19,22;19:20,
22
reverse (2)
81:17;82:19
review (4)
13:14;20:56:12;
65:22
reviewed (2)
14:4;66:20
reviewing (1)
74:24
revolving (1)
19:1
ridiculous (1)
20:19
right (46)
5:12;10:5;15:11;
19:20;21:1;22:7;24:16;
26:2;28:15;29:19;31:6;
38:24;40:17;21;41:3,
11;42:2;46:9;48:23;
49:16;53:20,21;54:12;
55:8;59:5,6;60:13,17;
61:14,18,21;63:17;
66:5,11;66:12;67:10,
14;68:5,6;70:6,8;
71:10;74:7,9;82:9;83:5
rights (1)
26:8
risk (1)
30:14
Rule (1)
21:10
run (2)
47:9;81:19
running (1)
20:17

S

sales (1)
8:11
Same (8)
26:24;30:23;31:17;
40:1,3;44:17;48:24;
79:22
SAP (2)
8:18,19
Saratoga (1)
67:21
saying (5)
17:23;23:7;29:9;
52:22;61:6
Schedule (4)
23:16,17,20;26:1
school (2)
5:17,21
scope (1)
28:14
screen (10)
11:18;43:3,5;46:14;
49:8,16;51:16;66:21;
70:5,6
screens (2)
14:3;56:13
searching (1)
55:15
second (2)
34:11;80:14
secondary (1)
22:9
Securities (2)
27:10;28:3
security (1)
37:8
seeing (2)
51:18;54:20
seize (1)
44:9
sense (1)
82:8
segregated (1)
47:4
Senate (2)
55:10,12
send (1)
59:11
sense (1)
38:22
sent (2)
41:23;80:20
separate (2)
34:2;51:3
September (4)
33:14;37:2;66:16;
67:13
series (8)
43:17,17,19,21;44:5,
23;57:13;58:13
service (1)
71:24
services (1)
54:21
servicing (11)
36:8;30:14,16,17,19;
52:1;71:20,23;72:14,
16,18
set (1)
57:20
sets (3)
62:16,23
seven (2)
6:24;82:23
several (3)
7:23;11:5;13:4
share (3)
43:13;55:14;67:7
sheet (3)
33:11;44:19;47:1
sheets (1)
47:3
short (1)
19:24
shot (3)
20:18;43:5,7
showing (2)
28:5;62:9
shows (8)
27:4;33:6;38:5;53:5,
11;54:11;65:11;81:23
signage (1)
79:11
significance (1)
44:14
similarly (1)
14:19
simply (4)
15:3;24:16:13,19
single (2)
39:7,21
situation (1)
75:7
six (1)
82:18
skip (2)
24:9;30:16
small (1)
48:17
Smith (46)
5:11;11:3,6;12:9,21,
21;13:23,24;14:24;
20:1;39:3;71:13;72:2,
73:18;77:28;82:17
smoothly (1)
23:1
so-called (1)
39:8
software (8)
8:12,20;76:11
sold (1)
69:18
somebody (2)
36:17;37:21;60:16
someone (1)
74:24
sometime (2)
37:5;80:21
Sometimes (1)
13:12
Somewhat (1)
47:17
soon (1)
21:2
23:10
SOP (3)
29:3,20;30:4
SOP'S (1)
33:3
Sorry (5)
10:8;25:12;34:9;
61:7;65:6
sort (3)
46:5;49:23;80:4
sound (1)
51:12
sounds (1)
63:21
speaking (4)
12:15;13:7;19:11;
39:13
speaks (15)
18:2;19:21;22:1,12;
23:19;24:7;25:3,7,22;
26:4;29:24;30:8;33:5,
16;38:16
special (1)
53:15
specific (7)
9:12;48:9,22,14,15;
16:49:8
specifically (12)
10:4;11:14;13:20;
15:16;40:15;45:3;51:4;
66:19;72:8;73:20;
79:23;80:12
spectrum (1)
71:4
speed (1)
13:16
spend (2)
12:15;13:7
spent (2)
11:9;12:18
spoke (5)
11:4;12:3,7,12;58:10
spreadsheet (2)
67:11;68:19
stamp (2)
41:7;49:15
Standards (3)
28:13;36:24;38:4
stands (2)
16:3;22:8
start (2)
5:14;7:11;25:11
started (1)
7:13
starting (3)
8:7;26:10;59:22
stated (1)
68:4
statement (4)
27:20,21;34:24;75:16
statements (3)
13:5;24:7
[illegible]

*Exhibit 442*

### 3270 Explorer: Loan Transfer History (LNTH)

JPMORGAN CHASE BANK, N.A. - 155

Loan Number: ████████      Borrower Name: KELLEY, JAMES M

RR Investigative Agency
Exhibit 5

Exhibit 042

INVESTOR Disclosure Letters

**CHASE ⬭**

[illegible redacted text]

Exhibit 442
Pg 2

CHASE

Chase (OH4-7302)
3415 Vision Drive
Columbus OH 43219-6009

April 25, 2011

[redacted]
[illegible]

Re: Account Number: ******2424
[redacted]

Loan Investor

Dear [redacted]:

I am writing in response to the inquiry Chase received about the loan referenced above.

Your loan was sold into a public security managed by JPMorgan Chase Bank NA and may include additional investors. As the servicer of your loan, Chase is authorized by the company to handle any related concerns on their behalf. The address of your investor is:

3415 Vision Drive
Columbus OH 43219
Attn (CT)

We appreciate your business. If you have questions, please call us at the telephone number below.

Sincerely,

Chase
(800) 848-9136
(800) 582-0542 TDD / Text Telephone
www.chase.com

RC20

Exhibit 443



LINDSEY TOWELL CLERK OF COURT
MIAMI-DADE COUNTY, FLORIDA
LAST PAGE

Prepared for:

RECORD AND ⟶
RETURN TO

KNOW ALL MEN BY THESE PRESENTS:



STATE OF
COUNTY OF